# 22-599(L)

22-602(Con)

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

---

UNITED STATES OF AMERICA,

*Appellee,*

–v–

ERIC TOMPKINS,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

## APPENDIX OF DEFENDANT-APPELLANT ERIC TOMPKINS

---

DANIEL M. PEREZ, ESQ.
*Attorney for Defendant-Appellant*
Law Offices of Daniel M. Perez
93 Spring Street, Suite 505
Newton, New Jersey 07860
(973) 300-5135

# TABLE OF CONTENTS

Docket Sheet, *United States v. Tompkins*,
  Dkt. No. 19-cr-165 (TJM) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 3

Docket Sheet, *United States v. Tompkins*,
  No. 20-cr-37 (TJM) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 9

Indictment, *United States v. Tompkins*,
  Dkt. No. 19-cr-165 (TJM) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 17

Indictment, *United States v. Tompkins*,
  Dkt. No. 20-cr-37 (TJM) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 19

Memorandum of Law in Support of Motion to Suppress . . . . . . . . . . A 22

Search and Seizure Warrant (April 19, 2019) . . . . . . . . . . . . . . . . . . A 32

Application for a Search Warrant (April 19, 2019) . . . . . . . . . . . . . . A 36

Search and Seizure Warrant (August 14, 2019) . . . . . . . . . . . . . . . . A 54

Application for a Search Warrant (August 14, 2019) . . . . . . . . . . . . . A 62

Government's Response to Motion to Suppress . . . . . . . . . . . . . . . . . A 84

Transcript of Suppression Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . A 99

Defense Post-Hearing Brief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 117

Government's  Post-Hearing Brief . . . . . . . . . . . . . . . . . . . . . . . . . . . A 122

Decision and Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 137

Conditional Plea Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 160

Judgment in a Criminal Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 181

Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 189

## U.S. District Court
## Northern District of New York − Main Office (Syracuse) [NextGen CM/ECF
## Release 1.7 (Revision 1.7.1.1)] (Albany)
## CRIMINAL DOCKET FOR CASE #: 1:19−cr−00165−TJM All Defendants

Case title: USA v. Tompkins

Magistrate judge case number: 1:19−mj−00159−DJS

Date Filed: 04/25/2019

Date Terminated: 03/16/2022

Assigned to: Senior Judge Thomas
J. McAvoy

### Defendant (1)

**Eric Tompkins**
*TERMINATED: 03/16/2022*
*also known as*
Eric W. Tompkins
*TERMINATED: 03/16/2022*

represented by **James P. Egan**
Office of the Federal Public Defender − Syracuse
Office
Northern District of New York
4 Clinton Square, 3rd Floor
Syracuse, NY 13202
315−701−0080
Fax: 315−701−0081
Email: James_Egan@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community
Defender Appointment*

**Paul J. Evangelista**
Office of the Federal Public Defender
39 North Pearl Street, 5th Floor
Albany Main Office
Albany, NY 12207
518−436−1850
Email: paul_evangelista@fd.org
*TERMINATED: 03/21/2022*
*LEAD ATTORNEY*
*Designation: Public Defender or Community
Defender Appointment*

### Pending Counts

18:2250.F FAILURE TO
REGISTER AS A SEX
OFFENDER
(1)

### Disposition

Deft sentenced to 41 months of imprisonment in
19−cr−165 and 120 months of imprisonment in
20−cr−37, to run concurrently, for a total term of
120 months of imprisonment; Court makes sex
offender and drug treatment recommendations; Deft
placed Supervised Release for 5 years as to
Indictment 19−cr−165 and 15 years as to Indictment
20−cr−37, to run concurrently, for a total term of 15
years of Supervised Release; Deft is directed to
comply w/standard and special conditions as
previously provided; Deft directed to pay $200.00
Special Assessment; Deft is directed to forfeit items
and property as stated

A 3

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                          **Disposition**

None

**Highest Offense Level
(Terminated)**

None

**Complaints**                                                      **Disposition**

18:2250(a): Failure to Register and
Update a Sex Offender
Registration as Required by the
Sex Offender Registration and
Notification Act

---

**Plaintiff**

**USA**                                  represented by  **Alicia Suarez**
                                                         Office of United States Attorney − Albany
                                                         James T. Foley U.S. Courthouse
                                                         445 Broadway, Room 218
                                                         Albany, NY 12207−2924
                                                         518−431−0247
                                                         Email: alicia.g.suarez@usdoj.gov
                                                         *TERMINATED: 03/26/2021*
                                                         *LEAD ATTORNEY*
                                                         *Designation: Assistant US Attorney*

                                                         **Rachel L Williams**
                                                         DOJ−USAO
                                                         445 Broadway
                                                         Room 218
                                                         Albany, NY 12207
                                                         518−431−0234
                                                         Email: rachel.williams@usdoj.gov
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*
                                                         *Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/18/2019 | 1 | COMPLAINT as to Eric W. Tompkins (1). (mab) [1:19−mj−00159−DJS] (Entered: 03/19/2019) |
| 03/18/2019 | 3 | APPLICATION/MOTION to Seal by USA as to Eric W. Tompkins. (mab) [1:19−mj−00159−DJS] (Entered: 03/19/2019) |
| 03/18/2019 | 4 | ORDER granting 3 Application/Motion to Seal as to Eric W. Tompkins (1). Signed by Magistrate Judge Daniel J. Stewart on 3/18/2019. (Attachments: # 1 Public Sealing Order). (mab) [1:19−mj−00159−DJS] (Entered: 03/19/2019) |
| 03/28/2019 |  | Attorney update in case as to Eric W. Tompkins. (mab) [1:19−mj−00159−DJS] (Entered: 03/29/2019) |
| 03/28/2019 | 5 | ORAL MOTION to Unseal Case by USA as to Eric W. Tompkins. (mab) [1:19−mj−00159−DJS] (Entered: 03/29/2019) |

A4

| | | |
|---|---|---|
| 03/28/2019 | 6 | ORDER granting 5 Oral Motion to Unseal Case as to Eric W. Tompkins (1). Signed by Magistrate Judge Daniel J. Stewart on 3/28/2019. (mab) [1:19–mj–00159–DJS] (Entered: 03/29/2019) |
| 03/28/2019 | | Tex Minute Entry for proceedings (2:08PM–3:01PM) held before Magistrate Judge Daniel J. Stewart: Initial Appearance and Detention Hearing as to Eric W. Tompkins held on 3/28/2019. Appearances: AUSA Alicia Suarez and AFPD Paul Evangelista. Government makes an oral motion to unseal the Complaint. The court grants the motion and the Complaint is unsealed. A Financial Affidavit is submitted and approved. The Court appoints the Office of the Federal Public Defender for representation. Defendant is advised of his rights, charges, maximum penalties and given a copy of the Complaint. Government moves for detention based upon the Defendant being a risk of flight and a danger to the community. Atty Evangelista speaks on behalf of Defendant and requests release on conditions. After hearing from both counsel, the Court finds that there are conditions that can be set, however, Defendant will not be released until a suitable residence is approved by Pretrial Services. Conditions of release are set and acknowledged by Defendant. Defendant waives his time period for a Preliminary Hearing, but reserves his right to request such hearing if circumstances change. Defendant is remanded to the custody of the USMS until conditions of release are satisfied. (Court Reporter: Lisa Tennyson/CRD: Maria Blunt). (mab) [1:19–mj–00159–DJS] (Entered: 03/29/2019) |
| 03/28/2019 | 7 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Eric W. Tompkins. Signed by Magistrate Judge Daniel J. Stewart on 3/28/2019. (mab) [1:19–mj–00159–DJS] (Entered: 03/29/2019) |
| 03/28/2019 | 8 | ORDER Setting Conditions of Release s to Eric W. Tompkins. Defendant is remanded until conditions of release are satisfied. Signed by Magistrate Judge Daniel J. Stewart on 3/28/2019. (mab) [1:19–mj–00159–DJS] (Entered: 03/29/2019) |
| 04/25/2019 | 9 | FELONY INDICTMENT: as to Eric W. Tompkins (1), count 1. (nmk) (Entered: 04/26/2019) |
| 04/25/2019 | | TEXT Minute Entry for proceedings held before U.S. Magistrate Judge Andrew T. Baxter: GRAND JURY makes a partial report and returns Indictment. No special requests. Indictment is authorized for filing. Tally Sheet is ordered sealed. Appearances: Alicia Suarez, AUSA, Grand Jury Foreperson, Steno: S. Byrne. (nmk) (Entered: 04/26/2019) |
| 04/26/2019 | 10 | NOTICE TO DEFENSE COUNSEL for Eric W. Tompkins: An Indictment dated 4/25/2019 regarding your client has been filed with the Court. If the Defendant wishes to waive appearance for an arraignment, both the Defendant and Defendant's counsel must complete and electronically file with the Court the attached form by 5/2/2019. If the court does not receive the form by 5/2/2019, the court will IMMEDIATELY schedule the arraignment of your client. Because of Speedy Trial issues, the Court appearance for arraignment may be scheduled with very little advanced notice. (nmk) (Entered: 04/26/2019) |
| 04/29/2019 | 11 | ORDER REASSIGNING CASE as to Eric Tompkins. Case reassigned to Senior Judge Thomas J. McAvoy for all further proceedings. Signed by Chief Judge Glenn T. Suddaby on 4/29/2019. (khr) (Entered: 04/30/2019) |
| 04/30/2019 | 12 | WAIVER of Personal Appearance at Arraignment and Entry of Plea of Not Guilty by Eric Tompkins (Evangelista, Paul) (Entered: 04/30/2019) |
| 05/02/2019 | 13 | ORDER APPROVING WAIVER OF APPEARANCE AT ARRAIGNMENT: as to Eric Tompkins. Signed by U.S. Magistrate Judge Andrew T. Baxter on 5/2/2019. (nmk) (Entered: 05/02/2019) |
| 05/02/2019 | 14 | CRIMINAL PRETRIAL SCHEDULING ORDER as to Eric Tompkins: Motions are to be filed by 5/30/2019. Jury Trial is set for 7/1/2019 at 10:00 AM in Binghamton before Senior Judge Thomas J. McAvoy. Signed by U.S. Magistrate Judge Andrew T. Baxter on 5/2/2019. (nmk) (Entered: 05/02/2019) |
| 05/30/2019 | 15 | STIPULATION by USA to exclude speedy trial time (Suarez, Alicia) (Entered: 05/30/2019) |



A5

| 05/30/2019 | 16 | ORDER TO CONTINUE − Ends of Justice as to Eric Tompkins: Time excluded from 5/30/2019 until 6/28/2019. Motions to be filed by 6/25/2019 and shall be returnable on 7/26/2019 at 10:00am in Binghamton. Jury Trial set for 7/30/2019 at 10:00 AM in Binghamton before Senior Judge Thomas J. McAvoy. **All pretrial submissions, including any motions in limine, shall be filed on or before 7/16/2019.** Signed by Senior Judge Thomas J. McAvoy on 5/30/2019. (amt) (Entered: 05/30/2019) |
| 06/12/2019 | 17 | Letter request from Eric Tompkins requesting a second chance. (khr) (Entered: 06/12/2019) |
| 06/19/2019 | 18 | DEFT Eric Tompkins: CHARACTER LETTER(S) RE: SENTENCING submitted by Katrina Willett (sfp, ) (Entered: 06/20/2019) |
| 06/26/2019 | 19 | STIPULATION by USA to exclude speedy trial time (Suarez, Alicia) (Entered: 06/26/2019) |
| 06/27/2019 | 20 | ORDER TO CONTINUE − Ends of Justice as to Eric Tompkins: Time excluded from 6/29/2019 until 8/25/2019. Jury Trial set for 9/30/2019 at 10:00 AM in Albany before Senior Judge Thomas J. McAvoy. **All pretrial submissions, including any motions in limine, shall be filed on or before 9/16/2019.** Signed by Senior Judge Thomas J. McAvoy on 6/27/2019. (amt) (Entered: 06/27/2019) |
| 09/05/2019 | | COURT TEXT NOTICE as to Eric Tompkins scheduling a Change of Plea Hearing for 9/9/2019 at 02:30 PM in Albany before Senior Judge Thomas J. McAvoy. (amt) (Entered: 09/05/2019) |
| 09/05/2019 | 21 | OFFER OF PROOF filed by the Government as to Eric Tompkins. (Suarez, Alicia) (Entered: 09/05/2019) |
| 09/09/2019 | | Minute Entry for proceedings held before Senior Judge Thomas J. McAvoy; Change of Plea as to Eric Tompkins held 9/9/2019 in Albany; App: A. Suarez, AUSA, for Govt; P. Evangelista, AFPD, for Deft; Court Reporter: T. Casal; Deft appears w/counsel and enters GUILTY plea as to Count 1; Court accepts the plea; No plea agreement is filed; Presentence Report is ordered; Sentencing set for 1/7/2020 at 10:00am in Albany; Deft remanded. (amt) (Entered: 09/09/2019) |
| 09/09/2019 | 22 | GUIDELINE ORDER as to Eric Tompkins: Sentencing set for 1/7/2020 at 10:00 AM in Albany before Senior Judge Thomas J. McAvoy. Government / Defendant Sentencing Memo Deadline: 12/17/2019. Signed by Senior Judge Thomas J. McAvoy on 9/9/2019. (amt) (Entered: 09/09/2019) |
| 12/12/2019 | 23 | Letter from AUSA Alicia Suarez as to Eric Tompkins requesting 30−Day Adjournment of Sentencing (Suarez, Alicia) (Entered: 12/12/2019) |
| 12/13/2019 | 24 | TEXT ORDER granting the Government's 23 Letter Request for an adjournment of the sentencing. Authorized by Senior Judge Thomas J. McAvoy on 12/13/2019. (amt) (Entered: 12/13/2019) |
| 12/17/2019 | | COURT TEXT NOTICE as to Eric Tompkins rescheduling the Sentencing for 2/21/2020 at 01:30 PM in Binghamton before Senior Judge Thomas J. McAvoy. Defendant / Government Sentencing Memo Deadline: 2/7/2020. (amt) (Entered: 12/17/2019) |
| 01/02/2020 | | COURT TEXT NOTICE as to Eric Tompkins rescheduling the Sentencing for 2/27/2020 at 02:00 PM in Binghamton before Senior Judge Thomas J. McAvoy. (amt) (Entered: 01/02/2020) |
| 01/16/2020 | 25 | PRESENTENCE INVESTIGATION REPORT − INITIAL DISCLOSURE [LODGED] as to Eric Tompkins. The Presentence Investigation Report in this matter is now available for review. Any objections to the report shall be served on the Probation Office within 14 days of this notice, by mailing a hard copy to the Probation Officer. Please contact the probation officer who prepared the report if you have any questions.**[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (anp, ) (Entered: 01/16/2020) |

A 6

| | | |
|---|---|---|
| 02/06/2020 | 26 | PRESENTENCE INVESTIGATION REPORT – FINAL DISCLOSURE [LODGED] as to Eric Tompkins. The final version of the Presentence Investigation Report, including all revisions and the most recent Addendum is now available for review. This version of the report will be used by the Court at the time of sentencing. **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. Any further distribution or dissemination is prohibited.]** (anp, ) (Entered: 02/06/2020) |
| 02/07/2020 | 27 | Letter from AUSA Alicia Suarez as to Eric Tompkins requesting Adjournment of Sentencing (Suarez, Alicia) (Entered: 02/07/2020) |
| 02/13/2020 | 28 | TEXT ORDER granting the 27 Letter Request for an adjournment of the sentencing. Authorized by Senior Judge Thomas J. McAvoy on 2/13/2020. (amt) (Entered: 02/13/2020) |
| 07/29/2020 | 29 | FINAL PRESENTENCE INVESTIGATION REPORT (AMENDED) [LODGED] as to Eric Tompkins. The Presentence Investigation Report and/or Addendum have been AMENDED and supersede any previously submitted versions. This final version includes all revisions and the most recent Addendum, and will be used by the Court at the time of sentencing. **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (anp, ) (Entered: 07/29/2020) |
| 12/30/2020 | 30 | RULE 5(f) BRADY ORDER as to Eric Tompkins. Signed by Senior Judge Thomas J. McAvoy on 12/30/2020. (amt) (Entered: 12/30/2020) |
| 03/26/2021 | 31 | NOTICE OF ATTORNEY APPEARANCE: Rachel L Williams appearing for USA as substituted counsel for Attorney Alicia G Suarez (Williams, Rachel) (Entered: 03/26/2021) |
| 08/11/2021 | | COURT TEXT NOTICE as to Eric Tompkins rescheduling the Sentencing for 12/15/2021 at 10:00 AM in Albany before Senior Judge Thomas J. McAvoy. Defendant / Government Sentencing Memo Deadline: 12/1/2021. (amt) (Entered: 08/11/2021) |
| 11/12/2021 | 32 | FINAL PRESENTENCE INVESTIGATION REPORT (AMENDED) [LODGED] as to Eric Tompkins. The Presentence Investigation Report and/or Addendum have been AMENDED and supersede any previously submitted versions. This final version includes all revisions and the most recent Addendum, and will be used by the Court at the time of sentencing. **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (anp, ) (Entered: 11/12/2021) |
| 12/20/2021 | | COURT TEXT NOTICE as to Eric Tompkins rescheduling the Sentencing for 2/16/2022 at 01:30 PM in Albany before Senior Judge Thomas J. McAvoy. (amt) (Entered: 12/20/2021) |
| 02/01/2022 | | COURT TEXT NOTICE as to Eric Tompkins rescheduling the Sentencing for 5/9/2022 at 02:00 PM in Albany before Senior Judge Thomas J. McAvoy. (amt) (Entered: 02/01/2022) |
| 03/09/2022 | | COURT TEXT NOTICE as to Eric Tompkins MOVING UP the Sentencing to 3/15/2022 at 10:00 AM in Albany before Senior Judge Thomas J. McAvoy. (amt) (Entered: 03/09/2022) |
| 03/16/2022 | | Minute Entry for proceedings held before Senior Judge Thomas J. McAvoy; Sentencing held on 3/16/2022 for Eric Tompkins; App: R. Williams, AUSA, for Govt; P. Evanglista, AFPD, for Deft; S. Sheffer, USPO; Court Reporter: J. Stroffolino; Deft appears w/counsel; Parties are heard re: sentencing; Deft sentenced to 41 months of imprisonment in 19−cr−165 and 120 months of imprisonment in 20−cr−37, to run concurrently, for a total term of 120 months of imprisonment; Court makes sex offender and drug treatment recommendations; Deft placed Supervised Release for 5 years as to Indictment 19−cr−165 and 15 years as to Indictment 20−cr−37, to run |

A7

| | | |
|---|---|---|
| | | concurrently, for a total term of 15 years of Supervised Release; Deft is directed to comply w/standard and special conditions as previously provided; Deft is directed to pay $200.00 Special Assessment; Deft is directed to forfeit items and property as stated; Deft remanded. (amt) (Entered: 03/16/2022) |
| 03/16/2022 | 33 | JUDGMENT as to Eric Tompkins: Deft sentenced to 41 months of imprisonment in 19−cr−165 and 120 months of imprisonment in 20−cr−37, to run concurrently, for a total term of 120 months of imprisonment; Court makes sex offender and drug treatment recommendations; Deft placed Supervised Release for 5 years as to Indictment 19−cr−165 and 15 years as to Indictment 20−cr−37, to run concurrently, for a total term of 15 years of Supervised Release; Deft is directed to comply w/standard and special conditions as previously provided; Deft directed to pay $200.00 Special Assessment; Deft is directed to forfeit items and property as stated. Signed by Senior Judge Thomas J. McAvoy on 3/16/2022. (amt) (Entered: 03/16/2022) |
| 03/16/2022 | 34 | STATEMENT OF REASONS [LODGED] as to Eric Tompkins **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (jmb) (Entered: 03/16/2022) |
| 03/21/2022 | 35 | NOTICE OF APPEAL by Eric Tompkins re 33 Judgment,, No fee paid. (Evangelista, Paul) (Entered: 03/21/2022) |
| 03/21/2022 | 36 | ELECTRONIC NOTICE AND CERTIFICATION as to Eric Tompkins sent to US Court of Appeals re 35 Notice of Appeal − Final Judgment (khr) (Entered: 03/21/2022) |
| 03/21/2022 | 37 | NOTICE OF ATTORNEY APPEARANCE: James P. Egan appearing for Eric Tompkins as substitute with/for Attorney: Paul Evangelista (Egan, James) (Entered: 03/21/2022) |
| 07/27/2022 | 38 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Eric Tompkins: Plea held on 9/9/2019 before Judge Thomas J. McAvoy, Court Reporter: Theresa Casal. **IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/17/2022. Redacted Transcript Deadline set for 8/29/2022. Release of Transcript Restriction set for 10/25/2022. Notice of Intent to Redact due by 8/1/2022 (jlh, ) (Entered: 07/27/2022) |

*A 8*

# U.S. District Court
## Northern District of New York − Main Office (Syracuse) [NextGen CM/ECF Release 1.7 (Revision 1.7.1.1)] (Albany)
## CRIMINAL DOCKET FOR CASE #: 1:20−cr−00037−TJM All Defendants

Case title: USA v. Tompkins

Date Filed: 01/30/2020

Date Terminated: 03/16/2022

Assigned to: Senior Judge Thomas J. McAvoy

### Defendant (1)

**Eric Tompkins**
*TERMINATED: 03/16/2022*

represented by **James P. Egan**
Office of the Federal Public Defender − Syracuse Office
Northern District of New York
4 Clinton Square, 3rd Floor
Syracuse, NY 13202
315−701−0080
Fax: 315−701−0081
Email: James_Egan@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Paul J. Evangelista**
Office of the Federal Public Defender
39 North Pearl Street, 5th Floor
Albany Main Office
Albany, NY 12207
518−436−1850
Email: paul_evangelista@fd.org
*TERMINATED: 03/21/2022*
*Designation: Public Defender or Community Defender Appointment*

### Pending Counts

18:2252A(a)(5)(B)&(b)(2):
Possession of Child Pornography
w/Forfeiture Allegation
(1)

### Disposition

Deft sentenced to 41 months of imprisonment in 19−cr−165 and 120 months of imprisonment in 20−cr−37, to run concurrently, for a total term of 120 months of imprisonment; Court makes sex offender and drug treatment recommendations; Deft placed Supervised Release for 5 years as to Indictment 19−cr−165 and 15 years as to Indictment 20−cr−37, to run concurrently, for a total term of 15 years of Supervised Release; Deft is directed to comply w/standard and special conditions as previously provided; Deft directed to pay $200.00 Special Assessment; Deft is directed to forfeit items and property as stated

### Highest Offense Level (Opening)

Felony

### Terminated Counts

### Disposition



None

**Highest Offense Level
(Terminated)**

None

**Complaints**                                          **Disposition**

None

---

**Plaintiff**

**USA**                                          represented by   **Rachel L Williams**
                                                                  DOJ—USAO
                                                                  445 Broadway
                                                                  Room 218
                                                                  Albany, NY 12207
                                                                  518—431—0234
                                                                  Email: rachel.williams@usdoj.gov
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  *Designation: Assistant US Attorney*

                                                                  **Elizabeth A. Conger**
                                                                  U.S. Attorney's Office, Northern District
                                                                  of New York
                                                                  100 South Clinton St.
                                                                  Syracuse, NY 13261—7198
                                                                  315—448—0672
                                                                  Fax: 315—448—0689
                                                                  Email: Elizabeth.Conger@usdoj.gov
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  *Designation: Assistant US Attorney*

                                                                  **Emily C. Powers**
                                                                  DOJ—USAO
                                                                  445 Broadway
                                                                  Room 218
                                                                  Albany, NY 12207
                                                                  518—431—0389
                                                                  Email: emily.powers@usdoj.gov
                                                                  *TERMINATED: 01/07/2022*
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  *Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/30/2020 | 1 | INDICTMENT as to Eric Tompkins (1), Count(s) 1. (mab) (Entered: 01/31/2020) |
| 01/30/2020 |   | Text Minute Entry for proceedings held before Magistrate Judge Daniel J. Stewart: GRAND JURY makes a partial report and returns Indictment. Tally Sheet is ordered sealed. Appearances: AUSA Rachel Williams. (Court Reporter: David Mayo). (mab) (Entered: 01/31/2020) |
| 02/05/2020 |   | Attorney update in case as to Eric Tompkins. (mab) (Entered: 02/05/2020) |
| 02/05/2020 |   | Text Minute Entry for proceedings (2:06PM—2:10PM) held before Magistrate Judge Daniel J. Stewart: Initial Appearance and Arraignment as to Eric Tompkins (1), Count 1 held on 2/5/2020. Appearances: AUSA Rachel Williams and AFPD Paul Evangelista. The Court questions Defendant as to his financial circumstances. Based upon his responses, the Court appoints the Office of the Federal Public Defender for representation. Defendant is advised of his rights, charges, maximum penalties and given a copy of the Indictment. Atty Evangelista acknowledges receipt of the |

*A 10*

| | | Indictment, waives a formal reading and enters a Plea of Not Guilty to Count 1 on behalf of Defendant. Defendant is currently in custody on Judge McAvoy's order in a separate case. Defendant waives a Detention Hearing in this matter, but reserves his right to request such hearing if circumstances change. Defendant is remanded to the custody of the USMS. (Court Reporter: Jacqueline Stroffolino/CRD: Maria Blunt). (mab) (Entered: 02/05/2020) |
|---|---|---|
| 02/05/2020 | 2 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Eric Tompkins. Signed by Magistrate Judge Daniel J. Stewart on 2/5/2020. (mab) (Entered: 02/05/2020) |
| 02/05/2020 | 3 | CRIMINAL PRETRIAL SCHEDULING ORDER as to Eric Tompkins. Motions to be filed by 3/4/2020. A Jury Trial is set for 4/7/2020 at 10:00 AM in Binghamton, NY before Senior Judge Thomas J. McAvoy. Signed by Magistrate Judge Daniel J. Stewart on 2/5/2020. (mab) (Entered: 02/05/2020) |
| 02/05/2020 | 4 | ORDER APPROVING WAIVER OF DETENTION HEARING as to Eric Tompkins. Signed by Magistrate Judge Daniel J. Stewart on 2/5/2020. (mab) (Entered: 02/05/2020) |
| 02/27/2020 | 5 | STIPULATION by USA to Exclude Speedy Trial Time (Williams, Rachel) (Entered: 02/27/2020) |
| 02/28/2020 | 6 | ORDER TO CONTINUE − Ends of Justice as to Eric Tompkins: Time excluded from 2/28/2020 until 4/27/2020. Motions to be filed by 4/21/2020 and shall be returnable 5/22/2020. Jury Trial set for 6/8/2020 at 10:00 AM in Albany before Senior Judge Thomas J. McAvoy. **All pretrial submissions, including any motions in limine, shall be filed on or before 5/26/2020.** Signed by Senior Judge Thomas J. McAvoy on 2/28/2020. (amt) (Entered: 02/28/2020) |
| 04/17/2020 | 7 | STIPULATION by USA to Exclude Speedy Trial Time (Attachments: # 1 Proposed Order/Judgment)(Williams, Rachel) (Entered: 04/17/2020) |
| 04/20/2020 | 8 | ORDER TO CONTINUE − Ends of Justice as to Eric Tompkins: Time excluded from 4/20/2020 until 6/18/2020. Motions to be filed by 6/12/2020 and shall be returnable on 7/13/2020. Jury Trial set for 8/4/2020 at 10:00 AM in Albany before Senior Judge Thomas J. McAvoy. **All pretrial submissions, including any motions in limine, shall be filed on or before 7/21/2020.** Signed by Senior Judge Thomas J. McAvoy on 4/20/2020. (amt) (Entered: 04/20/2020) |
| 06/12/2020 | 9 | First MOTION to Suppress *Evidence* by Eric Tompkins. Motion Hearing set for 7/13/2020 09:00 AM in Albany before Senior Judge Thomas J. McAvoy. Response to Motion due by 6/26/2020 Reply to Response to Motion due by 7/2/2020. (Attachments: # 1 Memorandum of Law, # 2 Exhibit(s) filed under seal, # 3 Exhibit(s) filed under seal)(Evangelista, Paul) Modified on 6/16/2020 (amt). (Entered: 06/12/2020) |
| 06/15/2020 | 10 | Letter from Paul Evangelista as to Eric Tompkins requesting that exhibits 1 and 2 to Doc. #9 be filed under seal. (Attachments: # 1 Proposed Order/Judgment)(Evangelista, Paul) (Entered: 06/15/2020) |
| 06/16/2020 | 11 | TEXT ORDER granting Defendant's 10 Letter requesting Exhibits #1 and #2 in support of the 9 Motion be filed under seal. Authorized by Senior Judge Thomas J. McAvoy on 6/16/2020. (amt) (Entered: 06/16/2020) |
| 06/16/2020 | 12 | DEFENDANT'S SEALED Exhibits 1 and 2 in support of the 9 Motion − maintained in Clerk's Office and not available for electronic viewing (Attachments: # 1 Exhibit 2) (amt) (Entered: 06/16/2020) |
| 06/26/2020 | 13 | RESPONSE to Motion by USA as to Eric Tompkins re 9 First MOTION to Suppress *Evidence* (Williams, Rachel) (Entered: 06/26/2020) |
| 06/29/2020 | 14 | Letter from Paul Evangelista as to Eric Tompkins requesting to file a reply brief (Evangelista, Paul) (Entered: 06/29/2020) |
| 06/29/2020 | 15 | TEXT ORDER as to Eric Tompkins granting Defendant's 14 Letter Request for permission to file a 5 page reply on or before 7/2/2020. Authorized by Senior Judge Thomas J. McAvoy on 6/29/2020. (amt) (Entered: 06/29/2020) |

A 11

| 07/02/2020 | 16 | REPLY TO RESPONSE to Motion by Eric Tompkins re 9 First MOTION to Suppress *Evidence* (Evangelista, Paul) (Entered: 07/02/2020) |
|---|---|---|
| 07/10/2020 | | COURT TEXT NOTICE advising the Defendant's Motion to Suppress currently pending before Senior Judge Thomas J. McAvoy will be on SUBMIT. If a suppression hearing is needed, the Court will contact counsel to schedule a hearing.(amt) (Entered: 07/10/2020) |
| 07/20/2020 | 17 | STIPULATION by USA to Exclude Speedy Trial Time (Attachments: # 1 Proposed Order/Judgment)(Williams, Rachel) (Entered: 07/20/2020) |
| 07/27/2020 | 18 | ORDER TO CONTINUE − Ends of Justice as to Eric Tompkins: Time excluded from 7/27/2020 until 10/24/2020. Jury Trial set for 10/13/2020 at 10:00 AM in Albany before Senior Judge Thomas J. McAvoy. **All pretrial submissions, including any motions in limine, shall be filed on or before 9/29/2020.** Signed by Senior Judge Thomas J. McAvoy on 7/27/2020. (amt) (Entered: 07/27/2020) |
| 10/06/2020 | | COURT TEXT NOTICE by Eric Tompkins: Due to the pending 9 Motion to Suppress, the Jury Trial is **adjourned without date.** The trial will be rescheduled once the Court issues a decision on the pending motion. (amt) (Entered: 10/06/2020) |
| 10/07/2020 | | COURT TEXT NOTICE as to Eric Tompkins scheduling an Evidentiary Hearing re: Defendant's 9 Motion to Suppress for 11/10/2020 at 02:00 PM in Albany before Senior Judge Thomas J. McAvoy. Witness Lists and Exhibit Lists due by 10/27/2020. (amt) (Entered: 10/07/2020) |
| 10/27/2020 | 19 | STIPULATION by USA to a Ninety Day Order for Continuance (Attachments: # 1 Proposed Order/Judgment)(Williams, Rachel) (Entered: 10/27/2020) |
| 10/27/2020 | 20 | WITNESS LIST by USA as to Eric Tompkins (Williams, Rachel) (Entered: 10/27/2020) |
| 10/27/2020 | 21 | EXHIBIT LIST by USA as to Eric Tompkins (Williams, Rachel) (Entered: 10/27/2020) |
| 10/28/2020 | 22 | ORDER TO CONTINUE − Ends of Justice as to Eric Tompkins: Time excluded from 10/28/2020 until 1/25/2021. Jury Trial set for 1/11/2021 at 10:00 AM in Albany before Senior Judge Thomas J. McAvoy. **All pretrial submissions, including any motions in limine, shall be filed on or before 12/28/2020.** Signed by Senior Judge Thomas J. McAvoy on 10/28/2020. (amt) (Entered: 10/28/2020) |
| 11/10/2020 | | Minute Entry for proceedings held before Senior Judge Thomas J. McAvoy; Suppression Hearing as to Eric Tompkins held on 11/10/2020; App: R. Williams, AUSA, for Govt; P. Evangelista, AFPD, for Deft; Court Reporter: J. Stroffolino; In Court; Testimony is heard from Govt witnesses P. Kozal and R. Imburgio; Govt rests; Deft offers Deft's exhibit 1 into evidence − RECEIVED; Deft rests; Court directs Deft to file supplemental brief by 12/1/2020; Govt brief to be filed by 12/8/2020; Deft remanded. (amt) (Entered: 11/12/2020) |
| 11/10/2020 | 23 | GOVT LIST of EXHIBITS received during 11/10/2020 Suppression Hearing.(amt) (Entered: 11/12/2020) |
| 11/20/2020 | 24 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Eric Tompkins: Suppression Hearing held on 11/10/2020 before Judge Thomas J. McAvoy, Court Reporter: Jacqueline Stroffolino, Telephone number: (518) 257−1894. **IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/11/2020. Redacted Transcript Deadline set for 12/21/2020. Release of Transcript Restriction set for 2/18/2021. Notice of Intent to Redact due by 11/25/2020 (jxs, ) (Entered: 11/20/2020) |

A 12

| 12/01/2020 | 25 | MEMORANDUM OF LAW *post hearing brief* (Evangelista, Paul) (Entered: 12/01/2020) |
|---|---|---|
| 12/06/2020 | 26 | MOTION for Extension of Time to File Response/Reply as to 25 Memorandum of Law by USA as to Eric Tompkins. (Williams, Rachel) (Entered: 12/06/2020) |
| 12/07/2020 | 27 | TEXT ORDER granting the Govt's 26 MOTION for Extension of Time to File a Supplemental brief. Supplemental brief to be filed on or before 12/14/2020. Authorized by Senior Judge Thomas J. McAvoy on 12/7/2020. (amt) (Entered: 12/07/2020) |
| 12/15/2020 | 28 | MEMORANDUM OF LAW re 25 Memorandum of Law *Government Post-Hearing Brief* (Williams, Rachel) (Entered: 12/15/2020) |
| 12/30/2020 | 29 | RULE 5(f) BRADY ORDER as to Eric Tompkins. Signed by Senior Judge Thomas J. McAvoy on 12/30/2020. (amt) (Entered: 12/30/2020) |
| 01/08/2021 | | COURT TEXT NOTICE adjourning the Criminal Jury Trial as Eric Tompkins without date. (amt) (Entered: 01/08/2021) |
| 01/22/2021 | 30 | STIPULATION by USA to a 90 Day Order for Continuance (Attachments: # 1 Proposed Order/Judgment)(Williams, Rachel) (Entered: 01/22/2021) |
| 01/27/2021 | 31 | ORDER TO CONTINUE – Ends of Justice as to Eric Tompkins: Time excluded from 1/26/2021 until 4/25/2021. Jury Trial set for 4/12/2021 at 10:00 AM in Albany before Senior Judge Thomas J. McAvoy. **All pretrial submissions, including any motions in limine, shall be filed on or before 3/29/2021.** Signed by Senior Judge Thomas J. McAvoy on 1/26/2021. (amt) (Entered: 01/27/2021) |
| 01/28/2021 | 32 | DECISION and ORDER. Defendant's 9 motion to suppress is DENIED. The Court Clerk is respectfully directed to unseal Dkt. 12 and Dkt. [12-1]. Signed by Senior Judge Thomas J. McAvoy on 1/28/2021. (dpk) (Entered: 01/28/2021) |
| 01/28/2021 | | Docket Annotation as to Eric Tompkins: Dkt. 12 and dkt. [12-1] unsealed pursuant to Judge McAvoy's Decision & Order. (dpk) (Entered: 01/28/2021) |
| 04/02/2021 | 33 | STIPULATION by USA to a 90 Day Order for Continuance (Attachments: # 1 Proposed Order/Judgment)(Williams, Rachel) (Entered: 04/02/2021) |
| 04/06/2021 | | COURT TEXT NOTICE adjourning the Jury Trial as to Eric Tompkins without date. Once the Court has rescheduled the trial, a new scheduling notice will be issued. (amt) (Entered: 04/06/2021) |
| 04/26/2021 | 34 | ORDER TO CONTINUE – Ends of Justice as to Eric Tompkins: Time excluded from 4/26/2021 until 7/24/2021. Jury Trial set for 7/12/2021 at 10:00 AM in Albany before Senior Judge Thomas J. McAvoy. **All pretrial submissions, including any motions in limine, shall be filed by 6/28/2021.** Signed by Senior Judge Thomas J. McAvoy on 4/26/2021. (amt) (Entered: 04/26/2021) |
| 06/25/2021 | 35 | STIPULATION by USA to a 90 Day Order for Continuance (Attachments: # 1 Proposed Order/Judgment)(Williams, Rachel) (Entered: 06/25/2021) |
| 07/27/2021 | | COURT TEXT NOTICE as to Eric Tompkins scheduling a Change of Plea Hearing for 8/11/2021 at 10:00 AM in Albany before Senior Judge Thomas J. McAvoy. (amt) (Entered: 07/27/2021) |
| 07/28/2021 | 36 | ORDER TO CONTINUE – Ends of Justice as to Eric Tompkins: Time excluded from 7/26/2021 until 10/23/2021. Jury Trial set for 10/18/2021 at 10:00 AM in Binghamton before Senior Judge Thomas J. McAvoy. Signed by Senior Judge Thomas J. McAvoy on 7/28/2021. (amt) (Entered: 07/28/2021) |
| 08/11/2021 | 37 | PLEA AGREEMENT as to Eric Tompkins (dpk) (Entered: 08/12/2021) |
| 08/11/2021 | | Text Minute Entry for proceedings held before Senior Judge Thomas J. McAvoy: Change of Plea Hearing as to Eric Tompkins held on 8/11/2021. Appearances: Rachel Williams, AUSA for Government; Paul Evangelista, AFPD for Defendant. Defendant appears with counsel and enters Guilty plea to Count 1 of the Indictment with prior conviction and forfeiture allegations. The Court accepts the plea; plea agreement is filed. The Court orders a Presentence Report. Sentencing is set for 12/15/2021 at 10:00 AM in Albany before Senior Judge Thomas J. McAvoy. Defendant is remanded |

A 13

| | | pending sentencing. (Court Reporter Lisa Tennyson/CRD: Daniel Krug) (dpk) (Entered: 08/12/2021) |
|---|---|---|
| 08/16/2021 | 38 | GUIDELINE ORDER as to Eric Tompkins: Sentencing set for 12/15/2021 at 10:00 AM in Albany before Senior Judge Thomas J. McAvoy. Government / Defendant Sentencing Memo Deadline: 11/24/2021. Signed by Senior Judge Thomas J. McAvoy on 8/16/2021. (amt) (Entered: 08/16/2021) |
| 11/15/2021 | 39 | NOTICE OF ATTORNEY APPEARANCE: Emily C. Powers appearing for USA as co−counsel with Attorney Rachel Williams *for the forfeiture aspect of the case;* (Powers, Emily) (Entered: 11/15/2021) |
| 11/16/2021 | 40 | PRESENTENCE INVESTIGATION REPORT − INITIAL DISCLOSURE [LODGED] as to Eric Tompkins. The Presentence Investigation Report in this matter is now available for review. Any objections to the report shall be served on the Probation Office within 14 days of this notice, by mailing a hard copy to the Probation Officer. Please contact the probation officer who prepared the report if you have any questions.[**This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.**] (dct, ) (Entered: 11/16/2021) |
| 11/24/2021 | 41 | SENTENCING MEMORANDUM by Eric Tompkins (Evangelista, Paul) (Entered: 11/24/2021) |
| 11/25/2021 | 42 | SENTENCING MEMORANDUM by USA as to Eric Tompkins (Williams, Rachel) (Entered: 11/25/2021) |
| 12/01/2021 | 43 | PRESENTENCE INVESTIGATION REPORT − FINAL DISCLOSURE [LODGED] as to Eric Tompkins. The final version of the Presentence Investigation Report, including all revisions and the most recent Addendum is now available for review. This version of the report will be used by the Court at the time of sentencing. [**This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. Any further distribution or dissemination is prohibited.**] (anp, ) (Entered: 12/01/2021) |
| 12/02/2021 | 44 | Letter from Emily C. Powers as to Eric Tompkins requesting that the proposed Preliminary Order of Forfeiture be signed and filed; (Attachments: # 1 Proposed Order/Judgment Preliminary Order of Forfeiture)(Powers, Emily) (Entered: 12/02/2021) |
| 12/20/2021 | | COURT TEXT NOTICE as to Eric Tompkins rescheduling the Sentencing for 2/16/2022 at 01:30 PM in Albany before Senior Judge Thomas J. McAvoy. (amt) (Entered: 12/20/2021) |
| 12/20/2021 | 45 | PRELIMINARY ORDER OF FORFEITURE FOR SPECIFIC PROPERTY as to Eric Tompkins. Signed by Senior Judge Thomas J. McAvoy on 12/20/2021. (dpk) (Entered: 12/20/2021) |
| 12/28/2021 | 46 | PROCESS RECEIPT AND RETURN of USM Returned executed on 12/27/2021 (dpk) (Entered: 12/29/2021) |
| 01/07/2022 | 47 | NOTICE OF ATTORNEY APPEARANCE: Elizabeth A. Conger appearing for USA as substituted counsel for Attorney Emily Powers *for the forfeiture aspect of the case;* (Conger, Elizabeth) (Entered: 01/07/2022) |
| 01/07/2022 | | Attorney update in case as to Eric Tompkins. Attorney Emily C. Powers terminated. (dpk) (Entered: 01/07/2022) |
| 01/27/2022 | 48 | PROCESS RECEIPT AND RETURN of USM Returned Executed on 12/30/2021: Please serve the Preliminary Order of Forfeiture; Notice to Potential Claimant; and the 21 U.S.C. 853 statute via certified mail upon Katrina Willett. Remarks − Sent via Certified Mail #7011 0470 0003 6290 9249 on 12/27/2021. (hmr) (Entered: 01/27/2022) |



| 02/01/2022 | | COURT TEXT NOTICE as to Eric Tompkins rescheduling the Sentencing for 5/9/2022 at 02:00 PM in Albany before Senior Judge Thomas J. McAvoy. (amt) (Entered: 02/01/2022) |
|---|---|---|
| 02/22/2022 | 49 | SERVICE by Publication of Notice of Forfeiture; Last publication date 2/20/2022 in the government's internet website: www.forfeiture.gov; *Claim deadline: 3/23/2022;* filed by USA (Conger, Elizabeth) (Entered: 02/22/2022) |
| 03/09/2022 | | COURT TEXT NOTICE as to Eric Tompkins MOVING UP the Sentencing to 3/15/2022 at 10:00 AM in Albany before Senior Judge Thomas J. McAvoy. (amt) (Entered: 03/09/2022) |
| 03/16/2022 | | Minute Entry for proceedings held before Senior Judge Thomas J. McAvoy; Sentencing held on 3/16/2022 for Eric Tompkins; App: R. Williams, AUSA, for Govt; P. Evanglista, AFPD, for Deft; S. Sheffer, USPO; Court Reporter: J. Stroffolino; Deft appears w/counsel; Parties are heard re: sentencing; Deft sentenced to 41 months of imprisonment in 19−cr−165 and 120 months of imprisonment in 20−cr−37, to run concurrently, for a total term of 120 months of imprisonment; Court makes sex offender and drug treatment recommendations; Deft placed Supervised Release for 5 years as to Indictment 19−cr−165 and 15 years as to Indictment 20−cr−37, to run concurrently, for a total term of 15 years of Supervised Release; Deft is directed to comply w/standard and special conditions as previously provided; Deft directed to pay $200.00 Special Assessment; Deft is directed to forfeit items and property as stated; Deft remanded.(amt) (Entered: 03/16/2022) |
| 03/16/2022 | 50 | JUDGMENT as to Eric Tompkins: Deft sentenced to 41 months of imprisonment in 19−cr−165 and 120 months of imprisonment in 20−cr−37, to run concurrently, for a total term of 120 months of imprisonment; Court makes sex offender and drug treatment recommendations; Deft placed Supervised Release for 5 years as to Indictment 19−cr−165 and 15 years as to Indictment 20−cr−37, to run concurrently, for a total term of 15 years of Supervised Release; Deft is directed to comply w/standard and special conditions as previously provided; Deft directed to pay $200.00 Special Assessment; Deft is directed to forfeit items and property as stated. Signed by Senior Judge Thomas J. McAvoy on 3/16/2022. (amt) (Entered: 03/16/2022) |
| 03/16/2022 | 51 | STATEMENT OF REASONS [LODGED] as to Eric Tompkins **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (jmb) (Entered: 03/16/2022) |
| 03/21/2022 | 52 | NOTICE OF APPEAL by Eric Tompkins re 50 Judgment,, No fee paid. (Evangelista, Paul) (Entered: 03/21/2022) |
| 03/21/2022 | 53 | ELECTRONIC NOTICE AND CERTIFICATION as to Eric Tompkins sent to US Court of Appeals re 52 Notice of Appeal − Final Judgment (khr) (Entered: 03/21/2022) |
| 03/21/2022 | 54 | NOTICE OF ATTORNEY APPEARANCE: James P. Egan appearing for Eric Tompkins as substitute with/for Attorney: Paul Evangelista (Egan, James) (Entered: 03/21/2022) |
| 03/21/2022 | 55 | TRANSCRIPT REQUEST *for plea and sentencing* by Eric Tompkins for proceedings held on 8/11/21 & 3/16/22 before Judge McAvoy. (Evangelista, Paul) (Entered: 03/21/2022) |
| 03/24/2022 | 56 | STATUS REPORT *notifying the Court that no ancillary claims were filed and the Preliminary Order of Forfeiture is now final as to the defendant, and no separate final order will be presented;* by USA as to Eric Tompkins (Conger, Elizabeth) (Entered: 03/24/2022) |
| 04/14/2022 | 57 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Eric Tompkins: Change of Plea Hearing held on August 11, 2021, before Judge Thomas J. McAvoy, Court Reporter: Lisa L. Tennyson, Telephone number: (518) 257−1823. **IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court |

**A15**

| | | website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/5/2022. Redacted Transcript Deadline set for 5/16/2022. Release of Transcript Restriction set for 7/13/2022. Notice of Intent to Redact due by 4/19/2022 (lt, ) (Entered: 04/14/2022) |
|------------|----|---|
| 04/27/2022 | 58 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Eric Tompkins: Sentencing held on 3/16/2022 before Judge Thomas J. McAvoy, Court Reporter: Jacqueline Stroffolino, Telephone number: 518−742−9478. **IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/18/2022. Redacted Transcript Deadline set for 5/31/2022. Release of Transcript Restriction set for 7/26/2022. Notice of Intent to Redact due by 5/2/2022 (jxs, ) (Entered: 04/27/2022) |

A 16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.    1:19-CR- **165 FJS** ) |
| | ) | |
| v. | ) | **Indictment** |
| | ) | |
| **ERIC TOMPKINS,** | ) | Violation:    18 U.S.C. § 2250(a) |
| | ) | [Failure to Register] |
| | ) | |
| | ) | 1 Count |
| | ) | |
| Defendant. | ) | County of Offense:    Saratoga |

## THE GRAND JURY CHARGES:

### COUNT 1
### [Failure to Register]

From in or about February 2017 through on or about March 18, 2019, in Saratoga County in the Northern District of New York and elsewhere, the defendant, **ERIC TOMPKINS**, an individual required to register under the Sex Offender Registration and Notification Act, having traveled in interstate commerce, did knowingly fail to register and update his registration as required by the Sex Offender Registration and Notification Act, in that **ERIC TOMPKINS** failed to update his registration after he moved to Clifton Park, New York from Soap Lake, Washington, in violation of Title 18, United States Code, Section 2250(a).

Dated:    April 25, 2019

A TRUE BILL,

███████████████████

Grand Jury Foreperson

A17

GRANT C. JAQUITH
United States Attorney

By: _____
Alicia G. Suarez
Assistant United States Attorney
Bar Roll No. 700218

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) Criminal No. 1:20-CR-037-TJM |
| | ) |
| v. | ) **Indictment** |
| | ) |
| **ERIC TOMPKINS,** | ) Violation: 18 U.S.C. § 2252A(a)(5)(B) & |
| | ) (b)(2) [Possession of Child |
| **Defendant.** | ) Pornography] |
| | ) |
| | ) |
| | ) 1 Count and Forfeiture Allegation |
| | ) |
| | ) County of Offense: Saratoga |

U.S. DISTRICT COURT – N.D. OF N.Y.
FILED
JAN 3 0 2020
AT_____ O'CLOCK____
John M. Domurad, Clerk – Albany

## THE GRAND JURY CHARGES:

### COUNT 1
### [Possession of Child Pornography]

On or about March 28, 2019 in Saratoga County in the Northern District of New York, the defendant, **ERIC TOMPKINS**, did knowingly possess material that contained one or more images of child pornography that had been shipped and transported using a means and facility of interstate and foreign commerce, and in and affecting such commerce by any means, including by computer, and that was produced using materials that had been shipped and transported in and affecting such commerce by any means, including by computer, that is a Samsung model SM-J336AZ cellular telephone, serial number R28K53A6L4T, containing a SanDisk Micro SD (secure digital) card, which contained numerous graphic images of minors engaged in sexually explicit conduct, in violation of Title 18, United States Code, Sections 2252A(a)(5)(B).

This violation includes images of child pornography involving prepubescent minors and minors who had not attained 12 years of age, in violation of Title 18, United States Code, Section 2252A(b)(2).

A19

## PRIOR CONVICTION ALLEGATION

The defendant, **ERIC TOMPKINS**, committed the offense charged in Count 1 of this indictment after he had a final conviction under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward, in that on or about July 23, 2009, he pleaded guilty in the Superior Court of Washington for Okanogan County to Child Molestation in the Third Degree in violation of Revised Code of Washington Section 9A 44.089. By virtue of said prior conviction, the defendant is subject to the enhanced penalty provisions contained within Title 18, United States Code, Section 2252A(b)(2).

## FORFEITURE ALLEGATION

The allegation contained in Count 1 of this indictment is hereby realleged and incorporated by reference herein for the purposes of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 2253.

Pursuant to Title 18, United States Code, Section 2253, upon conviction of the charge alleged in Count 1 of this Information, the defendant, **ERIC TOMPKINS**, shall forfeit to the United States of America:

    (a)    Any visual depiction described in Title 18, United States Code, Sections 2251, 2251A, and 2252, 2252A, 2252B, and 2260, and any book, magazine, periodical, film, videotape, and other matter which contains any such visual depiction, which was produced, transported, mailed, shipped and received in violation of this chapter;

    (b)    Any property, real and personal, constituting and traceable to gross profits and other proceeds obtained from such offense; and

    (c)    Any property, real and personal, used and intended to be used to commit and to promote the commission of such offense and any property traceable to such property.

The property to be forfeited includes, but is not limited to, the following:

      (1) A Samsung model SM-J336AZ, IMEI: 355269091218588, and serial number

      R28K53A6L4T; and

      (2) A SanDisk Micro SD XC 1 card bearing serial number 88460VJG50FF.

Dated:    January 30, 2020

                                        ***REDACTED***
                              A TRUE BILL,

                              Grand Jury Foreperson

        GRANT C. JAQUITH
        United States Attorney

By:

        Rachel L. Williams
        Assistant United States Attorney
        Bar Roll No. 701542

3

A 21

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,


-V-                                        CASE NO.: 20-CR-37 (TJM)


ERIC TOMPKINS

---


# MEMORANDUM OF LAW IN SUPPORT OF
# ERIC TOMPKINS' MOTION TO SUPPRESS


DATED:      June 12, 2020              Respectfully submitted,

            Albany, New York          LISA PEEBLES
                                       Federal Public Defender


                              By:  Paul Evangelista, Esq.
                                   Assistant Federal Defender
                                   Bar Roll No.: 507507
                                   39 North Pearl Street, 5th Flr.
                                   Albany, New York 12207
                                   (518) 436-1850 x 112
                                   paul_evangelista@fd.org

## PRELIMINARY STATEMENT

Eric Tompkins ("Mr. Tompkins") was taken into federal custody after he was charged with failing to register as a sex offender. When he was taken into custody, law enforcement officials seized his cell phone. Law enforcement thereafter applied for a warrant to search the phone for evidence relating to Mr. Tompkins' failure to register. Law enforcement did not seek permission to search any electronic devices or other items attached to the phone. The warrant authorized only the search of the phone itself. Despite the clear language of the warrant, law enforcement exceeded the bounds of the warrant and searched a MicroSD card that had been inserted into the phone. During this warrantless search, law enforcement allegedly discovered images of child pornography. Months later, citing no proof of probable cause other than the images allegedly viewed during the warrantless search, law enforcement belatedly applied for a warrant to search the MicroSD card.

The defense now moves under Federal Rule of Criminal Procedure 12(b)(3)(C) to suppress all evidence discovered through the initial warrantless search and all evidence discovered through the later warrant, as a fruit of the poisonous tree. See, Wong Sun v. United States, 371 U.S. 471 (1963). If contested issues of fact emerge through the motion process, the defense requests an evidentiary hearing to address and explore those issues.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Mr. Tompkins was convicted of a sex offense in Washington State in September 2009. Exhibit 1, ¶ 7. Mr. Tompkins was required to register as a sex offender. *Id.* Mr. Tompkins

---

[1] All factual information presented in this section is drawn from the April 19, 2019 and the August 14, 2019 Search Warrants and accompanying supporting documents, which are attached as Exhibit 1 (April 19, 2019 Search warrant and Supporting Documentation) and Exhibit 2 (August 14, 2019 Search Warrant and Supporting Documentation).

*A23*

complied with this required registry from November 2009 through October 2011. Sometime in 2011 it appears Mr. Tompkins was reminded of his obligation to register. *Id.* ¶ 11.

In October 2018, the United States Marshal Service ("USMS") opened an investigation into whether Mr. Tompkins had moved to New York State without complying with his sex offender registration obligations. (*United States v. Tompkins*, Case No. 1:19-mj-00159-DJS, Dkt. No. 1 ¶ 4.) On March 18, 2019, a sealed complaint was filed charging Mr. Tompkins with failure to register in violation of 18 U.S.C. § 2250(a). *Id.* at 1. Mr. Tompkins made his initial appearance before Magistrate Judge Daniel J. Stewart on March 28, 2019. (*United States v.* *Tompkins*, Case No. 1:19-mj-00159-DJS, Text Minute Entry Mar. 28, 2019.) Mr. Tompkins was remanded into the custody of the USMS until certain conditions regarding his housing were met. (*United States v. Tompkins*, Case No. 1:19-mj-00159-DJS, Dkt. No. 8.)

The USMS seized Mr. Tompkins's cell phone when they took him into custody on March 28, 2019. On April 19, 2019, Deputy United States Marshal Robert Imburgio applied for a warrant to search the phone, which is a Samsung SM-J336AZ. (Ex. 1.) Imburgio specifically described the property to be searched as a Samsung Model SM-J336AZ cell phone bearing the serial number R28K35A6L4t. *Id.* Imburgio did not apply to search any other electronic devices or items connected to the cell phone, such as SIM cards or Micro SD cards. *Id.*

Judge Stewart issued the warrant on April 19, 2019. It stated that "[t]he property to be searched is a Samsung Model SM-J336AZ cell phone bearing serial number R28K53A6L4T currently located in the United States Marshals Service evidence locker located in Albany New York." The warrant did not authorize the search of any electronic devices or items connected to the cell phone.

On May 1, 2019, USMS transferred possession of the Samsung telephone to the New York State Police (NYSP) Computer Crimes Unit (CCU) for the execution of the search warrant. Because the phone was password protected, the CCU was unable to open the phone. The CCU was, accordingly unable to perform the search authorized by the warrant. During this process, however, the CCU noticed that a micro SD card had been inserted into the phone. The CCU did not return to court to seek a warrant for the phone's password or to search the micro SD card. Instead, the CCU executed a warrantless search of the SanDisk Micro SD card by removing it from the phone and extracting its data. During the search of the micro SD card, NYSP Senior Investigator Peter Kozel allegedly observed several images in the SD card's deleted space that he identified as depicting the sexual exploitation of minors, as defined in 18 USC §2256.

Months passed. Then, on August 14, 2019, Special Agent Brian Seymour applied for a second search warrant for the Samsung model SM-J336Az cellphone with the serial number R28K53A6L4T. In this warrant application, the government also sought permission to search the SanDisk Micro SD XC 1 card with the serial number 88460VJG50FF. In this application, the agent falsely represented that "[o]n April 19, 2019, based on probable cause established in an affidavit sworn to by DUSM Imburgia . . . the Honorable Daniel J. Stewart issued a search warrant for the SUBJECT DEVICE **(inclusive of the SUBJECT PHONE and SUBJECT CARD)**." (Emphasis added) (Exhibit 2, ¶9). The second search warrant sought evidence of violations of 18 USC §2252A(a)(5)(B); 18 USC §2252A(a)(2)(A) and 18 USC §2252(a)(1) (Possession of Child Pornography, Receipt and Distribution of Child Pornography, Transportation of Child Pornography). The August 14, 2019, search warrant and application are attached in their entirety as defense Exhibit 2. The only probable cause offered in support of the August 14, 2019 search warrant were images discovered by New York State Police investigators

4

A25

in the deleted space of the SanDisk Micro SD card during their warrantless search. (Exhibit 2 ¶ 11.)

Mr. Tompkins was indicted in this case on January 30, 2020. (Dkt. No. 1.) The indictment alleges that he possessed child pornography on March 28, 2020, the day the USMS seized his phone. *Id.* The indictment contains a forfeiture allegation, seeking forfeiture of both the phone and the SD card. *Id.*

## RELIEF REQUESTED

The defendant makes the following claims. The April 19, 2019 search warrant did not authorize the search of the SanDisk Micro SD card that was searched by the NYSP between June 4, 2019 and June 9, 2019. Attachment A did not name the Micro SD card as property to be searched. The April 19, 2019 search warrant did not identify the Micro SD card as an item to be searched. Second, the August 14, 2019 search warrant, authorizing a search of the Samsung Cellular phone and the Micro SD card for child pornography was fatally based on the fruits of the illegal warrantless search of the Micro SD card. The evidence seized as a result of the execution of the August 14, 2019 search warrant, must be suppressed as the fruits of an illegal search.

## ARGUMENT

### I. THE APRIL 19, 2019, SEARCH WARRANT DID NOT AUTHORIZE THE SEARCH OF THE SANDISK MICRO SD CARD.

The search of the MicroSD card during the execution of the April 2019 warrant violated Mr. Tompkin's Fourth Amendment rights because the warrant authorized only the search of the cell phone, not any electronic devices or items connected to the cell phone. The evidence discovered in that warrantless search should, therefore, be suppressed.

The Fourth Amendment requires that search warrants particularly describe the place to be searched and the items to be seized. *Kentucky v. King*, 563 U.S. 452, 459 (2011); *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). This "particularity" requirement is well-established in Supreme Court precedent. *See, Stanford v. Texas*, 379 U.S. 476, 481-85 (1965) (describing the history and purpose of the particularity requirement). The particularity requirement serves two purposes. First, it is supposed to "make[] general searches . . . impossible and prevent[] the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196 (1927). Second, a "particular warrant also assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *Groh v. Ramirez*, 540 U.S. 551, 561 (2004) (internal quotation marks omitted).

Here, the April 19, 2019 search warrant authorized the search of the property described in "Attachment A". Attachment A authorizes a search of the following property:

*"The property to be searched is a Samsung Model SM-J336AZ cell phone bearing serial number R28K53A6L4T currently located in the United States Marshals Service evidence locker located in Albany New York (hereinafter the SUBJECT DEVICE). This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B."*

Exhibit 1, Attachment A.

The description of the property to be searched could not be stated any clearer. Exhibit 1, Attachment A goes so far as to list the specific model number of the cellular phone, and its unique serial number. At no time does the warrant, or the application (April 19, 2019) mention

the SanDisk Micro SD card. Not only is the SanDisk Micro SD card not mentioned by name, Attachment A, places to be searched, does not mention "storage devices", "computer storage devices", "phone media devices" or other "storage media" as property to be searched. The application does not present any information on how the phone uses the Micro SD card, as memory or otherwise. The application simply does not discuss the Micro SD card. Probable cause to search cannot be established in an application which does not even mention the device to be searched.

The Magistrate Judge clearly identified and authorized the property to be searched as the Samsung cell phone. The Search warrant does not name any other property to be searched. The language in the search warrant is clear and unambiguous. Despite this clarity, law enforcement elected to search the MicroSD card, which was not listed in the warrant. Once the Micro SD Card was encountered during the attempted search of the Samsung cellular phone, law enforcement should have attempted to get a warrant to search the Micro SD card. Instead, a warrantless search was conducted, and evidence was illegally obtained. Such a search was blatant disregard to the clear, unambiguous terms of the April 19, 2019 search warrant. Exclusion of the evidence obtained by law enforcement as a result of the warrantless search of the Micro SD card is necessary to deter illegal searches. *See*, *United States v. Leon*, 468 U.S. 897 (1984). Therefore, the defense respectfully requests that the Court suppress all evidence discovered during the April 2019 search of the MicroSD card.

II. **ALL EVIDENCE DISCOVERED DURING THE EXECUTION OF THE AUGUST 2019 SEARCH WARRANT MUST BE EXCLUDED AS FRUIT OF THE POISONOUS TREE.**

The probable cause relied on to issue the August 14, 2019 search warrant authorizing the search of the Samsung Cellular phone and the SanDisk Micro SD card for evidence of

possession of child pornography was wholly based on the images seized during the warrantless search of the SanDisk Micro SD card. All evidence discovered during the execution of the August 2019 search warrant is fruit of the poisonous three. It must, therefore, be excluded.

Evidence seized during an illegal search should not be included in a warrant affidavit. *See, Wong Sun v. United States*, 371 U.S. 471, 484-85. For the reasons stated above, the search of the Micro SD card was illegal, not authorized by the April 19, 2019 warrant. The August 14, 2019 warrant completely relies on the illegally obtained images to support the August 14, 2019 warrant application. The application exclusively relies on what was found on the Micro SD card to support the warrant application for a search of the Samsung Cell Phone and the SanDisk Micro SD card for a violation of 18 USC 2252A(a)(5)(B). Exhibit 2, ¶11. When the tainted evidence is excised from the August 14, 2019 warrant application, there is no probable cause to issue the warrant.

The application for the August warrant shows that law enforcement was aware of the deficiency in the April warrant application. The application for the second warrant intentionally misled the court about what property the April search warrant authorized to be searched. The August 14, 2019 application describes the April 19, 2019 warrant as follows, "On April 19, 2019, based on probable cause established in an affidavit sworn to by DUSM Imburgia, attached hereto as an exhibit and incorporated by reference as if fully set forth herein, the Honorable Daniel J. Stewart issued a search warrant for the SUBJECT DEVICE **(inclusive of the SUBJECT PHONE and SUBJECT CARD)**, to search for information that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 2250(a). That search warrant is also attached hereto as an exhibit for reference." (Emphasis added) (Exhibit 2, ¶9). Contrary to what was sworn out in the August application, the April 19, 2019 search warrant clearly defined the

"subject device" to be searched as a "Samsung Model SM-J336AZ cell phone bearing serial number R28K53A6L4T currently located in the United States Marshals Service evidence locker located in Albany New York (hereinafter the SUBJECT DEVICE)". Exhibit 1, Attachment A. Neither the warrant nor application make any mention of the "SUBJECT CARD" as reported to the court in the August application. The August warrant, in contrast, specifically lists the Micro SD card in Attachment A, complete with serial number, as property to be searched. Exhibit 2, Attachment A.

For the good faith exception to apply, the police must reasonably believe that the warrant was based on a valid application of the law to the known facts. *U.S. v. Reilly*, 76 F.3d 1271, 1280 (2nd Cir. 1996). The application presented to the Magistrate Judge on August 14, 2019 shows law enforcement was aware that the April warrant was deficient for failing to name the SanDisk Micro SD card as a place to be searched. Misleading the Court by affirming that the original warrant defined the "SUBJECT DEVICE" as "inclusive of the SUBJECT PHONE and SUBJECT CARD", which it clearly does not state, was an attempt to prevent the Magistrate from discovering that the information presented in ¶11 of the August 14, 2019 (the deleted images) were recovered as the result of a warrantless search. The good faith exception cannot apply in these circumstances. *See, Reilly, at 1281.*

The August 14, 2019 search warrant is based exclusively on evidence seized during a warrantless search of the SanDisk Micro SD card, as such, any evidence seized as a result of the August warrant must be suppressed as the fruits of the unlawful search.

**CONCLUSION**

Based on the foregoing analysis, this Court should suppress any and all evidence seized directly as a result of the warrantless search of the SanDisk Micro SD card. The Court should

9

**A 30**

suppress evidence derived from the subsequent search of the Samsung Cellular telephone and the SanDisk Micro SD card because the warrant issued for the search of these devices was issued based on fruits of the warrantless search and lacked other reliable probable cause. The place to be searched was set forth with particularity in the April warrant. It clearly did not authorize the search of the Micro SD card. Law enforcement ignored the plain language of the warrant. Law enforcement intentionally obscured the source of the probable cause (images) used in the second warrant by intentionally misrepresenting and expanding the property the Magistrate authorized to be searched to include the SanDisk Micro SD card. The good faith exception cannot apply in these circumstances.

DATED:    June 12, 2020            Respectfully submitted,

          Albany, New York         LISA PEEBLES
                                        Federal Public Defender

                          By:    Paul Evangelista, Esq.
                                 Assistant Federal Defender
                                 Bar Roll No.: 507507
                                 39 North Pearl Street, 5th Flr.
                                 Albany, New York 12207
                                 (518) 436-1850 x 112
                                 paul_evangelista@fd.org

# UNITED STATES DISTRICT COURT
## for the
### Northern District of New York

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. 1:19-mJ-264-DJS |
| IN THE MATTER OF THE SEARCH OF | ) | |
| SAMSUNG SM-J336AZ CELL PHONE | ) | |
| (S/N: R28K53A6L4T) CURRENTLY | ) | |
| LOCATED AT US MARSHALS | ) | |
| SERVICE OFFICE LOCATED IN | ) | |
| ALBANY NEW YORK | ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of New York *(identify the person or describe the property to be searched and its given location)*:

Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before     May 3, 2019

                                                                *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10 p.m.        ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Hon. Daniel J. Stewart.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*.

☐ until, the facts justifying, the later specific date of     Click here to enter a date..

Date issued:     April 19, 2019

Time issued:     3:16 pm                              _____
                                                              *Judge's signature*

City and State:     Albany, NY          Hon. Daniel J. Stewart, U.S. Magistrate Judge

                                                     *Printed name and title*

A 32

| Return | | |
|---|---|---|
| Case No.: | Date & time warrant executed: | Copy of warrant & inventory left with: |

| Inventory made in the presence of : |
|---|
| |

| Inventory of the property taken and name of any person(s) seized: |
|---|
| |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

A 33

TOMPK000167

## ATTACHMENT A

The property to be searched is a Samsung Model SM-J336AZ cell phone bearing serial number R28K53A6L4T currently located in the United States Marshals Service evidence locker located in Albany New York (hereinafter the SUBJECT DEVICE).

This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

A 34

TOMPK000168

**ATTACHMENT B**

1.      All records on the SUBJECT DEVICE described in Attachment A that relate to violations of 18 U.S.C. § 2250(a), Failure to Register as a Sex Offender, and involve ERIC TOMPKINS, including:

     a.  Evidence indicating TOMPKINS' location and residence, including photographs, messages, call logs, GPS and geolocation data, WiFi connections, internet browsing history and financial records;

     b.  TOMPKINS' employment information;

     c.  TOMPKINS' registration as a sex offender, including in New York and Washington; and

     d.  Evidence indicating TOMPKINS' state of mind as it relates to the crime under investigation.

2.      Evidence of user attribution showing who used or owned the SUBJECT DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

*A 35*

TOMPK000169

U.S. DISTRICT COURT - N.D. OF N.Y.

**FILED**

APR 1 9 2019

AT_____ O'CLOCK
John M. Domurad, Clerk - Albany

## UNITED STATES DISTRICT COURT
### for the
### Northern District of New York

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| IN THE MATTER OF THE SEARCH OF | ) |
| SAMSUNG SM-J336AZ CELL PHONE (S/N: | ) |
| R28K53A6L4T) CURRENTLY LOCATED AT | ) |
| US MARSHALS SERVICE OFFICE LOCATED | ) |
| IN ALBANY NEW YORK | ) |

Case No. 1:19-mJ-264-OJS

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:
*(identify the person or describe the property to be searched and its given location)*:

Attachment A

located in the ___Northern___ District of ___New York___ , there is now concealed
*(identify the person or describe the property to be seized)*:

Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 2250 | Failure to Register as a sex offender |

The application is based on these facts:

See Attached Affidavit

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days): _____
is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Robert Imbugio, Deputy US Marshal
*Printed name and title*

A 36

Sworn to before me and signed in my presence.

Date: April 19, 2019

City and State: Albany, NY

Judge's signature

Hon. Daniel J. Stewart, U.S. Magistrate Judge

*Printed name and title*

A 37

TOMPK000171

IN THE MATTER OF THE SEARCH OF
SAMSUNG SM-J336AZ CELL PHONE (S/N:
R28K53A6L4T) CURRENTLY LOCATED
AT US MARSHALS SERVICE OFFICE
LOCATED IN ALBANY NEW YORK

Case No. 1:19-mj-264-DJS

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Robert Imburgio, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—an

electronic device—which is currently in law enforcement possession, as described in Attachment

A, and the extraction from that property of electronically stored information described in

Attachment B.

2.      I am a Criminal Investigator/Deputy United States Marshal with the United States

Marshals Service, and I have been so employed for 9 years.  I am currently assigned to the

Albany, New York Division, and I conduct various criminal investigations including violations

of the Adam Walsh Child Protection Act of 2006.  In 2018, I attended Sex Offender

Investigation Coordinator Basic training and am a collateral district Sex Offender Investigations

Coordinator.  As a Deputy Marshal, I am authorized to seek and execute federal arrest and search

warrants for Title 18 criminal offenses, including offenses related to the Sex Offender

Registration and Notification Act ("SORNA"), and specifically those involving the interstate

*A 38*

TOMPK000172

travel of persons required to register under SORNA, in violation of Title 18, United States Code, Section 2250. I have received training and instruction in conducting online SORNA investigations.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2250(a), Failure to Register as a Sex Offender, have been committed by Eric TOMPKINS and there is probable cause to search the device described in Attachment A for evidence of this crime, as described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. The property to be searched is a Samsung Model SM-J336AZ cell phone bearing serial number R28K53A6L4T currently located in the United States Marshals Service evidence locker located in Albany New York (hereinafter the SUBJECT DEVICE).

6. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7. The USMS is conducting a criminal investigation into TOMPKINS' failure to register as a sex offender in violation of 18 U.S.C. § 2250(a). On February 9, 2009, TOMPKINS was arrested by the Okanogan County Sheriff's Office in Washington and charged with Child

2

*A 39*

TOMPK000173

Molestation First Degree, in violation of the Revised Code of Washington ("RCW") §

9A.44.083. On September 3, 2009, TOMPKINS was convicted of violating RCW 9A.44.089,

Child Molestation Third Degree. A person is guilty of such an offense when he "has, or

knowingly causes another person under the age of eighteen to have, sexual contact with another

who is at least fourteen years old but less than sixteen years old and not married to the

perpetrator and the perpetrator is at least forty-eight months older than the victim." The victim

in the case was allegedly ten years old and the defendant was 25 years old at the time of the

offense. TOMPKINS was sentenced to a term of twelve (12) months Community Custody and

required to register as a sex offender.

8.      On July 23, 2009, TOMPKINS signed a plea agreement in the Superior Court of

Washington for Okanogan County. As part of this plea, TOMPKINS signed and dated a

"Statement of Defendant on Plea of Guilty to Sex Offense" and "Offender Registration

Attachment" which included the advisement that he must register as a sex offender, and that "if I

move to another state, or if I work, carry on a vocation, or attend school in another state I must

register a new address, fingerprints, and photograph with the new state within 10 days after

establishing residence, or after beginning to work, carry on a vocation, or attend school in the

new state." TOMPKINS signed the Statement indicating that he understood the requirements of

the Statement and Attachment.

9.      On September 3, 2009, TOMPKINS was sentenced in the Superior Court of

Washington for Okanogan County to 12 months of Community Custody. As part of sentencing,

TOMPKINS signed and dated a "Felony Judgement and Sentence" which included the provision,

"[i]f you move to another state, or if you work, carry on a vocation, or attend school in another

state you must register a new address, fingerprints, and photograph with the new state within 10

3

**A 40**

days after establishing residence, or after beginning to work, carry on a vocation, or attend school in the new state."

10.     From November 2009 through October 2011 TOMPKINS was compliant with registration requirements and submitted change of address registration updates to the Grant County Sheriff on five separate occasions.

11.     On October 27, 2014, the Grant County Sheriff's Office became aware that TOMPKINS had failed to verify his address, or complete change of address notifications since his last registration update in 2011. The Grant County Sheriff's Office located TOMPKINS and provided a copy of the "Sex and Kidnapping Offender Notification of Registration and Requirements (Revised 7/22/2011)" RCW 9A.44.130. A Grant County Sheriff's Deputy reviewed the registration requirements with TOMPKINS and the document, which stated "[o]ffenders required to register in Washington, who move to another state, or who work, carry on a vocation, or attend school in another state shall register a new address, fingerprints, and photograph with the new state within three business days after establishing residence, or after beginning to work, carry on a vocation, or attend school in the new state," was signed by both the Grant County Deputy and TOMPKINS.

12.     On August 11, 2016, the Grant County Sheriff's Office attempted to locate TOMPKINS at his registered address 726 Eastlake Ave (aka Main Ave), Soap Lake, Washington to conduct an annual address verification. The Grant County Sheriff's Office discovered that TOMPKINS was no longer residing at his registered address and had not completed a change of address notification as required. Between August 2016 and February 2017 the Grant County Sheriff's Office was unable locate TOMPKINS and an arrest warrant for TOMPKINS was

4

A 41

TOMPK000175

issued by the Grant County Superior Court for violation of RCW 9A.44.132 Fail to Register as Sex Offender.

13. On February 27, 2017 TOMPKINS obtained employment at the Hoffman Car Wash, 5 Lowes Drive, Saratoga Springs, New York. According to Hoffman employee records, TOMPKINS was employed at the Hoffman Car Wash from February 27, 2017 through July 11, 2017. According to Hoffman employee records TOMPKINS listed his home address as a residence in Clifton Park, New York.

14. On January 24, 2018 TOMPKINS obtained employment at Taco Bell, 811 Route 146, Clifton Park, New York. According to Taco Bell employee records, TOMPKINS was employed at this location from January 24, 2018 through August 14, 2018. According to Taco Bell employee records TOMPKINS listed his home address as a residence in Clifton Park, New York.

15. On October 19, 2018, a due diligence search was performed by investigators with the New York State Division of Criminal Justice Services (NYDCJS) and determined TOMPKINS was not registered as a sex offender in New York State. Investigators have continued to conduct a search of NYDCJS records regularly since October 19, 2018, including March 13, 2019, and have determined that TOMPKINS has not registered as a sex offender in New York State.

16. On March 18, 2019, based on the facts provided in an affidavit, including the facts set forth above, the Honorable Daniel J. Stewart signed a Criminal Complaint accusing TOMPKINS of violating 18 U.S.C. 2250(a), failure to register and update a sex offender registration as required by the Sex Offender Registration and Notification Act, and a warrant for TOMPKINS's arrest.

*A 42*

TOMPK000176

17.     TOMPKINS was arrested on March 28, 2019.  Prior to entering the transport

vehicle, TOMPKINS asked his girlfriend to get his shoes and phone.  TOMPKINS' girlfriend

placed the SUBJECT DEVICE in his pocket.  At the time that TOMPKINS entered the transport

vehicle following arrest he had the SUBJECT DEVICE in his possession.  At that time, the

SUBJECT DEVICE was seized by your Affiant.  TOMPKINS was read his *Miranda* rights while

in transit to the USMS office and agreed to speak with your Affiant.  While in the vehicle, I

asked TOMPKINS if he would like any phone numbers from the SUBJECT DEVICE.  He said

yes and provided the passcode to unlock the SUBJECT DEVICE.  I then provided TOMPKINS

with the phone numbers for his uncle, aunt and girlfriend, all of whom reside in the Northern

District of New York, that were contained in the contacts section of the SUBJECT DEVICE.

18.     As part of this investigation, investigators also reviewed publicly-available

information on Facebook, which reveals an account in the name "Eric Bleu," which appears to

be the account of TOMPKINS.  The account contains "selfie" photographs of TOMPKINS,

including photographs taken in front of what appears to be a residence where he was staying for

a period of time in Clifton Park, New York.  The selfies appear to be the type that are typically

taken using a cell phone.  In my training and experience, people also often access Facebook

through the use of a cell phone.

19.     The SUBJECT DEVICE is currently in the lawful possession of the United States

Marshals Service.  It came into the Marshals Service's possession when it was seized incident to

TOMPKINS' arrest on March 28, 2019.  Therefore, while the Marshals Service might already

have all necessary authority to examine the SUBJECT DEVICE, I seek this additional warrant

*A43*

TOMPK000177

out of an abundance of caution to be certain that an examination of the SUBJECT DEVICE will comply with the Fourth Amendment and other applicable laws.

20.     The SUBJECT DEVICE is currently in storage in the evidence locker at the United States Marshals Service's office in Albany, New York. In my training and experience, I know that the SUBJECT DEVICE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT DEVICE first came into the possession of the Marshals Service.

## TECHNICAL TERMS

21.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing

7

*A 44*

TOMPK000178

dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

8

A 45

TOMPK000179

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets,

9

TOMPK000180

and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP

10

*A 47*

TOMPK000181

addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

22. Based on my training, experience, and research, I know that the SUBJECT DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, as well as where and when they possessed and used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

23. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

24. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how

11

*A 48*

TOMPK000182

the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

A49

TOMPK000183

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

25. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

26. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

//

//

//

//

//

13

*A 50*

TOMPK000184

## CONCLUSION

27.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Device described in Attachment A to seek the items described

in Attachment B.

Respectfully submitted,

Robert Imburgio
Criminal Investigator/Deputy Marshal
United States Marshals Service

Subscribed and sworn to before me
on April 19, 2019:

Hon. Daniel J. Stewart
UNITED STATES MAGISTRATE JUDGE

14

A51

TOMPK000185

## ATTACHMENT A

The property to be searched is a Samsung Model SM-J336AZ cell phone bearing serial number R28K53A6L4T currently located in the United States Marshals Service evidence locker located in Albany New York (hereinafter the SUBJECT DEVICE).

This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

A 52

TOMPK000186

## ATTACHMENT B

1.    All records on the SUBJECT DEVICE described in Attachment A that relate to violations of 18 U.S.C. § 2250(a), Failure to Register as a Sex Offender, and involve ERIC TOMPKINS, including:

    a.  Evidence indicating TOMPKINS' location and residence, including photographs, messages, call logs, GPS and geolocation data, WiFi connections, internet browsing history and financial records;

    b.  TOMPKINS' employment information;

    c.  TOMPKINS' registration as a sex offender, including in New York and Washington; and

    d.  Evidence indicating TOMPKINS' state of mind as it relates to the crime under investigation.

2.    Evidence of user attribution showing who used or owned the SUBJECT DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

A53

TOMPK000187

ORIGINAL

# UNITED STATES DISTRICT COURT
for the
Northern District of New York

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.    1:19-MJ-264 (DJS) |
| IN THE MATTER OF THE SEARCH OF | ) | |
| SAMSUNG SM-J336AZ CELL PHONE | ) | |
| (S/N: R28K53A6L4T) AND SANDISK | ) | |
| MICRO SD CARD (S/N: 88460VJG50FF) | ) | |
| CURRENTLY LOCATED AT US | ) | |
| MARSHALS SERVICE OFFICE | ) | |
| LOCATED IN ALBANY NEW YORK | ) | |

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of New York *(identify the person or describe the property to be searched and its given location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before    August 28, 2019
                                                          *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10 p.m.    ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Hon. Daniel J. Stewart.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*.

☐ until, the facts justifying, the later specific date of _____

Date issued:    August 14, 2019

Time issued:    10:53 am

City and State:    Albany, NY            *Judge's signature*

Hon. Daniel J. Stewart, U.S. Magistrate Judge

A 54

| Return | | |
|---|---|---|
| Case No.:<br>1:19-MJ-264 (DJS) | Date & time warrant executed: | Copy of warrant & inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the
original warrant to the designated judge.

Date: _____

_____
Executing officer's signature

_____
Printed name and title

A55

**ATTACHMENT A**

The property to be searched includes:

1. A Samsung model SM-J336AZ (Galaxy J3 Neo), IMEI: 355269091218588, and serial number R28K53A6L4T manufacture in China ("SUBJECT PHONE"); and

2. A SanDisk Micro SD XC I card bearing serial number 88460VJG50FF, that was attached to the SUBJECT PHONE ("SUBJECT CARD"),

each of which is currently located at the New York State Police office located in Latham, New York (collectively, the "SUBJECT DEVICE").

This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

*A 56*

## ATTACHMENT B

All records and information on the SUBJECT CARD described in Attachment A, in any form, that constitute the fruits, evidence and instrumentalities of violations of Title 18, United States Code, **Section 2252A(a)(5)(B)** (accessing with intent to view or possessing child pornography), and all records and information on the SUBJECT PHONE described in Attachment A, in any form, that constitute the fruits, evidence and instrumentalities of violations of Title 18, United States Code, **Sections 2252A(a)(1)** (transportation of child pornography), **2252A(a)(2)(A)** (receipt and distribution of child pornography) **and 2252A(a)(5)(B)** (accessing with intent to view or possessing child pornography):

1.     The search of electronic data to include deleted data, remnant data and slack space.  The seizure and search of electronic media will be conducted in accordance with the affidavit submitted in support of this warrant.

2.     Electronic storage device software, meaning any and all data, information, instructions, programs, or program codes, stored in the form of electronic, magnetic, optical, or other media, which is capable of being interpreted by the SUBJECT PHONE.  Such software may also include data, data fragments, or control characters integral to the operation of computer software, such as operating systems software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended to be used to communicate with the SUBJECT PHONE.

3.     Any electronically stored material that explains or illustrates the configuration or use of the SUBJECT PHONE.

4.     Any programs or data on the SUBJECT DEVICE that can be used or are designed to be used to restrict access to, or to facilitate concealment of any software, documentation, or

*A 57*

electronic data records. Such items include, but are not limited to data security software or information (such as test keys and encryption codes), and similar information that is required to access device programs or data or to otherwise render programs or data into usable form.

5.     Any electronic records, documents, and materials on the SUBJECT CARD and/or SUBJECT PHONE referencing or relating to the above-described offenses.

6.     Records of personal and business activities relating to the operation and ownership of the SUBJECT CARD and SUBJECT PHONE.

7.     Any records pertaining to accounts held with Internet Service Providers or of Internet use.

8.     Records of address or identifying information for the target of the investigation, and any user/account names, user IDs, eIDs (electronic ID numbers), and passwords held on the SUBJECT CARD and/or SUBJECT PHONE.

9.     Electronic records, including, for example, receipts, banking records, bills, statements, telephone records, and other similar indicia of ownership indicating occupation, possession, or control over the SUBJECT DEVICE.

10.     Evidence identifying who the particular user was who distributed, transmitted, downloaded any child pornography on the SUBJECT PHONE and/or possessed any child pornography found on the SUBJECT CARD and SUBJECT PHONE (evidence of attribution).

### _Materials Relating to Child Pornography, Child Erotica, and Depictions of Minors_

11.     Any and all child pornography, and any and all visual depictions of minors, including, but not limited to, sexually explicit images of minors, as those terms are defined in Title 18, United States Code, Section 2256.

2

A58

12.     Any and all address books, names, and lists of names and addresses of minors visually depicted while engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2).

13.     Any and all evidence on the SUBJECT CARD relating to the possession of child pornography and any and all evidence on the SUBJECT PHONE relating to the transportation, receipt, distribution and/or possession of child pornography.

A 59

## UNITED STATES DISTRICT COURT
### for the
### Northern District of New York

FILED
U.S. DISTRICT COURT - N.D. OF N.Y.
AUG 1 4 2019
AT _____ O'CLOCK
John M. Domurad, Clerk - Albany

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.   1:19-MJ-264 (DJS) |
| IN THE MATTER OF THE SEARCH OF | ) | |
| SAMSUNG SM-J336AZ CELL PHONE (S/N: | ) | |
| R28K53A6L4T) AND SANDISK MICRO SD | ) | |
| CARD (S/N: 88460VJG50FF) CURRENTLY | ) | |
| LOCATED AT US MARSHALS SERVICE | ) | |
| OFFICE LOCATED IN ALBANY NEW YORK | ) | |

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:
*(identify the person or describe the property to be searched and its given location)*:

See Attachment A

located in the ____Northern____ District of ____New York____, there is now concealed
*(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒   evidence of a crime;

☒   contraband, fruits of crime, or other items illegally possessed;

☒   property designed for use, intended for use, or used in committing a crime;

☐   a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 2252A(a)(5)(B) | Possession of Child Pornography |
| 18 USC § 2252A(a)(2(A) | Receipt and Distribution of Child Pornography |
| 18 USC § 2252(a)(1) | Transportation of Child Pornography |

The application is based on these facts:

See Attached Affidavit

☒   Continued on the attached sheet.

☐   Delayed notice of _____ days (give exact ending date if more than 30 days):   Click here to enter a date.
is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

A 60

Applicant's signature

Brian Seymour, Special Agent, FBI

*Printed name and title*

Sworn to before me and signed in my presence.

Date: August 14, 2019

*Judge's signature*

City and State: Albany, NY

Hon. Daniel J. Stewart, U.S. Magistrate Judge

*Printed name and title*

A 61

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF SAMSUNG SM-J336AZ CELL PHONE (S/N: R28K53A6L4T) AND SANDISK MICRO SD CARD (S/N: 88460VJG50FF) CURRENTLY LOCATED AT US MARSHALS SERVICE OFFICE LOCATED IN ALBANY NEW YORK | Case No. 1:19-MJ-264-DJS |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Brian Seymour, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, as described in Attachment A, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since September 2007. I am assigned to the Albany Division, Albany, NY, and previously worked in the Buffalo Division. I have investigated a variety of violent crimes, including in the areas of child exploitation, counter-terrorism and drug overdose deaths. I am currently investigating federal violations concerning child pornography and the sexual exploitation of children. I have gained experience regarding such crimes through training in seminars, classes, and everyday work related to conducting these types of investigations.

*A 62*

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2252A(a)(1) (transportation of child pornography), 2252A(a)(2)(A) (receipt and distribution of child pornography), and 2252(a)(5)(B) (possession of child pornography) have been committed by ERIC TOMPKINS (TOMPKINS) and there is probable cause to search the devices described below and in Attachment A for fruits, evidence and instrumentalities of these crimes, as specifically described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.     The property to be searched includes:

a.   a Samsung model SM-J336AZ (Galaxy J3 Neo), IMEI: 355269091218588, and serial number R28K53A6L4T that was manufactured in China ("SUBJECT PHONE"); and

b.   a SanDisk Micro SD XC I card bearing serial number 88460VJG50FF, that was attached to the Samsung phone ("SUBJECT CARD"),

each of which is currently located at the New York State Police office located in Latham, New York (hereinafter collectively referred to as the "SUBJECT DEVICE").

6.     The applied-for warrant would authorize the forensic examination of the SUBJECT PHONE and SUBJECT CARD, for the purpose of identifying electronically stored data particularly described in Attachment B.

2

A 63

## **PROBABLE CAUSE**

7.     On March 18, 2019, based on an affidavit sworn to by United States Deputy

Marshal, Eric Gregoire, the Honorable Daniel J. Stewart, United States Magistrate Judge for the

Northern District of New York, signed a Criminal Complaint accusing TOMPKINS of violating

18 U.S.C. § 2250(a), failure to register and update a sex offender registration as required by the

Sex Offender Registration and Notification Act ("SORNA"), and issued a warrant for

TOMPKINS's arrest.[1]

8.     Pursuant to that warrant, TOMPKINS was arrested by the United States Marshal

Service ("USMS") on March 28, 2019.  Prior to entering the transport vehicle, and in the

presence of law enforcement officers, TOMPKINS asked his girlfriend to get his shoes and his

cellular telephone.  TOMPKINS' girlfriend placed the cellular telephone, herein identified as the

SUBJECT DEVICE (inclusive of the SUBJECT PHONE and SUBJECT CARD), in

TOMPKINS' pocket.  TOMPKINS then entered the transport vehicle with the SUBJECT

DEVICE in his possession, and the SUBJECT DEVICE was seized by Deputy United States

Marshal (DUSM) Robert Imburgio because arrestees are not permitted to possess cellular

telephones while in custody.  While in transit to the USMS office, TOMPKINS was provided

with his *Miranda* rights and agreed to speak with DUSM Imburgio.  TOMPKINS was asked if

he would like any phone numbers from the SUBJECT DEVICE.  TOMPKINS indicated that he

would.  DUSM Imburgio handed the SUBJECT DEVICE back to TOMPKINS to unlock the

phone.  TOMPKINS unlocked the SUBECT DEVICE without providing the PIN to DUSM

---

[1]     On April 25, 2019, a federal grand jury returned an indictment charging TOMPKINS
with failing to register and update a sex offender registration as required by SORNA,
("SORNA") in violation of 18 U.S.C. § 2250(a).

*A64*

Imburgio. TOMPKINS then handed the phone back to DUSM Imburgio and DUSM Imburgio wrote down the contact information for TOMPKINS' uncle, aunt and girlfriend and provided TOMPKINS with that information. Following his arraignment and detention, neither TOMPKINS nor his attorney requested the return of the SUBJECT DEVICE and it remained in the custody of the United States Marshals. The telephone numbers were contained in the "contacts" section of the SUBJECT DEVICES.

9.       On April 19, 2019, based on probable cause established in an affidavit sworn to by DUSM Imburgio, attached hereto as an exhibit and incorporated by reference as if fully set forth herein, the Honorable Daniel J. Stewart issued a search warrant for the SUBJECT DEVICE (inclusive of the SUBJECT PHONE and SUBJECT CARD), to search for information that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 2250(a). That search warrant is also attached hereto as an exhibit for reference.

10.     On May 1, 2019, USMS transferred possession of the SUBJECT DEVICE to the New York State Police's ("NYSP") Computer Crimes Unit ("CCU") requesting that a forensic examination be completed. At that time, the SUBJECT DEVICE was off and could not be turned on because it was not charged. DUSM Imburgio informed NYSP CCU that the locked SUBJECT DEVICE contained a PIN and that he did not have the number. Between June 4, 2019 and June 9, 2019, investigators with the NYSP CCU attempted to conduct a forensic examination of the SUBJECT DEVICE pursuant to the federal search warrant authorized in the Northern District of New York on April 19, 2019. As of June 28, 2019, a full forensic extraction and examination of the contents of the SUBJECT PHONE has not been completed because the device is PIN protected, therefore the data contained within the internal memory of the SUBJECT PHONE has not been accessed. However, a forensic examination has been completed

4

A 65

of the SUBJECT CARD, which was attached to, and removed from, the SUBJECT PHONE, and

the data extracted has been analyzed for evidence of SORNA violations (18 U.S.C. § 2250(a)),

as authorized by Judge Stewart's warrant.

11.     During the course of the forensic examination of the data extracted from the

SUBJECT CARD, NYSP Senior Investigator Peter Kozel observed several images in the

SUBJECT CARD's deleted space that he identified as depicting the sexual exploitation of

minors, as that term is defined in 18 U.S.C. § 2256. The following are descriptions of some of

those identified images. Your affiant has not reviewed the identified images, and the descriptions

detailed below were provided to your affiant by Senior Investigator Kozel who has 13 years of

experience investigating sexual exploitation and child pornography related cases:

a)     **net.zedge.android-1.asec_embedded_25.DELETED** - An image file
depicting what appears to be a prepubescent female's genital region, encompassing the
upper legs to the lower abdomen with an erect penis penetrating her vagina. There is no
body hair present on the female's vagina, and the size of the penis in relation to her
vagina, is indicative of the small frame and young age of the female.

b)     **net.zedge.android-1.asec_embedded_79.DELETED** - An image file
depicting what appears to be a screenshot from a mobile device by the carrier "Cricket".
The image on the screen is that of a nude prepubescent female looking down at the
camera. The focus of the image is the female's vagina, which encompasses
approximately half of the image and the child does not appear to possess any body hair.
The female's chest is also underdeveloped.

c)     **net.zedge.android-1.asec_embedded_105.DELETED** - An image file
depicting what appears to be a screenshot from a mobile device. The image on the screen
is of a living room with couches and a mattress in it. There are five (5) prepubescent
children within the shot, only four (4) prepubescent females are fully visible. They are
standing in a line in front of the mattress with their panties drawn to their knees, exposing
their genitals. In the upper right corner of the screenshot, the time on the screen is
10:54PM and the icons indicate Wi/Fi and Bluetooth connections. In the upper left
corner, the icon indicates a screenshot was recently taken.

d)     **net.zedge.android-1.asec_embedded_109.DELETED** - An image file
similarly depicting the minors described in the aforementioned image file,

5

A 66

**net.zedge.android-1.asec_embedded_105.DELETED,**with the time indicated in the image as 10:55PM.

12.     After locating the images described above, Senior Investigator Kozel stopped his review of the related data extracted from the SUBJECT CARD and reported his findings to DUSM Imburgio. Your affiant is seeking this search warrant to search the SUBJECT CARD for evidence of violations of 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography).

13.     Because the SUBJECT CARD containing these deleted images was attached to the SUBJECT PHONE, there is probable cause to believe that the SUBJECT PHONE was used in obtaining those images and that the SUBJECT PHONE's internal memory will include evidence of violations of 18 U.S.C. §§ 2252A(a)(1) (transportation of child pornography), 2252A(a)(5)(B) (possession of child pornography) and 2252A(a)(2)(A) (receipt and distribution of child pornography).

14.     In attempting to unlock and access the SUBJECT PHONE, NYSP's CCU utilized a limited number of tools to do so. Under the proposed search warrant, NYSP's CCU would utilize additional tools at its disposal to attempt to access the phone and if those do not work, will seek the assistance of the FBI, who has additional software and tools that have been used with varying success to unlock cellular telephones.

15.     The SUBJECT DEVICE is currently in the lawful custody of the NYSP. Custody was transferred to the NYSP by the USMS on May 1, 2019. Prior to the transfer, the SUBJECT DEVICE had been stored in the evidence locked at the USMS office in Albany, New York. Based on my conversations with USMS Deputy Marshals and NYSP Investigators, I understand that the SUBJECT DEVICE has been stored, both with USMS and NYSP in a manner in which

*A 67*

its contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT DEVICE first came into the possession of the Marshals Service.

## ELECTRONIC STORAGE DEVICES AND FORENSIC ANALYSIS

16.     I have consulted in this matter with other members of law enforcement officers with specialized knowledge and training in electronic storage devices, networks, and Internet communications. To properly retrieve and analyze electronically stored data, and to insure accuracy and completeness of such data and to prevent loss of the data either from accidental or programmed destruction, it is necessary to conduct a forensic examination of the SUBJECT DEVICE. As described above and in Attachment B, this application seeks permission to search and seize records that might be found within the SUBJECT DEVICE, in whatever form they are found. Some of this electronic information, as explained below, might take a form that becomes meaningful only upon forensic analysis.

17.     Based on my knowledge, training and experience, I know that cellular telephones and memory cards located within cellular telephones may be important to a criminal investigation in three distinct and important respects.

   a.     The objects themselves may be instrumentalities used to commit the crime;

   b.     the objects may have been used to collect and store information about crimes (in the form of electronic data); and

   c.     the objects may be contraband or fruits of the crime.

18.     Based on my knowledge, training, and experience, I know that electronic storage device files or remnants of such files can be recovered months or even years after they have been

A 68

downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person deletes a file on an electronic storage device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. It follows that deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, if the electronic storage device uses an operating system (in the case, for example, of a computer, cellular telephone or tablet device) the device may also contain a record of deleted data in a swap or recovery file.

19. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICE because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

8

*A 69*

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the computer and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

20.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or cache. The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them. This information can sometimes be recovered with forensics tools.

9

A 70

21. Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some electronic storage device equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

    a. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how an electronic storage device has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

    b. The volume of evidence. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

    c. Technical requirements. Electronic storage devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools

A 71

or knowledge that might not be present on the search site. The vast array of electronic storage device hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

22. In light of these concerns, I hereby request the Court's permission to search the SUBJECT DEVICE and associated storage media that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon searching the SUBJECT DEVICE, the agents executing the search conclude that it would be impractical to search the hardware, media, or peripherals on-site for this evidence.

## BACKGROUND ON ELECTRONIC STORAGE DEVICES AND CHILD PORNOGRAPHY

23. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Cellular telephone: A cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or

11

A 72

traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other

12

A 73

digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. A portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs

A 74

usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

g.  Electronic Storage Devices: Includes computers, cellular telephones, tablets, and devices designed specifically to store electronic information (e.g., external hard drives and USB "thumb drives"). Many of these devices also permit users to communicate electronic information through the internet or through the cellular telephone network (e.g., computers, cellular telephones, and tablet devices such as an iPad).

h.  Internet Service Providers (ISPs): Commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications

14

A 75

equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an Internet Service Provider (ISP) over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

24. Based on my training, experience, and research, I know that the SUBJECT PHONE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, as well as where and when they possessed and used the device.

25. Cellular telephones, and other electronic storage devices have dramatically changed the way in which individuals interested in child pornography interact with each other. Electronic storage devices basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

26. Many electronic storage devices (e.g., cellular telephones), have cameras built into the device which allows users to create and store still and video images on the device.

A 76

Moreover, if the device has internet connectivity, users can distribute still and video images from the device. Photos and videos taken on a cellular telephone may be stored on a removable memory card in the cellular telephone. These memory cards often store up to 32 gigabytes of data, which provides enough space to store thousands of high-resolution photographs and videos.

27.     Internet-enabled electronic storage devices can connect to other internet-enabled devices the world over. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to an internet-enabled electronic storage device. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), and easy access to the Internet, electronic storage devices are the preferred method of distribution and receipt of child pornographic materials.

28.     Electronic storage devices are the ideal repository for child pornography. The amount of information that an electronic storage device can hold has grown exponentially over the last decade. Electronic storage devices can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. One-terabyte external and internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on a computer or other electronic storage device. It is extremely easy for an individual to take a photo with a digital camera, upload that photo to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and

16

DVDs are unique in that special software must be used to save or "burn" files onto them). Many electronic storage devices can easily be concealed and carried on an individual's person.

29.　　The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

30.　　Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any internet-enabled electronic storage device. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's electronic storage device in most cases.

31.　　As is the case with most digital technology, communications by way of electronic storage device can be saved or stored on the device. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, an electronic storage device user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

**CONCLUSION**

32.　　Based on the aforementioned factual information, your Affiant respectfully submits that there is probable cause to believe that fruits, evidence and instrumentalities of



criminal offenses, namely, violations of 18 U.S.C. § 2252A(a)(1) (transportation of child pornography), 2252A(a)(2)(A) (receipt and distribution of child pornography), and 2252(a)(5)(B) (possession of child pornography), will be located within the SUBJECT PHONE and 18 U.S.C. § 2252(a)(5)(B) (possession of child pornography) will be located within the SUBJECT CARD.

33.     Your Affiant, therefore, respectfully requests that the attached warrant be issued authorizing the search of the SUBJECT DEVICE for evidence of transporting, receiving, distributing and possessing child pornography, as more fully described in Attachment B.

34.     Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the search warrant to be executed at any time during the day or night.

Respectfully submitted,

Brian Seymour
Special Agent - FBI

Subscribed and sworn to before me
on August 14, 2019:

Hon. Daniel J. Stewart
UNITED STATES MAGISTRATE JUDGE

18

A 79

## ATTACHMENT A

The property to be searched includes:

1. A Samsung model SM-J336AZ (Galaxy J3 Neo), IMEI: 355269091218588, and serial number R28K53A6L4T manufacture in China ("SUBJECT PHONE"); and

2. A SanDisk Micro SD XC I card bearing serial number 88460VJG50FF, that was attached to the SUBJECT PHONE ("SUBJECT CARD"),

each of which is currently located at the New York State Police office located in Latham, New York (collectively, the "SUBJECT DEVICE").

This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

*A 80*

# ATTACHMENT B

All records and information on the SUBJECT CARD described in Attachment A, in any form, that constitute the fruits, evidence and instrumentalities of violations of Title 18, United States Code, **Section 2252A(a)(5)(B)** (accessing with intent to view or possessing child pornography), and all records and information on the SUBJECT PHONE described in Attachment A, in any form, that constitute the fruits, evidence and instrumentalities of violations of Title 18, United States Code, **Sections 2252A(a)(1)** (transportation of child pornography), **2252A(a)(2)(A)** (receipt and distribution of child pornography) **and 2252A(a)(5)(B)** (accessing with intent to view or possessing child pornography):

1. The search of electronic data to include deleted data, remnant data and slack space. The seizure and search of electronic media will be conducted in accordance with the affidavit submitted in support of this warrant.

2. Electronic storage device software, meaning any and all data, information, instructions, programs, or program codes, stored in the form of electronic, magnetic, optical, or other media, which is capable of being interpreted by the SUBJECT PHONE. Such software may also include data, data fragments, or control characters integral to the operation of computer software, such as operating systems software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended to be used to communicate with the SUBJECT PHONE.

3. Any electronically stored material that explains or illustrates the configuration or use of the SUBJECT PHONE.

4. Any programs or data on the SUBJECT DEVICE that can be used or are designed to be used to restrict access to, or to facilitate concealment of any software, documentation, or

electronic data records. Such items include, but are not limited to data security software or information (such as test keys and encryption codes), and similar information that is required to access device programs or data or to otherwise render programs or data into usable form.

5. Any electronic records, documents, and materials on the SUBJECT CARD and/or SUBJECT PHONE referencing or relating to the above-described offenses.

6. Records of personal and business activities relating to the operation and ownership of the SUBJECT CARD and SUBJECT PHONE.

7. Any records pertaining to accounts held with Internet Service Providers or of Internet use.

8. Records of address or identifying information for the target of the investigation, and any user/account names, user IDs, eIDs (electronic ID numbers), and passwords held on the SUBJECT CARD and/or SUBJECT PHONE.

9. Electronic records, including, for example, receipts, banking records, bills, statements, telephone records, and other similar indicia of ownership indicating occupation, possession, or control over the SUBJECT DEVICE.

10. Evidence identifying who the particular user was who distributed, transmitted, downloaded any child pornography on the SUBJECT PHONE and/or possessed any child pornography found on the SUBJECT CARD and SUBJECT PHONE (evidence of attribution).

### *Materials Relating to Child Pornography, Child Erotica, and Depictions of Minors*

11. Any and all child pornography, and any and all visual depictions of minors, including, but not limited to, sexually explicit images of minors, as those terms are defined in Title 18, United States Code, Section 2256.

2

A 82

12.    Any and all address books, names, and lists of names and addresses of minors visually depicted while engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2).

13.    Any and all evidence on the SUBJECT CARD relating to the possession of child pornography and any and all evidence on the SUBJECT PHONE relating to the transportation, receipt, distribution and/or possession of child pornography.

A 83

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

*****************************************

UNITED STATES OF AMERICA,

Docket No.: 1:20-CR-00037-TJM

v.

Eric William Tompkins,

Defendant.

*****************************************

**GOVERNMENT RESPONSE TO
DEFENSE MEMORANDUM OF LAW
IN SUPPORT OF ERIC TOMPKINS' MOTION TO SUPPRESS**

Dated: June 26, 2020

GRANT C. JACQUITH
United States Attorney
Northern District of New York

By:

Rachel L. Williams
Assistant United States Attorney
Bar Roll No. 701542
455 Broadway
Albany, New York 12007
T: (518) 431-0234
Rachel.Williams@usdoj.gov

A 84

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................................1

II.    BACKGROUND.................................................................................................................2

III.   ANALYSIS...........................................................................................................................5

      A.    The Search of the SUBJECT CARD was constitutional......................................5

      B.    Law Enforcement Officers acted in good faith when they searched the SUBJECT

           CARD purusant to the Original and Subsequent Search Warrants ..................................9

IV.   CONCLUSION ...................................................................................................................12

A 85

The United States of America (hereinafter "government"), by and through its attorney, the United States Attorney for the Northern District of New York, submits this memorandum of law in opposition to defendant Eric William Tompkins' Motion to Suppress. *See* Dkt. No. 9-1

## I.     **INTRODUCTION**

The defendant moves to suppress all evidence discovered during a government forensic examination of the SUBJECT CARD, inserted inside of the SUBJECT PHONE. The defense argues that the Original Search Warrant for the SUBJECT PHONE did not specifically describe or mention the SUBJECT CARD, which rendered its search unconstitutional. The defense further asserts that the good faith exception does not apply in the instant case, because law enforcement officials who executed the Subsequent Search Warrant "intentionally obscured the source of the probable cause 'images' used in the second warrant by intentionally misrepresenting and expanding the property the Magistrate authorized to be searched to include the SanDisk Micro SD Card." *See* Dkt. 9-1.

The Government submits that the search of the SUBJECT CARD was authorized by the Original Search Warrant. The plain language of the Original Search Warrant permitted the search of the SUBJECT CARD. Additionally, the SUBJECT CARD is a component of the SUBJECT PHONE and therefore lawfully searched by law enforcement officials pursuant to the Original Search Warrant. Alternatively, even if this Court finds the search of the SUBJECT CARD to be outside the scope of the Original Search Warrant, a hearing on this issue would be necessary to establish that law enforcement officers acted in good faith when they searched the SUBJECT CARD. At a hearing, the government would establish that law enforcement officials had an objective and reasonable belief that the SUBJECT CARD was a component of the SUBJECT PHONE, and could therefore be lawfully searched.

1

*A 86*

## II.  BACKGROUND

On September 3, 2009, the defendant was convicted of violating RCW A.44.089, Child Molestation Third Degree in the State of Washington as a result of his guilty plea to this offense. As part of his plea agreement, the defendant was required to register as a sex offender and register his address with any new state to which he moved. *See* Dkt. 9-2, ¶ 7.

On October 19, 2019, the New York State Division of Criminal Justice Service (NYDCJS) determined the defendant was not registered as a sex offender in New York State. *See* Dkt. 9-2, ¶ 15.

On March 18, 2019, the Honorable Daniel J. Stewart signed a Criminal Complaint accusing the defendant of violating 18 U.C.S. § 2250(a) – failure to register as a sex offender, and signed a warrant for the defendant's arrest. *See* Dkt. 9-2, ¶ 16.

On March 28, 2019, the defendant was arrested by the United States Marshal Service (USMS). Law enforcement officials seized the defendant's Samsung SM-J336AZ cell phone, bearing serial number R28K53A6L4T (SUBJECT PHONE), from the defendant's person. The SUBJECT PHONE remained in the possession of the USMS. *See* Dkt. 9-2, ¶ 17.

On April 19, 2019, law enforcement officials applied for a Search and Seizure Warrant for the SUBJECT PHONE (Original Search Warrant). In Attachment A to the Original Search Warrant, the property to be searched is "a Samsung Model SM-J336AZ cell phone bearing serial number R28K53A6L4T currently located in the United States Marshals Service evidence locker located in Albany New York (hereinafter the SUBJECT DEVICE). This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the *electronically stored information* described in Attachment B." *See* Dkt. 9-2, Attachment A. (emphasis added).

A 81

Attachment B to the Original Search Warrant directed law enforcement officials to search "All records on the SUBJECT DEVICE described in Attachment A that related to violations of 18 U.C.S. § 2250(a), Failure to Register as a Sex Offender, and involve ERIC TOMPKINS […]" *See* Dkt. 9-2, Attachment B. The last paragraph of Attachment B stated the "terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or *electronic storage (such as flash memory or other media that can store data)* and an photographic form." *See* Dkt. 9-2, Attachment B (emphasis added).

On May 1, 2019, the USMS transferred possession of the SUBJECT DEVICE to the New York State Police's Computer Crimes Unit (CCU) in order for the CCU to conduct a forensic analysis of the SUBJECT DEVICE. The CCU observed a Micro SD Card, bearing serial number 88460VJG50FF (SUBJECT CARD), inserted inside and attached to the SUBJECT PHONE. The CCU was unable to unlock the SUBJECT PHONE, as it was locked and required a PIN to open, which neither the USMS or the CCU obtained from the defendant. The CCU removed the attached SUBJECT CARD from the SUBJECT PHONE and conducted a forensic examination of the SUBJECT CARD's data for evidence of the defendant's charged 18 U.S.C. § 2250(a) violation. During the course of the forensic examination of the SUBJECT CARD, a senior investigator with the CCU observed several images of child pornography contained in the SUBJECT CARD's deleted space. This senior investigator stopped his review of the SUBJECT CARD and reported his discovery of the child pornography images to Deputy United States Marshal (DUSM) Imburgio. *See* Dkt. 9-3, ¶ 10.

On August 14, 2019, DUSM Imburgio requested a search and seizure warrant for the SUBJECT PHONE and SUBJECT CARD (Subsequent Search Warrant). Attachment A to the

3

*A 88*

Subsequent Search Warrant described the property to be searched as the SUBJECT PHONE and SUBJECT CARD, which Attachment A collectively referred to as the "SUBJECT DEVICE." *See* Dkt. 9-3, Attachment A. Attachment B limited the records and information sought to those related to violations of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(a)(1). *See* Dkt. 9-3, Attachment B.

In paragraph 9 of the Affidavit that supported the Subsequent Search Warrant (Subsequent Affidavit), the affiant stated that the Magistrate Judge "issued a search warrant for the SUBJECT DEVICE (inclusive of the SUBJECT PHONE and SUBJECT CARD), to search for information that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 2250(a). That search warrant is also attached hereto as an exhibit for reference." *See* Dkt. 9-3, ¶ 9.

In paragraph 10 of the Subsequent Affidavit, the affiant stated that a "forensic examination has been completed of the SUBJECT CARD, which was attached to, and removed from, the SUBJECT PHONE, and data extracted has been analyzed for evidence of SORNA violations (18 U.S.C. § 2250(a)), as authorized by Judge Stewart's warrant." *See* Dkt. 9-3, ¶ 10.

In paragraph 11 of the Subsequent Affidavit, the affiant stated that the Senior Investigator who completed the forensic examination on the SUBJECT CARD "observed several images in the SUBJECT CARD's deleted space that he identified as depicting the sexual exploitation of minors, as that term is defined in 18 U.S.C. § 2256." The affiant then provided an example of four of these images, providing their file names and image descriptions. *See* Dkt. 9-3, ¶ 11.

On January 30, 2020, the defendant was indicted in the present case for a violation of 18 U.S.C. 2252A(a)(5)(B), possession of child pornography. *See* Dkt. 1.

## III.    ANALYSIS

The search of the SUBJECT CARD was constitutional because the Original Search Warrant provided for its search, as the SUBJECT CARD is a form of electronic storage and is a component of the SUBJECT PHONE. Even if this Court finds that the SUBJECT CARD should have been specifically described in the Original Search Warrant, law enforcement officials acted in good faith when they searched the SUBJECT CARD pursuant to the Original and Subsequent Search Warrants.

### A.    The search of the SUBJECT CARD was constitutional.

To comport with the Fourth Amendment, a search warrant must particularly describe the place to be searched and the person or things to be seized. U.S. Const. amend. IV. This 'particularity requirement' provides a "limitation curtailing the officers' discretion when executing the warrant" so that the "safeguard of having a magistrate determine the scope of the search is not lost.'" United States v. Voustianiouk, 685 F.3d 206, 211 (2d Cir. 2012) (quoting United States v. George, 975 F.2d 72, 76 (2d Cir. 1992)). However, the "particularity requirement is a standard of practical accuracy rather than a hypertechnical one." United States v. Fiorito, 640 F.3d 338, 348 (8th Cir. 2011); see also United States v. Otero, 563 F.3d 1127, 1132 (10th Cir. 2009)(" [a] warrant need not necessarily survive a hyper-technical sentence diagraming and comply with the best practices of *Strunk & White* to satisfy the particularity requirement.") Additionally, "Courts have frequently rejected particularity arguments where context makes clear that a specific phrase or paragraph, although insufficiently precise when read in isolation, is nevertheless appropriately limited." United States v. Alston, 2016 U.S. Dist. LEXIS 63776, at 12 (S.D.N.Y. Apr. 29, 2016) (citing Hale v. United States, No. 08 Civ. 94,

A 90

2010 U.S. Dist. LEXIS 73604 (N.D. Ill. July 22, 2010) (Government admitted that phrase was non-specific when read in isolation, but context prevented warrant from being overbroad)).

As the Supreme Court has recently noted, modern cellphones are "mini computers" capable of storing a litany of data. Riley v. California, 573 U.S. 373 (2014). Federal courts have "rejected most particularity challenges to warrants authorizing the seizure and search of entire personal or business computers." United States v. Bass, 785 F.3d 1043, 1049 (6th Cir. 2015)(quoting United States v. Richards, 659 F.3d 527, 539 (6th Cir. 2011)). This occurs because "[c]riminals can—and often do—hide, mislabel, or manipulate files to conceal criminal activity [such that] a broad, expansive search of the [computer] may be required." Bass, 785 F.3d at 1049 (quoting United States v. Stabile, 633 F.3d 219, 237 (3d Cir. 2011)).

In United States v. Wilson, a 2019 decision by the U.S. District Court of the Western District of Missouri, the Court was presented with the issue of whether the search of a micro SD card inserted into a cell phone was lawful when the search warrant did not specifically describe the SD card as property to be searched. United States v. Wilson, No. 17-4106, 2019 U.S. Dist. LEXIS 166318, (W.D. Mo., Sept. 16, 2019). Instead, the search warrant sought "all data [...] including but not limited to all contents of the cellular phone, such as applications installed, messages sent and received, picture and video files which may still be on the device, including any deleted data which may be recovered from the memory of the cell phone." Id. at 4. On appeal, Wilson argued that the search of the SD Card was unconstitutional because the SD Card was not specifically described in the search warrant and, therefore, constituted an unlawful warrantless search. Id. at 7.

In upholding the constitutionality of the search of the SD Card, the Wilson Court refused to apply a strict, "hypertechnical" application of the particularity requirement of the Fourth

6

A 91

Amendment, and instead chose a "standard of practical accuracy." Id at 7 (quoting <u>United States v. Fiorito</u>, 640 F. 3d 338, 346 (8th Cir. 2011). The <u>Wilson</u> Court looked to the 8th Circuit's analysis of the particularity requirement in the <u>Beckmann</u> decision.

In <u>Beckmann</u>, law enforcement officers received a defendant's consent to search his computer, which had two external hard drives connected to it and one of the hard drives was disconnected from a wall socket. <u>United States v. Beckmann</u>, 786 F.3d 672. 676 (8th Cir. 2015). On appeal, Beckmann argued that his consent to search the computer did not include the two external hard drives. <u>Id</u>. at 677. Beckmann asserted that the hard drives at issue were not component parts of the computer, but rather more akin to a cellular phone. <u>Id</u>. at 679. The 8th Circuit disagreed based on the functionality of a hard drive. It found that the "sole purpose of an external hard drive is to store computer data. Additionally, external hard drives, unlike cellular telephones, are functionally inoperable – and their contents unreviewable – when unplugged from a computer." <u>Id</u>. The Circuit Court next looked to the term "computer" and found that the "common understanding" of this term "encompasses the collection of component parts involved in a computer's operation." <u>Id</u>. at 678 (quoting <u>United States v. Herndon</u>, 501 F.3d 683, 690 (6th Cir. 2007)). The Court then concluded that the connected external hard drives were a component of the computer and, a result, law enforcement had an objectively reasonable basis to conclude that they were encompassed in Beckmann's consent to search the computer. <u>Id</u>. at 678-679.

The <u>Wilson</u> Court similarly reviewed the functionality of an SD Card and determined it was "substantially similar and functionally the same" as an external hard drive as "both are solely used to store digital data." <u>Wilson</u> at 9. Like an external hard drive, an SD Card is "functionally inoperable – and their contents unreviewable – when unplugged from a digital device." <u>Id</u> at 9-10 (quoting <u>Beckmann</u>, 786 F.3d at 679). As a result, the <u>Wilson</u> Court found

7

A-92

that, "because as a connected external hard drive is commonly understood to be part of a computer, it therefore follows that a connected SD card is commonly understood to be part of a cell phone." Wilson at 10; see also United States v. Herndon, 501 F.3d 683, 691 (6th Cir 2007)(holding that "the term "computer" is commonly understood to include the collection of components involved in a computer's operation"). As a component of the cellular phone, the Court held that the search warrant for the cellular phone did not need to specifically describe the SD Card, and the search of the SD Card was therefore constitutional.

In the instant matter, this Court should find that the Original Search Warrant authorized a search of the SUBJECT CARD for two primary reasons: First, the plain language of Attachment B to the Original Search Warrant directed law enforcement officials to search the SUBJECT PHONE for all "records" of the SORNA violation in "whatever form and by whatever means [the records] may have been created or stored, including any form of computer or *electronic storage (such as flash memory or other media that can store data)* and any photographic form." As the SUBJECT CARD is by its very nature electronic storage, and was connected to the SUBJECT PHONE, the Original Search Warrant provided for its lawful search. Additionally, Attachment B to the Original Search Warrant further directed law enforcement officials to search only those records that related to the alleged 18 U.S.C. 2250(a) violation. As a result, the Original Search Warrant particularly described those items to be searched and seized, in compliance with the Fourth Amendment.

Second, this Court should adopt the logic applied by the Wilson Court, and find that the SUBJECT CARD is a component of the SUBJECT PHONE and did not need to be specifically described in the Original Search Warrant. The SUBJECT CARD is solely used to store digital data and is inoperable when not inserted into the SUBJECT PHONE. Further, its contents are

8

A 93

unreviewable when disconnected from the SUBJECT PHONE. As a result, the SUBJECT

CARD is component of the SUBJECT PHONE, not akin to one. Additionally, because a cellular

phone is a minicomputer, a component of a cellular phone should be treated no differently than a

component of a computer. Following the "common understanding" that the term "computer"

encompasses the collection of component parts involved in the computer's operation, the term

"cellular phone" encompasses the collection of component parts involved in its operation.

Therefore, the SUBJECT CARD in the present case was encompassed in the search of the

SUBJECT PHONE and did not need to be specifically described in the Original Search Warrant

to meet the particularly requirement of the Fourth Amendment. For these reasons, the search of

the SUBJECT CARD pursuant to the Original Search Warrant was constitutional.

**B.    Law Enforcement Officers acted in good faith when they searched the
SUBJECT CARD pursuant to the Original and Subsequent Search Warrants**

The government maintains that the SUBJECT CARD is a component of the SUBJECT

PHONE and did not need to be specifically described in the Original Search Warrant. However,

to the extent this Court disagrees, the Government submits the law enforcement officials' search

of the SUBJECT CARD was executed in good faith.

The Supreme Court created a "good faith" exception to prevent the exclusion of evidence

otherwise unlawfully obtained, applicable only when police act with a "reasonable good faith

belief" that their conduct is lawful. United States v. Mayo, No. 2:13-CR-48, U.S. Dist LEXIS

158866 (D. Vt. Nov. 6, 2013)(quoting United States v. Leon, 468 U.S. 897, 909, 919 (1984)).

As discussed above, in Beckmann, the 8th Circuit analyzed whether a deputy reasonably

believed that Beckmann's consent to search the computer included the external hard drives

connected to the computer. In finding the deputy's belief reasonable, the Court looked to the

9

A 94

"common understanding that the term "computer" encompasses the collection of component parts involved in a computer's operation." Beckmann, 786 F.3d at 678-679.

Moreover, in evaluating whether officers acted in good faith when conducting a search, courts may look to allied or supporting documents that accompanied the search warrant. United States v. Rosa, 626 F.3d 56, 64 (2d Cir. 2010). While these documents cannot cure a constitutionally defective warrant, "those documents are still relevant to [the] determination of whether the officers acted in good faith, because they contribute to [the] assessment of the officers' conduct in a particular case." Id.

In the present case, the defendant claims that law enforcement officials attempted to conceal their unlawful search of the SUBJECT CARD "by affirming that the original warrant defined the "SUBJECT DEVICE" as inclusive of the SUBJECT PHONE and SUBJECT CARD." Dkt. 9-1, 8-9. The defendant points to paragraphs 9 and 10 of the Subsequent Affidavit as evidence of this intent to mislead and "prevent the Magistrate Judge from discovering that the information presented in ¶ 11 of the August 19, 2019 (the deleted images) were recovered as the result of a warrantless search." Id. at 9.

The defendant's argument fails for several reasons. First, the plain language of Attachment B of the Original Search Warrant directed law enforcement officials to search the *electronic storage (such as flash memory or other media that can store data* [...]" on the phone for evidence of the underlying SORNA violation. Dkt 9-2, Attachment B (emphasis added). By its very function, the SUBJECT CARD provided electronic storage for the SUBJECT PHONE, so law enforcement had a reasonable good faith basis to search the SUBJECT CARD, narrowed in scope for evidence of the SORNA violation.

A95

Second, and as described above, the SUBJECT CARD is logically – if not commonly – considered a component of the SUBJECT PHONE. A review of the Affidavit in support of the Subsequent Search Warrant (Subsequent Affidavit) evidences law enforcement officers' reasonable belief that the SUBJECT CARD is a component of the SUBJECT PHONE. For example, paragraph 9 of the Subsequent Affidavit states that the Magistrate Judge "issued a search warrant for the SUBJECT DEVICE (inclusive of the SUBJECT PHONE and SUBJECT CARD), to search for information that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 2250(a). That search warrant is also *attached hereto as an exhibit for reference*." Dkt. 9-3, ¶ 9. (emphasis added). This paragraph is not evidence of law enforcement's attempt to fool the Magistrate Judge, but rather evidence of law enforcement's reasonable belief that the authorized search of the SUBJECT PHONE encompassed a search of the SUBJECT CARD. Additionally, paragraph 10 of the Subsequent Affidavit states that the SUBJECT CARD, "which was attached to and removed from, the SUBJECT PHONE" had data extracted from it and analyzed for evidence of SORNA violations "*as authorized* by Judge Stewart's warrant." Dkt. 9-3, ¶ 10. Like paragraph 9, paragraph 10 is further evidence that law enforcement officers reasonably believed the Original Search Warrant permitted the search of the SUBJECT CARD. Further, it would be illogical for law enforcement to attach the Original Search Warrant to the Subsequent Search Warrant if their intent was to mislead the Magistrate Judge in regard to what he authorized in the Original Search Warrant. For these reasons, law enforcement had an objective and reasonable belief that the SUBJECT CARD is a component of the SUBJECT PHONE and could lawfully be searched pursuant to the Original Search Warrant.

Third, the fact that law enforcement officials specifically described the SUBJECT CARD in the Subsequent Search Warrant and not the Original Search Warrant does not render the

11

A 96

search of the SUBJECT CARD pursuant to the Original Search Warrant unconstitutional or performed in bad faith. Law enforcement was not aware of the existence of the SUBJECT CARD at the time the Original Search Warrant was requested, and therefore could not have specifically described it. To require law enforcement to specifically – and prospectively – describe in a search warrant every conceivable attachment to and component of an electronic device is not only a hypertechnical interpretation of the Fourth Amendment's particularity requirement, but likely a legal impracticability due to the inexhaustible nature of modern day technology.

Fourth, had law enforcement officials truly intended to mislead the Magistrate Judge into believing that the Original Search Warrant specifically described the SUBJECT CARD, the officials would not have incorporated and attached the Original Search Warrant – which did not specifically describe the SUBJECT CARD – to the Subsequent Search Warrant. The only logical conclusion to be reached from the totality of the circumstances surrounding the search of the SUBJECT CARD is that law enforcement officials reasonably believed – in good faith – that the Original Search Warrant permitted their search of the SUBJECT CARD.

## IV.    CONCLUSION

Based on the foregoing, the government respectfully requests that this Court deny the Defense's Motion to Suppress and hold that the search of the SUBJECT CARD pursuant to the Original and Subsequent Search Warrants was constitutional or, in the alternative, performed in good faith.

A 97

**CERTIFICATE OF SERVICE**

I hereby certify that on June 26, 2020 the foregoing was electronically filed with the clerk of the court by using the CM/ECF system. I further certify that on this date the foregoing document and the notice of electronic filing were mailed by first-class mail to the following non-CM/ECF participant:

Paul Evangelista, Es.
Email: paul_evangelista@fd.org

Paul Evangelista, Esq.
First Assistant Defender
39 N. Pearl Street, 5th Flr.
Albany, New York 12207

/s/ Yolanda Maeweather
Yolanda Maeweather
Legal Assistant

A98

```
                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA,          )
                                   )
                                   )  CASE NO. 20-CR-37
    vs.                            )
                                   )
ERIC TOMPKINS,                     )
               Defendant.          )
_____    )

              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HON. THOMAS J. McAVOY
            TUESDAY, NOVEMBER 10, 2020
                ALBANY, NEW YORK

FOR THE GOVERNMENT:
    UNITED STATES ATTORNEY'S OFFICE
    By:  RACHEL L. WILLIAMS, ESQ. and ASHLYN J. MIRANDA, AUSA
    445 Broadway, Room 218
    Albany, New York 12207

FOR THE DEFENDANT:
    OFFICE OF THE FEDERAL PUBLIC DEFENDER
    By:  PAUL J. EVANGELISTA, ESQ.
    39 North Pearl Street, 5th Floor
    Albany, New York 12207
```

---

1          (Open court.)

2          THE CLERK:  United States of America versus Eric

3  Tompkins, 20-CR-37.  May I have the appearance for the

4  government, please.

5          MS. WILLIAMS:  Good afternoon, Your Honor.  Rachel

6  Williams for the government.

7          THE COURT:  Good afternoon, Ms. Williams.

8          THE CLERK:  On behalf of the defendant, please.

9          MR. EVANGELISTA:  Paul Evangelista for Eric Tompkins

10  present to my left.  Good afternoon, Judge.

11          THE COURT:  Good afternoon, Mr. Evangelista.  Good

12  afternoon, Mr. Tompkins.

13          THE DEFENDANT:  Good afternoon.

14          THE COURT:  All right.  As I understand it, there was

15  a couple of search warrants issued in connection with a certain

16  cellphone and a device that was inserted in or attached to the

17  cellphone for purposes I believe of recording information, and

18  the government may want to offer that at trial.

19          Defense says no, you can't do that.  We're going to

20  bring a motion to suppress on the grounds that the warrant did

21  not authorize search of the device that was inserted in the

22  phone.  That only authorized the search of the phone itself, and

23  the fact that the government got a second warrant directed

24  primarily at the device underscores the fact that the first

25  warrant didn't do what it was supposed to do.  Basically that's

**A 99**

---

1  what we're here to decide, whether the Court should suppress the

2  evidence or not.

3          So I think, Ms. Williams, it's up to you to call a

4  witness and convince me we should not suppress.

5          MS. WILLIAMS:  Yes, Your Honor.  And as a first

6  witness, the government would call retired State Police

7  Investigator Peter Kozel.

8          THE COURT:  Okay.

9          MS. WILLIAMS:  May I get that witness, Your Honor?

10          THE COURT:  Sure.

11          MS. WILLIAMS:  Thank you.

12          THE CLERK:  Please come forward to be sworn.  Would

13  you state your name for the record, please.

14          THE WITNESS:  My name is Peter J. Kozel.

15          THE CLERK:  Spell your last name.

16          THE WITNESS:  K-o-z-e-l.

17               PETER KOZEL,

18  having been first duly sworn as a witness, was examined and

19               testified as follows.

20          THE CLERK:  Thank you.  If you'd take the witness

21  stand, please.  Peter J. Kozel, K-o-z-e-l.

22  :          I'd remind the witness and all parties, please project

23  your voices into the microphones.

24          MS. WILLIAMS:  Thank you.  If I may, Your Honor.

25          THE COURT:  You may.

---

1          MS. WILLIAMS:  Thank you.

2  DIRECT EXAMINATION BY MS. WILLIAMS:

3  Q    Mr. Kozel, I understand that you are a retired State Police

4  investigator; is that correct?

5  A    That is correct.

6  Q    When did you retire?

7  A    I retired in August of 2019.

8  Q    What was your title and position when you retired in 2019?

9  A    I was the senior investigator in charge of the Computer

10  Crime Unit in Troop G.

11  Q    What is the Computer Crime Unit?

12  A    It's part of a larger overall organization in the State

13  Police.  What we did was assist our agency and any other agency

14  in our area with investigations into cyberinvestigations and

15  digital forensics.

16  Q    How long were you with the CCU?

17  A    Almost 13 years.

18  Q    And prior to that, prior to those 13 years with the CCU,

19  where were you employed?

20  A    I was still with the State Police.  I was just a uniform

21  trooper for 14 years and a back room investigator for another

22  two years.

23  Q    In order to work for the CCU and through the duration of

24  your employment with the CCU, in the CCU, did you have any

25  specific training and experience in digital forensics?

Kozel - Direct

1  A    Initially, there was -- initially, no, when we first
2  started out.  However, through the course of those 13 years, I
3  acquired a little over 3,600 hours of training from a variety of
4  sources to include the National Computer Forensic Institute, the
5  National White Collar Crime Center, the Internet Crimes Against
6  Children Taskforce, a number of vendors who we used their
7  products from to include Cellebrite and Paraben, and I was also
8  an NK certified examiner.
9        And I'd also received quite a few hours in formal
10  education.  I took coursework early on after joining the
11  Computer Crime Unit from the Schenectady County Community
12  College, and I also finished with a master of science in
13  forensic computing and cybercrime investigation from the
14  University of Delaware in 2019.
15  Q    In all of that training and experience, did any of that
16  training and experience encompass the examinations, forensic
17  examinations of cellular phones?
18  A    Yes.
19  Q    And what specific training do you have in cellular phone
20  examinations?
21  A    As I mentioned earlier, several tools I obtained
22  certifications in, and from Teel Technologies out of
23  Connecticut, I received advanced mobile forensic training in
24  data recovery to include chip-off.
25  Q    I'm going to ask you about some technical terms that we're

Kozel - Direct

1  going to talk about here today.  Could you explain to the Court
2  what flash media is?
3  A    Flash media is a type of storage.  Primarily there are two
4  types that are commonly used.  One is referred to as a spinning
5  disk.  That's usually the kind that you remember has plates and
6  big chunky things that go in your computer.  They're still in
7  existence.
8        Flash media is another type of storage.  The storage method
9  is different.  It's typically much smaller, and there are no
10  moving parts.
11  Q    What is an SD card?
12  A    An SD card is a type of flash media.
13  Q    And can you describe what the purpose of an SD card is or
14  purposes?
15  A    Depending on the operating system and what your data needs
16  to be, it's typically additional storage.
17  Q    How does an SD card interact with a phone when an SD card
18  is inserted inside of a phone?
19  A    The mobile device will use it as additional storage, as
20  additional storage space.  Typically what happens is as soon as
21  it's inserted, it will install a file, its own file system so
22  that it can utilize the device.  And from then on, it's more
23  user interactive to determine.  The operating system may ask if
24  you want to store your pictures there, what you want to store
25  there as opposed to the internal memory of the phone.

**A 100**

Kozel - Direct

1  Q    So for example, if I put a thumb drive into my government
2  computer, I get a pop-up that says, "How do you want to use this
3  thumb drive?"  Would it be similar when you put an SD card
4  inside of a phone that you get a direction from the phone to the
5  user as to how to use the SD card?
6  A    The only immediate notification that I can think of that
7  would be across all platforms and operating systems is if it was
8  unformatted media, at which time it would ask you if you want to
9  format it.  As far as anything else, that would be operating
10  system dependent.
11  Q    So once the phone recognizes an SD card has been inserted
12  inside of it and it creates this file structure, for lack of a
13  better term in layman's terms, is the phone and the SD card
14  communicating?
15  A    Correct.
16        MR. EVANGELISTA:  Judge, I guess I'll object to the
17  leading nature of the question, and also I don't know if this
18  witness has been qualified as an expert in phones or operating
19  systems on phones or even the interaction between the phone and
20  the storage device used in the phone.
21        THE COURT:  Okay.  You've got a number of different
22  topics here.  Let's deal with the first one first, whether or
23  not he's qualified to testify here with respect to the phone and
24  ·the device that is in question.  And did you have any questions
25  you wanted to ask him about his qualifications before I rule on

Kozel - Voir dire

1  that?
2        MR. EVANGELISTA:  Sure, Judge.
3        THE COURT:  Go ahead.
4  VOIR DIRE BY MR. EVANGELISTA:
5  Q    So have you been -- what training have you received in the
6  operations of cellular telephones?
7  A    Mobile devices?  2007, I began which is when the State
8  Police began working with mobile systems.  The tool that we use
9  was Paraben.  I got a certification for the use of that tool.
10  Q    So Paraben is a tool used to search what's on a phone,
11  correct?
12  A    Correct.
13  Q    It doesn't tell you how the operating system of the phone
14  works or in fact the hardware of the phone works, does it?
15  A    Paraben was actually, in spite of the tool itself, it was a
16  very inclusive training regime.  There was a lot that they
17  covered including networks, how the device connects to networks,
18  how it was used, and the basics of its inner operation.
19  Q    So did it cover how a SanDisk media card would be used in a
20  cellular telephone?
21  A    Yes.  At the time, SD cards were very common.
22  Q    What did you learn about the interaction of the SanDisk
23  media card with the telephone?
24  A    Well, any SD card -- doesn't need to be SanDisk -- that
25  would be inserted into a mobile device would then become an

Kozel - Voir dire

1  extension of that device. It would be used as additional

2  storage for whatever the user and the operating system allowed

3  them to use it for.

4  Q   So what you said, so that I understand, is that you can

5  plug an SD card into a phone and it can be used as extra

6  storage?

7  A   Correct.

8  Q   So is that the extent of your knowledge of the interactions

9  between the SD card and a cellular telephone?

10  A   I guess I don't understand specifically what you're asking.

11  Is there --

12  Q   Well, you're being presented as having some knowledge of

13  the inner workings of a cellular telephone and how it interacts

14  with an SD card. My question to you is if you received training

15  on that, and you indicated you received training on a program

16  used to examine those devices. So I'm wondering if you received

17  training on the actual interaction how a cellular telephone

18  interacts with an SD card as opposed to its internal memory, for

19  example.

20  A   The answer to that question would be yes. Although it was

21  a tool that was providing the training on how to use that tool,

22  it was also training. As in most forensics, digital forensics,

23  it's important to understand what the tool is doing. So you're

24  not just pushing a button and coming up with an answer. It's

25  knowing where, what the tool is doing, and where the information

Kozel - Voir dire

1  is coming from, and hopefully what the relevance is and an

2  application to a case.

3       And Paraben was just the first that I had taken training in

4  in 2013. I also was certified and had been using the year

5  before in Cellebrite, which has a similar method of training,

6  which is not just how to use the tool, but what the tool is

7  doing with the device that is being searched.

8  Q   So Cellebrite is another software that you used to examine

9  these devices that we talked about?

10  A   That is correct.

11  Q   Do you use Cellebrite to examine an SD card?

12  A   Yes.

13  Q   And Cellebrite also to examine a telephone?

14  A   That's correct.

15  Q   So what you're saying is because you've used these forensic

16  software programs, it gives you some expertise in the operations

17  of the phone and the SD card?

18  A   Correct. And I also took training through Teel

19  Technologies, which specifically dealt with memory, removing

20  chips, knowing the architecture of a mobile device, identifying

21  the pieces on the motherboard, and being able to -- at the time,

22  we primarily removed those items of memory and then searched

23  those for evidence.

24  Q   You're talking about the internal memory of the cellular

25  phone there, correct?

A101

Kozel - Voir dire

1  A   Correct.

2  Q   The SD card that you talked about here isn't part of the

3  internal memory of the phone, is it?

4  A   No. It's an external item that's inserted into a slot.

5  Q   So the SD card can work externally from the phone?

6  A   Oh, yes.

7  Q   And phone can work exclusive of the SD card?

8  A   Yes.

9  Q   You've learned that through your training and experience?

10  A   Yes.

11       MR. EVANGELISTA: Judge, I do object to his

12  qualifications as an expert in the operations of the telephone

13  and the SD card and how they interact together. I understand

14  he's an expert in the use of Cellebrite and the other forensic

15  software, but I don't think his testimony so far has established

16  him as an expert in either of those.

17       THE COURT: Well, being a dinosaur myself, I am not

18  familiar totally with what he's talking about, but as far as I

19  can see, he has the ability to tell us what the two devices do,

20  that is the CD card and the cellphone, and what happens when the

21  CD card is inserted into the cellphone, how that generates

22  information. So I'm going to overrule your objection and allow

23  him to testify.

24       MS. WILLIAMS: Thank you, Your Honor. May I continue?

25       THE COURT: Wait a minute. There was more to his

Kozel - Direct

1  objection.

2       MR. EVANGELISTA: Judge, it was just a leading

3  question.

4       THE COURT: All right. Don't lead.

5       MS. WILLIAMS: Yes, Your Honor.

6  **DIRECT EXAMINATION BY MS. WILLIAMS:**

7  Q   Mr. Kozel, approximately how many cellphones have you

8  examined during the course of your career in CCU approximately?

9  A   A low estimate would be around 600.

10  Q   And again estimate of how many of those cellphones had SD

11  cards inserted or connected to them?

12  A   That would be a lot more difficult. I would say anywhere

13  between 25 and 50 percent of them.

14  Q   Now, we talked a bit about SD cards and flash media and how

15  SD cards interact with cellphones. Would you consider based

16  upon the interaction as you've testified to between an SD card

17  and a cellphone, is it considered a component of the phone?

18  A   Yes. If it's inserted into the phone, it's a component of

19  it.

20  Q   And I'll come back to that in a second, but why is it

21  considered a component of the phone? More specifically, why

22  would you consider it a component of the phone?

23  A   Because it's attached to it. Because it's included in the

24  device. It's the same as if a SIM card is attached to the

25  device.

Kozel - Direct

1   THE COURT: Okay. What's a SIM card? I know I once
2   had one. I put it into a phone, and I know it worked. I don't
3   know what the hell it is. If you could explain that to me, it
4   might help.
5   THE WITNESS: A SIM card stands for subscriber
6   identity module. It's a small chip that contains some very
7   specific information. There are several different architectures
8   that allow phones to communicate, such as companies such as AT&T
9   use a method that requires a SIM card to identify that phone on
10  the network as being able to communicate as having a
11  subscription.
12  So if you have a SIM card, back in the old days when
13  it was just you needed a SIM card or you didn't to identify
14  yourself on the network, you could take that SIM card, put it in
15  another phone, and that would identify you on that network. So
16  it didn't matter which phone you were on. That was your
17  connection to having AT&T service.
18  Verizon worked out a different architecture, which is
19  CDMA, which didn't need that SIM card. However, with the advent
20  of LTE, the LTE network, almost all phones now, smart phones
21  nowadays have a SIM card, which is not necessarily used to
22  identify like AT&T on a network, but it's used for the overall
23  communication purpose on the network.
24  THE COURT: Okay.
25  THE WITNESS: Basically the SIM card identifies you on

---

Kozel - Direct

1   that my understanding of what you just stated?
2   A   Yes.
3   Q   Is it possible for an SD card's contents to be viewed when
4   it's not connected to any electronic device like a phone or a
5   computer?
6   A   Yes.
7   Q   I'm sorry. You said the contents of an SD card can be
8   viewed when it's not connected to a phone?
9   A   Yes.
10  Q   How so?
11  A   All you need is an external memory card reader, a device
12  that will bridge the gap between a computer and that piece of
13  media.
14  Q   So you need some other device in order to read the contents
15  of an SD card?
16  A   Yes, or you need somewhere to plug it in. Computers now
17  come -- there's different memory card readers that have been
18  built into computers over time. There may be one built right
19  into a computer, or you may just need an external device to
20  bridge the gap.
21  Q   If an SD card was sitting on that desk in front of you
22  right now while you're testifying, by looking at it, could you
23  see its contents?
24  A   No. Not externally. I'm sorry. Ask that again.
25  Q   If an SD card was just sitting on the desk in front of you,

---

Kozel - Direct

1   AT&T's network saying I can talk.
2   THE COURT: I'm sorry.
3   MS. WILLIAMS: That's okay. Thank you, Your Honor.
4   BY MS. WILLIAMS:
5   Q   Specifically what types of information can be stored on an
6   SD card like a photo or a video? What are some examples of
7   information that can be stored on an SD card that's inserted
8   inside of a phone?
9   A   Whatever the operating system will allow for storage there.
10  It can be documents. Can be images. Can be any number of
11  things that could be stored internally, but now that you have a
12  piece of media, an external piece of media attached to it, you
13  can now use that, and the operating system will typically ask
14  you if you want to store it here or you want to store it there.
15  Q   So the user can decide what information they want to be
16  stored on the SD card, on the phone, both, none?
17  A   Through -- if they're storing through the phone itself,
18  then it's whatever the operating system is allowing them to
19  store there.
20  Q   Defense asked you if a phone can operate separate from an
21  SD card, and you said it could. That's correct?
22  A   Yes. I don't think I've come across one that absolutely
23  required it, but back in the old days, they were a much more
24  integral component because of the small internal memory size.
25  Q   So the inception of cellphones, an SD card was common; is

---

Kozel - Direct

1   would you be able to see what data and what contents are on the
2   SD card?
3   A   No.
4   Q   And why is that?
5   A   Because it's digital, and we're analog.
6   Q   Meaning?
7   A   Meaning we need something to display the item.
8   Q   Now, I want to turn to the case at hand. In your position
9   as a senior investigator with the CCU with the State Police of
10  New York, did you have the opportunity to examine a Samsung
11  cellphone for this matter?
12  A   Yes, I did.
13  Q   Now, before I get into that examination, what, if any,
14  paperwork did you review before you conducted your examination
15  of that Samsung cellphone?
16  A   When the item comes into our office, when it's brought in
17  from whoever the investigator is, there is some initial
18  paperwork that's done to bring it into our system. The person
19  bringing it in, bringing the item in or entering it into our
20  system is assigned a case number. They review the documentation
21  that's being provided to make sure that hopefully that we're
22  included on the authorizing document, whatever it is. And if
23  there's any immediate questions that need to be asked, the case
24  agent can be queried then. That information -- it's then taken
25  into evidence and put into storage.

A102

Kozel - Direct

When we begin an examination, we take that out and
initially go through the case paperwork to make sure, double
check. And then also the person doing the examination will
usually call the case agent and make sure that they know what
exactly it is that's being sought and that no major case change
has occurred in the time that has passed. So once as an
examiner, I have gone through that paperwork, then I begin
working on the item itself.

Q    Would you also review a search warrant if a search warrant
is issued for that device?

A    Yes.

Q    And what specifically do you look at in a search warrant
before you conduct an examination of a device?

A    Look to make sure that we are included as a person or
agency authorized to execute the warrant, to execute that
search. And then that whatever identifying numbers were taken
down, we'll compare that to the item itself to make sure that
they're correct, and go through and look at what is specifically
being sought, authorized to be sought through the document.
Occasionally we'll come across errors or things that we're not
sure of, at which point we would contact the case agent and try
to clarify them.

Q    Sure. In this case, did you have any questions or concerns
about what it was that the search warrant authorized you to
search?

Kozel - Direct

A    It appeared very clear.

Q    I'm sorry?

A    It appeared clear.

Q    What was it that you believed or you understood the search
warrant to authorize you to search?

A    The cellphone that had been admitted to us for evidence
regarding failure to register as a sex offender case.

Q    Now, did that search warrant specifically identify an SD
card, a SanDisk SD card?

A    No, it did not.

Q    Did you conduct an examination of a SanDisk SD card
connected to this case?

A    Yes, I did.

Q    Where was that SD card located in the phone?

A    It was inserted in the SD card slot.

Q    Was that observable to you just by looking at the outside
of the phone?

A    Not from the outside of the phone.

Q    Where did you see that SD card or how did you come to see
the SD card?

A    As we continue with an examination, after we've reviewed
the documentation, we take photographs of the item as its being
unpackaged and throughout the process. While I'm unpackaging
it, I'm also completing a hardware tech document that we fill
out with all those numbers that are identifiable on it and list

Kozel - Direct

out anything, any contents that we find that have again numbers
that may be identifiable so that we know what we're talking
about when it comes to reporting.

Some phones, you can open up. A lot of phones now, newer
phones, you can't. They're sealed, and depending on what
process we need to do is whether or not we -- how far we go with
opening them. The ones that are sealed, we do not. The ones
that we're able to, like this one, we take the back case off,
take a photograph, take the battery out, and underneath the
battery is usually an identification label. Then we make sure
that we document. If there are any pieces, parts, or anything
else, that's all documented by photograph as well.

In this case, there was an SD card inserted in that slot,
and there was a SIM card.

Q    Before you attempted an examination of the SD card, did you
attempt to examine the cellphone itself?

A    Yes.

Q    Were you able to conduct a thorough examination of the
cellphone itself?

A    I was not.

Q    Why not?

A    The cellphone was PIN code protected, and I was -- none of
the tools that I had were able to bypass that PIN.

Q    What did you do when you were unable to access the
cellphone to conduct an examination of it?

Kozel - Direct

A    Well, I did check with the lab to make sure that there were
no other processes that they had available for them that I
didn't have available myself, and then I moved on to the pieces
that I could analyze.

Q    Now, I have what's been marked for identification as
Government Exhibit 5.

MS. WILLIAMS: May I approach the witness with this
exhibit?

THE COURT: Yes, you may.

MS. WILLIAMS: Thank you.

Q    I'm handing the witness what's been marked as Government
Exhibit 5 for identification. Mr. Kozel, do you recognize what
I just handed you?

A    Yes. These are photographs that I took of the item while
it was being examined.

Q    I'm sorry?

A    While it was being examined.

Q    And specifically on page 1 of Government Exhibit 5 for
identification, there are two pictures on that page. What are
those pictures of?

A    Page 1, the first photograph is of the front of the item,
and the second photograph is the back of the item.

Q    I forgot to ask you. Is there anything different about
those pictures as you look at them now than when you took them
originally?



Kozel - Direct

1  A   No.
2       MR. EVANGELISTA:  For purposes of the hearing, I have
3  no objection to the introduction of 5 into evidence.
4       THE COURT:  All right.
5       MS. WILLIAMS:  Thank you.
6       THE COURT:  You're welcome.
7  BY MS. WILLIAMS:
8  Q   I'm sorry.  So what are the two pictures on page 1 of
9  Government Exhibit 5?
10      THE COURT:  Did you want to ask me to receive it in
11 evidence?
12      MS. WILLIAMS:  Yes, Your Honor.  Thank you.  I
13 appreciate that, Your Honor.
14      THE COURT:  Receive Government's 5 in evidence.
15      MS. WILLIAMS:  Thank you.
16 Q   What are those two pictures on what's now been admitted as
17 Government Exhibit 5?
18 A   It is the front, the entire front of the item in the
19 packaging and the entire back.
20 Q   Could you turn to page 2.  There are two pictures on that
21 page.  Start with the top picture.  What is that a picture of?
22 A   This is primarily a photo of a document that was enclosed.
23 Q   And what would that be a document of?
24 A   I believe it's one of the federal documents.  Might be a
25 custody.  I'm sorry.  The print is -- I can't read the print on

Kozel - Direct

1  picture of?
2  A   That is a photo of the back with the case and battery
3  removed.
4  Q   Now, above where the battery would be, I see this.  In the
5  picture, it's kind of silver looking.  Is that where the battery
6  would be, that silver square?
7  A   On the top?
8  Q   The bottom picture.
9  A   No.  I'm sorry.  On the top of the phone next to the
10 camera?
11 Q   No.  Below it where the battery would be.
12 A   The large -- yes.  The large area below the lower half is
13 where the battery was.
14 Q   Now, is there an SD card visible in this picture?
15 A   Yes.
16 Q   And where is it in this picture?
17 A   Center right.
18 Q   Would that be just above and to the right of where you said
19 the battery had been taken out?
20 A   Correct.
21 Q   And what color is that SD card as you see it in the
22 picture?
23 A   The SD card is black with white type, white letters.
24 Q   Now, in this picture, how is the SD card attached or
25 connected to the phone?

Kozel - Direct

1  it.
2  Q   We'll move to the bottom picture.  In the bottom picture,
3  there appears to be a phone.  Is that the same phone that we saw
4  in the first page?
5  A   Yes.  That is the contents or the phone and the battery
6  face-up.
7  Q   And who removed that battery?
8  A   The battery was -- I removed it from the package, but the
9  battery was already removed when it was received.
10 Q   I'm going to have you turn to page 3.  What do we see on
11 page 3?  What's the top picture?
12 A   It is the back of the phone and the front of the phone
13 without the safety case.
14 Q   I'm going to have you skip the next page and the page after
15 that.  And now on the page that's before you, there should be
16 two pictures.  What's the top picture?
17      THE COURT:  Let's identify.  What is the page number?
18      MS. WILLIAMS:  I'm sorry.  It's page 6, Your Honor,
19 from Government Exhibit 5.  My apologies.
20      THE COURT:  Thank you.
21 A   I'm sorry.  Can you ask the question again?
22 Q   Sure.  What's the top picture?
23 A   The top picture is a photo of the -- would be the bottom of
24 the phone showing the port.
25 Q   And importantly, the picture below it, what is that a



Kozel - Direct

1  A   It's in the SD port.
2  Q   What do you mean by in the SD port?
3  A   It's been inserted into the slot that -- where it goes,
4  where it makes it usable.
5  Q   Would a user just put the SD card on top, or would they
6  have to insert it into something?
7  A   No.  It has to be pressed down and then inserted forward so
8  the connections are made.
9  Q   And once those connections are made, is that when you're
10 saying the phone would then create a file structure on the SD
11 card?
12 A   It has been my experience that when you insert a new SD
13 card into a mobile device that it has not been in before, then
14 an initial file system is saved to it so that the mobile device
15 can now access that piece of media.
16 Q   And Mr. Kozel, I'll have you turn your attention to page 8,
17 which is not the following page, but the page after that.  And
18 what's on these two pictures?
19 A   The top photo is -- every photo that I take, I try to get
20 the case number in on it.  So the top photo is the back side of
21 the SD card, and then the bottom is a close-up of that SD card
22 under a microscope.
23 Q   I'll have you turn one more page.  In the top of that
24 picture, what is that white square that says Cricket on it?
25 A   That is the SIM card, the subscriber identity module for

Kozel - Direct

1  that phone.

2  Q    Thank you.  I'll retrieve what's now been marked and

3  admitted as Government Exhibit 5 from the witness.

4       Now, Mr. Kozel, you said that you reviewed the search

5  warrant in this case and it did not specifically identify that

6  SanDisk SD card; is that my understanding of your answer to my

7  question?

8  A    The search warrant did not specifically list every

9  component in it.  Just listed the phone.

10 Q    But yet you did search the SanDisk SD card that we see in

11 these pictures; is that right?

12 A    That's correct.

13 Q    Why?

14 A    Because it's part of the overall device.

15 Q    When you say the device, what are you referring to?

16 A    The mobile device, the phone.

17 Q    And when you say that it's overall part of the mobile

18 phone, what makes it part of the mobile phone?

19 A    Because it's durably attached to it.

20 Q    So if the SanDisk SD card were located on this table and it

21 was not attached to the cellphone that we saw in these pictures,

22 would you have believed that the search warrant authorized your

23 search of that SanDisk SD card?

24 A    No.  Typically that would have been included as a separate

25 item of evidence and listed separately on a search warrant.

Kozel - Direct

1  Q    So you would not have searched it under those

2  circumstances?

3  A    Correct.

4  Q    But as you understood them to be in the search warrant you

5  reviewed, you found it appropriate to search the SanDisk SD

6  card?

7  A    Yes.  It was one item of evidence.  The prior item, the

8  item was listed.  It was a cellphone.  Everything attached to it

9  is part of that device.

10 Q    Is it common practice in the CCU, as a former senior

11 investigator of the CCU, to request a separate search warrant

12 for an attached and connected SD card inside of a cellular

13 phone?

14 A    No.

15 Q    Did you have any hesitation whatsoever about your search of

16 that SanDisk SD card as being outside the bounds of the search

17 warrant that you reviewed?

18 A    No, I did not.

19       MS. WILLIAMS:  May I have the moment, Your Honor?

20       THE COURT:  Yes, you may.

21 Q    One other question, Mr. Kozel.  Would you believe that

22 evidence of the crime at issue that generated the search warrant

23 in this case, a violation of the Sex Offender Registry

24 Notification Act, would potentially be located on that SD card?

25 A    Any type of evidence could be located in a variety of forms

Kozel - Direct

1  on an SD card.

2  Q    And specifically because the SD card was inserted inside

3  the cellphone, does that mean that if there's information on the

4  phone related to a violation of that particular offense, would

5  it be more or less likely that it would also be on the SD card?

6  A    Depending on how the operating system was utilizing the --

7  well, the SD card, and for that fact of the matter, the SIM

8  card, evidence that was being sought could be potentially found

9  on any part of that device.

10 Q    Would you know how this specific SD, SanDisk SD card was

11 set up with the phone if you didn't search it?

12 A    No.

13       MS. WILLIAMS:  Thank you, Your Honor.  With that, I

14 have no further questions, and I offer for cross-examination.

15       THE COURT:  Mr. Evangelista.

16       MR. EVANGELISTA:  Thanks, Judge.

17       Can I just use Government 5 with the witness.  He'll

18 probably need it for a little bit.  Judge, I'm just numbering

19 Exhibit 5 so I don't mix up the pages.  I know we referred to

20 specific pages.  They weren't numbered in my copy.  They're not

21 numbered in this copy.  Assist the Court as long as they match

22 up to what we already said.

23       THE COURT:  Okay.

24       MR. EVANGELISTA:  I think it's ten pages; is that

25 right, Rachel?

Kozel - Cross

1        MS. WILLIAMS:  It is.

2        MR. EVANGELISTA:  Judge, can I just approach and have

3  permission to approach?

4        THE COURT:  Yes, you may.

5  CROSS-EXAMINATION BY MR. EVANGELISTA:

6  Q    Retired Investigator Kozel, nice to see you.  Sorry to drag

7  you out of retirement for this.

8        So let me just start here.  I think you said you had no

9  problem searching the micro SD card despite the fact that it

10 wasn't named in the search warrant; is that right?

11 A    That's correct.

12 Q    Now, you knew that when you received the phone, it had been

13 opened before you received it, right?

14 A    Yes.

15 Q    The battery was out?

16 A    Yes.

17 Q    Did you take the battery out?

18 A    I did not.

19 Q    Did the information that was provided to you say how the

20 battery was taken out?

21 A    It did not.

22 Q    So the battery you assumed came from inside the phone,

23 correct?

24 A    Yes.  It was the battery that fit in the phone, yes.

25 Q    So you knew it had been opened?


A105

Kozel - Cross

1  A    Yes.

2  Q    You also know that an SD card is a portable device,

3  correct?

4  A    Yes.

5  Q    The SD card can come from a camera, correct?

6  A    It can.

7  Q    And looking at the outside of the SD card physically, you

8  had no idea whether it was formatted for the phone?

9  A    Not from the outside, no.

10 Q    So you knew nothing about the SD card when you looked at

11 the external physical characteristics of the SD card about what

12 was on it?

13 A    Correct.

14 Q    You knew from the writing it was a 128-gigabyte SD card,

15 correct?

16 A    Correct.

17 Q    But as far as what was on it, you knew nothing?

18 A    Correct.

19 Q    Whether it was formatted, you knew nothing?

20 A    Correct.

21 Q    You knew the phone had been opened before you got it?

22 A    Correct.

23 Q    You didn't know how the SD card got in the phone, correct?

24 A    No.

25 Q    You didn't know if the SD card would even work with the

---

Kozel - Cross

1  phone?

2  A    No.  The direct answer to the question was no.

3  Q    But you didn't know what was on the SD card?

4  A    Correct.

5       THE REPORTER:  Can you speak one at a time?

6  Q    That was my fault.  I have a tendency to do that.  I

7  apologize, Jackie.

8       So you started the investigation, and that's the first time

9  you knew whether or not the SD card was even formatted?

10 A    Correct.

11 Q    Now, let me just deal with this so I don't forget it.  Are

12 you familiar with -- you said you were familiar with the search

13 warrant that was issued in the case in April, I think it was, in

14 2019, correct?

15 A    That's correct.

16 Q    And the search warrant clearly is broken down into two

17 attachments, attachment A and attachment B; is that right?

18 A    If I recall correctly, yes.

19      MR. EVANGELISTA:  Do you want me to use the search

20 warrant that you have or I can use mine?

21      MS. WILLIAMS:  Sure.

22      MR. EVANGELISTA:  Do you have any objection if I offer

23 it?

24      MS. WILLIAMS:  Not at all.

25      MR. EVANGELISTA:  Judge, at this time, I think the

---

Kozel - Cross

1  government's exhibit, I'm going to offer.  I'll offer

2  Government's Exhibit 1, Judge, as strange as that sounds.  It's

3  the search warrant from April 19, 2019.  It's the search warrant

4  that we've been speaking about during examination, Judge.

5       THE COURT:  Any objection?

6       MR. EVANGELISTA:  Judge --

7       THE COURT:  Hold on.  Is there any objection to that

8  offer?

9       MS. WILLIAMS:  No, Your Honor.

10      THE COURT:  Received Government Exhibit 1 in evidence.

11      MR. EVANGELISTA:  Judge, what I was about to say is

12 that it also has with it the application for search warrant.  So

13 we would just clarify.

14      THE COURT:  Is that part of 1?

15      MR. EVANGELISTA:  It's part of 1.

16      THE COURT:  We'll receive it as part of 1.

17      MR. EVANGELISTA:  If there's no objection, Judge.

18      MS. WILLIAMS:  There's no objection, Your Honor.

19      THE COURT:  All right.

20      MR. EVANGELISTA:  May I approach the witness, Judge?

21      THE COURT:  Yes, you may.

22 BY MR. EVANGELISTA:

23 Q    For ease of administration, I've used the Government

24 Exhibit 1, if that's okay with you, Investigator Kozel.

25 A    Very good.

---

Kozel - Cross

1  Q    So it's in evidence.  It's broken down into two

2  attachments, A and B.  I'm talking about the first part, which

3  is the search and seizure warrant itself signed by the judge.  I

4  think we've established attachment A does not specifically

5  mention the SD card at all, correct?

6  A    Correct.

7  Q    Attachment B authorizes -- it tells you what you can search

8  for; is that right?

9  A    Yes.

10 Q    Where in attachment B does it say that you can physically

11 examine the telephone?

12 A    There is item 1.  All records on the subject device

13 described in attachment A.

14 Q    So you can examine what's on the subject device, correct?

15 Forensically?

16 A    Yes.

17 Q    You're talking about what's saved on the device?

18 A    On the item of evidence, yes.

19 Q    Does it authorize you to take the phone apart from the

20 language of that attachment and physically examine the phone?

21 A    I don't know if it specifically authorizes that on here.

22 It's standard practice to on computers, mobile devices, anything

23 you're examining or analyzing to --

24 Q    Let's talk about standard practice for a second.  You've

25 seen a lot of search warrants?

A106

Kozel - Cross

1   A    I'm sorry?

2   Q    You've seen a lot of search warrants?

3   A    Yes.

4   Q    You've seen a lot of search warrants.  On a search warrant

5   for a computer, do you typically see language such as the

6   computer, media storage devices, hard disk drives separately

7   stated in attachment A of these search warrants?

8   A    Sometimes, yes.

9   Q    So it's not standard for it to just assume that everything

10  in the computer or attached to the computer can be searched.  It

11  actually in attachment A on many of these search warrants, it

12  separately lists different media storage devices, correct?

13  A    Are we -- do you want me to refer strictly to federal

14  search warrants?  Because we -- I have seen all variety at

15  length and type of writing and language between our department,

16  municipal departments, and the federal government who we all

17  service.  So they are all -- they're all written a little

18  differently depending on which agency is pushing, producing it.

19  So no.  They do not all look alike, and they do not all use the

20  same wording.

21  Q    Okay.  So for example, in this case, the FBI submitted a

22  search warrant which listed the SD card as a specific item to be

23  searched in attachment A, correct?

24  A    I understand there was a second search warrant issued.  It

25  was after my retirement.

Kozel - Cross

1   Q    Did you get to review that before you took the stand today?

2   A    I have seen it.  I have seen it.

3   Q    Are you aware that it listed separately the SD card?  I

4   think that came up in direct as well.  Were you aware of that?

5   A    I am aware of that.

6   Q    That wouldn't be unusual is what you just said.  Different

7   agencies do different things in their description in the search

8   warrant?

9   A    Correct.

10  Q    The main goal of that description is to make sure that

11  whoever is looking at the search warrant has a clear

12  understanding of what's to be searched?

13  A    What is to be searched and what is to be searched for.

14  Q    So in attachment A, it's what is to be searched?

15  A    Yes.

16  Q    And attachment B then would be what is to be searched for?

17  A    Correct.

18  Q    So again the standard practice you've referred to is that

19  you do a physical search of the phone regardless of whether the

20  search warrant authorizes you to physically search the exterior

21  of the phone.

22  A    I've never seen one that just authorized to examine the

23  exterior of the phone.

24  Q    Well, a lot of phones don't come apart, correct?

25  A    Some don't, correct.

A107

Kozel - Cross

1   Q    I mean they come apart, but not easily?

2   A    Correct.

3   Q    This particular phone, you could take the back off?

4   A    Yes.

5   Q    And obviously someone removed the battery, correct?

6   A    Yes.  That's fairly typical.

7   Q    So in Exhibit 5 at page 7 is a sticker that was found

8   during your physical examination of the telephone.  I keep

9   saying telephone like I'm 100 years old.  Of the cellular phone?

10  A    Correct.

11  Q    Nowhere on that sticker does it say anything about an SD

12  card, correct?

13  A    That is correct.

14  Q    Does it say anything about any other kind of media storage

15  device?

16  A    It does not.

17  Q    Do you know -- and that sticker is not visible if the phone

18  is in one piece, correct?

19  A    Correct.

20  Q    And when you receive the phone, but for the battery being

21  removed, did it appear as it did in the top picture on page 3 of

22  Exhibit 5?

23  A    On page 3, no.  The top photo on page 3 is the back of the

24  device after I removed the case, the protection case.

25  Q    The top of my page 3 is the back of the phone with the case

Kozel - Cross

1   on.

2   A    There's a back cover, but if you look in the first couple,

3   there is a safety cover, safety case around the phone itself.

4   Page 3 is the first photos with that protection cover removed.

5   Q    So when the phone came to you, it was in one piece?  Was

6   the phone in one piece when it came to you?

7   A    Well, the back cover and the case were on, yes.

8   Q    And the battery was outside of that?

9   A    The battery was outside, correct.

10  Q    But you physically had to remove the back cover?

11  A    Yes.

12  Q    And were you aware that there was an SD card within the

13  phone before you removed the back cover?

14  A    No.

15  Q    Were you aware about any of the characteristics of a

16  Samsung phone before, about their ability to have an SD card

17  before you removed the cover?

18  A    If you're asking if I know that every Samsung device has an

19  SD, has an SD card ability, I can't tell you that for sure.

20  Q    So you weren't sure whether or not this particular Samsung

21  phone would have the capability of receiving an SD card before

22  you opened the back cover and saw the SD card?

23  A    Correct.  I mean I could have looked it up in the

24  specifications to see if it was an option, but that really

25  wasn't necessary at that point.

Kozel - Cross

1  Q  So before you searched the telephone either forensically or

2  physically, you read attachment A in the search warrant?

3  A  Yes.

4  Q  When you discovered the SD card upon your physical

5  examination of the phone, did you go back to attachment A to see

6  if it said anything about an SD card?

7  A  No. I knew it didn't.

8  Q  Did you make any calls to the prosecutor or the agent in

9  this case?

10  A  No, because at that time, it wasn't necessary.

11  Q  Because in your opinion, the warrant that you received

12  authorized you to search the SD card?

13  A  It authorizes me to search the Samsung phone, which is all

14  inclusive. It would be -- we would consider that the same as a

15  tower computer or laptop computer where we don't expect that.

16  In fact, we would prefer that the case agent or someone who is

17  untrained not open up it and pull all the hard drives out to

18  list them separately. It's standard, standard practice that

19  everything in a device is part of that device unless it's found

20  separately.

21  Q  So in your testimony, you indicated that. You said if it

22  came separately from the phone, you would have required a search

23  warrant to be provided before you searched it?

24  A  If it was a separate piece of evidence, we would require

25  that the search warrant address each item of evidence.

JACQUELINE STROFFOLINO, RPR
UNITED STATES DISTRICT COURT - NDNY

---

Kozel - Cross

1  MS. WILLIAMS:  I'm sorry. I didn't catch that. Could

2  you repeat that?

3  THE WITNESS:  If I got a hard drive with a cellphone,

4  I would not say that that's a cellphone. I would say that's --

5  what is this?  This obviously doesn't fit in the cellphone.

6  MS. WILLIAMS:  Thank you.

7  BY MR. EVANGELISTA:

8  Q  So if it was -- like if there was like a giant hard drive

9  in there with the cellphone, you would say it wasn't obviously?

10  A  Then I would get ahold of the case agent, but if they're

11  saying that this is a phone and this is what came with it, I

12  would take that as that piece of evidence.

13  Q  Because if that was a giant hard drive in there with a

14  cellphone, you would know that they wouldn't necessarily go

15  together just from physically looking at them?

16  A  Yes. That would be obvious.

17  Q  So you know from physically looking at the hard drive and

18  the phone that they really weren't the same thing, the same

19  item?

20  A  That would be the only thing I could think of that would

21  trigger me assuming that one -- that it was not one item of

22  evidence.

23  Q  When you looked at this SD card, nothing about it told you

24  whether it was -- had been operating with the phone or not,

25  correct?

JACQUELINE STROFFOLINO, RPR
UNITED STATES DISTRICT COURT - NDNY

---

Kozel - Cross

1  Q  So what if it was separate, removed from the phone, but

2  also in the same evidence bag?  What would you do then?

3  A  If it was part of the same item of evidence, we would treat

4  it as an item of evidence. Things such as batteries, SIM cards,

5  and network connecting devices, it's standard triage practice

6  for the investigator or whoever is seizing the item in the field

7  to remove it or make sure that does not have the ability to

8  connect to a network so that we don't get it and it's connected

9  and running and we wouldn't be able to tell what state it was in

10  at the time of the seizure.

11  So I guess the answer, specific answer to your question is

12  if they were saying it was one item of evidence, that's how we

13  would treat it, as one item of evidence, and we would assume

14  that if it were another item found somewhere else, that would be

15  another item of evidence.

16  Q  So if the search warrant names one item of evidence, but

17  the agent -- or I'm sorry. If the search warrant names one item

18  of evidence but the agent provides you with two separate items,

19  as far as you're concerned, if the agent says that's one item,

20  it's one item?

21  A  Yes. The only exception -- I'm sorry. May I say

22  something?

23  THE COURT:  Go ahead.

24  THE WITNESS:  The only exception would be if it was

25  obviously a disparate type of device.

JACQUELINE STROFFOLINO, RPR
UNITED STATES DISTRICT COURT - NDNY



A 108

---

Kozel - Cross

1  A  Not aside from the fact that it was inserted in the phone.

2  Q  I mean the hard drive could be plugged into a phone at some

3  point, right?

4  A  Yeah, with the proper connections. Whether it would be

5  recognized is another thing.

6  Q  So what would you have done if the agent told you, "Listen.

7  The warrant is for the phone only, and the judge only issued it

8  for the phone." Would you have -- and not an SD card if there's

9  one. What would you have done?

10  A  If he said specifically like you said the second time or

11  last time, I would not have examined the SD card.

12  Q  So when the attachment to the search warrant says nothing

13  about an external media device or an SD card or a hard drive or

14  anything other than a specific phone with a specific serial

15  number, you would have no problem searching the SD card?

16  A  I'm sorry. Can you say that one more time?

17  It was confusing.

18  You knew that the search warrant didn't mention the SD

19  card, right?

20  A  That is correct.

21  Q  You knew that the search warrant specifically said a

22  Samsung cellular telephone and gave a specific serial number?

23  A  Correct.

24  MR. EVANGELISTA:  Judge, I think that's all. Thank

25  you.

JACQUELINE STROFFOLINO, RPR
UNITED STATES DISTRICT COURT - NDNY

Kozel - Redirect

THE COURT: Redirect?

MS. WILLIAMS: Yes, Your Honor. May I have a brief moment?

THE COURT: Sure.

MS. WILLIAMS: Thank you.

REDIRECT EXAMINATION BY MS. WILLIAMS:

Q   Just to clarify, Mr. Kozel, did any agent or law enforcement officer tell you that the SD card had not been connected to the cellphone or was for a different device than the Samsung cellphone that was also collected in evidence and presented to you for examination?

A   No.

Q   Did you have any indication that this SD card was for some other device in fact?

A   No.

Q   And when you would conduct a forensic examination on the SanDisk SD card, would you see the file structure set up for it by the Samsung cellphone?

A   I would see the file structure.  I would not know if it were specifically from the Samsung cellphone without trial.

Q   How many file structures did you see?

A   Without reviewing the actual extraction at this point, I could not tell you.  It's been too far, too far long since and it's not something that I specifically noted.

Q   To be clear, you had no information that that SD SanDisk or

JACQUELINE STROFFOLINO, RPR
UNITED STATES DISTRICT COURT - NDNY

Kozel - Recross

SanDisk SD card had been connected to or attached to any other device besides the Samsung cellphone that was submitted in evidence along with that SD card?

A   Correct.  If I had noticed any irregularities in the file system, I would have noted it.

MS. WILLIAMS: Thank you.  I have no further questions.

THE COURT: Recross?

RECROSS-EXAMINATION BY MR. EVANGELISTA:

Q   In order for the battery to get out of the phone, the back had to be opened?

A   Correct.

Q   And you don't know who did that, correct?

A   I do not.

Q   You don't know whether that person observed the back of the phone when they took the battery out?

A   I do not.

MR. EVANGELISTA: Nothing further, Judge.

THE COURT: Further?

MS. WILLIAMS: No, Your Honor.

THE COURT: Thank you, Agent Kozel.  You may step down, sir.

Ms. Williams.

MS. WILLIAMS: Yes, Your Honor.  The government will next call Deputy United States Marshal Rob Imburgio.  May I

JACQUELINE STROFFOLINO, RPR
UNITED STATES DISTRICT COURT - NDNY

A109

Imburgio - Direct

retrieve him from the hallway, Your Honor?

THE COURT: All right.  Why don't you get him.

MS. WILLIAMS: Thank you.

THE CLERK: Please come forward to be sworn.  Would you state your full name for the record, please.

THE WITNESS: Robert John Imburgio.

THE CLERK: Spell your last name.

THE WITNESS: I-m-b-u-r-g-i-o.

THE CLERK: Thank you.  Please raise your right hand.

ROBERT IMBURGIO,

having been first duly sworn as a witness, was examined and testified as follows.

THE CLERK: Thank you.  If you'll take the witness stand, please.  Robert John Imburgio, I-m-b-u-r-g-i-o.

DIRECT EXAMINATION BY MS. WILLIAMS:

Q   Good afternoon.  How are you?

A   I'm good.  How are you?

Q   Thank you.  Could you please state what your current title is?

A   Deputy United States Marshal.

Q   And where are you currently assigned?

A   The Northern District of New York, Albany office.

Q   Were you a case agent or an investigator in the case that's now at this hearing involving Eric William Tompkins?

A   Yes.

JACQUELINE STROFFOLINO, RPR
UNITED STATES DISTRICT COURT - NDNY

Imburgio - Direct

Q   And in this case, did you happen to retrieve from Mr. Tompkins a silver Samsung cellphone?

A   I did.

Q   When you retrieved that cellphone from Mr. Tompkins, can you describe how many pieces that cellphone was in?

A   It was in one piece.

Q   Do you happen to know whether or not the battery was attached or removed from the cellphone when you retrieved it from Mr. Tompkins?

A   He was able to access it.  So the battery had to be attached.

Q   When you say that Mr. Tompkins accessed the phone, can you tell me what you mean by that?

A   Sure.  So he was not allowed to have custody of it while he was in our cellblock here.  I asked Mr. Tompkins if he needed phone numbers out of the phone.  He stated that he needed I believe his aunt's number and possibly one or two other numbers.  I think his girlfriend.  So I handed him the phone.  He accessed it, and I wrote down the numbers on a piece of paper for him.

Q   Did you observe Mr. Tompkins take out the battery of the phone?

A   No.

Q   You didn't take out the battery of the phone?

A   No.

Q   I'm going to retrieve Government Exhibit 5, the pictures.

JACQUELINE STROFFOLINO, RPR
UNITED STATES DISTRICT COURT - NDNY

Imburgio - Direct

A    I have them up here.

Q    I'm sorry.  They're up there.  Showing the witness
Government Exhibit 5 for the record, do you recognize what's in
those pictures?

A    Yes.  This appears to be the phone.

Q    And when you say the phone, what do you mean by that?

A    The phone that we took from Mr. Tompkins.

Q    And in reviewing those pictures, is there anything
different about the phone than how you recall it being?

A    Here, it looks like the battery is out of it.

Q    Do you know who took the battery out of the phone?

A    I do not.

Q    When you collected the -- I'm sorry.  Retrieving Government
Exhibit 5.

     When you collected Mr. Tompkins's cellphone, what did you
do with it?

A    So I took custody of it.  I spoke with my supervisor, who
is our office evidence custodian.  We placed it in an evidence
bag, and he locked it in our evidence room until the time where
I took it over to State Police lab.

Q    When you took it over to the State Police, was the battery
inside the phone or outside the phone?

A    It was, and it was sealed in the evidence bag.

Q    I'm sorry.  The battery was inside the phone?

A    Yes.

---

Imburgio - Cross

Q    You said that phone was sealed inside the evidence bag?

A    That's correct.

Q    Did you happen to see a SanDisk SD card inside the phone?

A    I did not.

Q    Did you happen to know whether an SD, a SanDisk SD card was
inside of the phone at all?

A    I had no knowledge of that yes or no.

Q    So from your recollection, the phone went from Mr. Tompkins
to you to your supervisor?

A    That's correct.

Q    And then to the CCU?

A    Yes.  It was transferred to me, and I took it to CCU.

     MS. WILLIAMS:  A moment, Your Honor.  I have no
further questions.  I offer for cross-examination, Your Honor.

     THE COURT:  All right.  Mr. Evangelista.

CROSS-EXAMINATION BY MR. EVANGELISTA:

Q    Is Government 1 still up there, Deputy?

A    Yes.  I believe it is.

Q    Government 1 is the search warrant and seizure warrant and
application for the Samsung SM-J336AZ cellphone; is that right?

A    I believe so, yes.

Q    Were you a participant in the preparation of this warrant?

A    I was, yes.

Q    Where did the -- do you know where the serial number came
from?

---

Imburgio - Cross

A    Not off the top of my head.  I would assume that it would
have been taken off of the phone when we seized it.

Q    So are you saying it was on the outside of the phone?

A    I'm not sure off the top of my head, no.

Q    You have Government Exhibit 5 there.  On page I think it's
7, it lists the serial number on the sticker.  I'll bring it up
to you.

     MR. EVANGELISTA:  Sorry.  May I approach, Judge?

     THE COURT:  Yes.

Q    Handing you page 7, 8, 9, 10 of Government 5.  I've left
the remainder up here for you.  On page 7, the picture with the
sticker has the Social Security number on it, correct?

A    I'm sorry.  The Social Security number?

Q    Social Security number.  The serial number, the S/N number.
Phones are almost people, but we don't give them Social Security
numbers yet.

A    It appears to be there, yes.

Q    And that number actually matches the number in the caption
of the search and seizure warrant; is that right?  R28K and so
on?

A    Yes, it does.

Q    Did you provide that number to the government to put into
the search and seizure warrant?

A    I don't recall off the top of my head where we got the
actual serial number from.

---

Imburgio - Cross

Q    Looking through those pictures, can you identify anywhere
on the exterior of the phone where the serial number is located?

A    No.  From these pictures, I do not see any on the exterior
anywhere.

Q    About how many search warrants for Samsung cellular phones
have you prepared in your nine-year career as an investigator
deputy with the Marshal Service?

A    It's actually ten years, but this was my first one of this
nature.

Q    Since then, have you prepared any other search warrants in
the same, like for a Samsung cellular phone?

A    No, I don't believe so.

Q    Did you look to a form or some other -- get some other
assistance in preparing --

     MS. WILLIAMS:  Objection, Your Honor.  Outside the
scope of direct examination.

     THE COURT:  Well, hold on a second.  He took the phone
from the defendant, gave it to his supervisor.  It was locked in
the building where they are.  Then he took it to the state.  So
the question has to do with if he looked to a form to get some
assistance in preparing for what?

     MR. EVANGELISTA:  Judge, this witness prepared and
signed and swore to the search warrant application that's in
evidence as Government Exhibit 1.

     THE COURT:  I think that's proper because he testified

A 110

1 he worked on preparing the warrant. Overruled.

2 MS. WILLIAMS: If I may, Your Honor, on direct

3 examination, I only limited the scope of this witness's

4 testimony to collecting the phone and turning it over to a

5 supervisor. We didn't get into the discussion of the search

6 warrant affidavit that he did prepare in this matter.

7 THE COURT: But at some point in time, you asked if he

8 worked on the search warrant application with the government.

9 He said he did, right?

10 Did you work on the preparation of the warrant?

11 THE WITNESS: I did.

12 THE COURT: You did. So that gives Mr. Evangelista

13 the ability to ask the question he's asking.

14 MS. WILLIAMS: Yes, Your Honor.

15 BY MR. EVANGELISTA:

16 Q Did you have any assistance, this being your first

17 cellular, Samsung cellular phone warrant, did you have any

18 assistance in preparing the warrant?

19 A Yes. I coordinated with the US Attorney's Office.

20 Q Did you cut and paste from other warrants in order to put

21 this application together?

22 A I believe I consulted with Alicia Suarez, and she prepared

23 most of the search warrant from our discussions, and then I read

24 it and signed it.

25 Q So as part of that warrant, you described the property, the

---

1 property to be searched; is that right?

2 A That's correct.

3 Q And in Exhibit 1, that's known as attachment A; is that

4 right?

5 A I would have to take a look, but I assume you're correct.

6 Q Page 3, attachment 1 or Exhibit 1, attachment A?

7 A That's correct.

8 Q And nowhere in attachment A does it mention the search of

9 the SanDisk SD card which was eventually searched; is that

10 right?

11 A That's correct.

12 Q But your experience in writing warrants was nothing before

13 this. So you can't tell me whether or not that's typically

14 included in the attachment A or not typically included, correct?

15 A This was my first warrant. That's correct, of this nature

16 anyway.

17 Q Did you conduct any search of the phone pursuant to the

18 warrant?

19 A I did not.

20 Q Did you do a physical search of the phone?

21 A I did not.

22 Q And it's your testimony that you weren't aware that the

23 Samsung telephone even had the capability of accepting an SD

24 card?

25 A I don't know the ins and outs of the interior of every



---

1 phone.

2 MR. EVANGELISTA: Nothing further, Judge.

3 THE COURT: Redirect?

4 MS. WILLIAMS: Yes, Your Honor.

5 REDIRECT EXAMINATION BY MS. WILLIAMS:

6 Q In preparing your affidavit to support this particular

7 search warrant, did you consult with anyone in addition to AUSA

8 Alicia Suarez?

9 A I believe I may have spoken with some of the other

10 investigators in my office or within the Marshal Service.

11 Q What about Mr. Greggoire, for example?

12 A I think I may have spoken with Mr. Greggoire. He's also in

13 the Northern District, although he's in our Syracuse office.

14 Q What is his title?

15 A His title has recently changed. He is the district sex

16 offender coordinator.

17 Q At this time during this search warrant, what was his

18 title?

19 A Sex offender investigations coordinator. It's essentially

20 the same title.

21 Q And how is that position in relation to your position? Is

22 he a supervisor, coworker?

23 A At the time, he was one promotional level above where I

24 was. Now, they've restructured us a bit. So we're technically

25 the same grade.

---

1 Q Are you forensically trained?

2 A I am not.

3 Q Have you received any instruction on Cellebrite

4 exams?

5 A No. I mean I'm aware of vaguely what Cellebrite

6 is, but I have no expertise in it. I've never used it.

7 Q Do you understand what all of the component parts are of a

8 cellular phone?

9 A No.

10 Q Or a computer for that matter?

11 A No.

12 Q Would you intend on any device like an SD card to be part

13 of a cellphone?

14 MR. EVANGELISTA: Objection, Your Honor. Speculation.

15 THE COURT: I'm not sure I understand the question.

16 Why don't you rephrase it.

17 Q Do you consider an SD card to be part of a cellphone?

18 A Yes.

19 Q Why is that?

20 A I'm not -- I don't know the ins and outs of a cellphone,

21 but I'm not sure if it can even store any kind of memory with or

22 without it. To my understanding, it's a piece of a cellphone.

23 Q So when you wrote the search warrant in coordination and

24 consultation with AUSA Suarez and other supervisors and

25 investigators in your office, did you intend for this search to

Imburgio - Recross

1  encompass just the exterior of the phone itself?

2  A    No.  We intended it to include the SD card as well of

3  course.

4        MS. WILLIAMS:  I have no further questions.

5        THE COURT:  Mr. Evangelista.

6        MR. EVANGELISTA:  Judge, just briefly.

7  RECROSS-EXAMINATION BY MR. EVANGELISTA:

8  Q    So you consider it to be part of the phone, right, the SD

9  card?

10 A    That's right.

11 Q    But you concede you know nothing about how the SD card and

12 the phone interact with each other?

13 A    No.  I don't have any technical knowledge of that.

14 Q    So how does the phone -- what does the phone do with the SD

15 card?

16 A    All I know is it has something to do with the memory.

17 Q    So how does the phone talk to the SD card?

18 A    I have no idea.

19 Q    Does the phone work without the SD card?

20 A    I don't know.

21 Q    Does the SD card work without the phone?

22 A    I believe there are ways to access an SD card without the

23 phone, but again I don't have any technical knowledge on how

24 they can do --

25 Q    Does the phone come with an SD card?

JACQUELINE STROFFOLINO, RPR
UNITED STATES DISTRICT COURT - NDNY

Imburgio - Recross

1  not as an expert, but in his capacity as the deputy marshal.  So

2  I'm going to allow him to answer that question.

3        Do you remember the question?

4        MR. EVANGELISTA:  I do, Judge.  I don't really care

5  whether his phone --

6  BY MR. EVANGELISTA:

7  Q    Do you know if all phones have SD cards?

8  A    I don't know.

9  Q    I'm just trying to get to the basis of your statement that

10 you consider this SD card to be part of the phone.  So what is

11 your basis for that statement?

12 A    That's my understanding that it is a component of the

13 phone.

14 Q    And then you said you intended the warrant to include the

15 SD card of course.  You said that on direct, correct?

16 A    That's correct.

17 Q    You didn't know the SD card existed, right?

18 A    I did not.

19 Q    Did you look in the back of the phone before you wrote the

20 warrant?

21 A    No.

22 Q    Did you open the phone before you assisted with writing the

23 warrant?

24 A    As in take it apart, no.

25        MR. EVANGELISTA:  Nothing further.

JACQUELINE STROFFOLINO, RPR
UNITED STATES DISTRICT COURT - NDNY

Imburgio - Recross

1  A    I assume so, but I don't know that for sure.

2  Q    Why would you assume that?

3  A    I would assume that because I've never had to buy an SD

4  card for my telephone specifically, but I don't know that

5  particular cellphone.

6  Q    What kind of phone do you have?

7  A    I have a cellphone.  I don't know that it's the same model.

8  Q    Do you even know if your phone has an SD card?

9  A    I don't.

10 Q    Do you know if all phones have SD cards?

11       MS. WILLIAMS:  Objection.

12       MR. EVANGELISTA:  Judge, he's made an opinion about

13 knowing that the SD card is part of the phone of course, I think

14 was his words.

15       THE COURT:  Overruled.

16 A    I'm sorry.  Can you repeat that?

17 Q    So do you know if your phone even has an SD card?

18 A    I don't know.

19       MS. WILLIAMS:  Objection.

20       THE COURT:  Hold on.

21       MS. WILLIAMS:  It is irrelevant whether this witness's

22 phone has an SD card, and the government has not qualified this

23 witness as a forensic expert.

24       THE COURT:  I understand that.  He can ask questions

25 that probe into an opinion that he gave while he was testifying

JACQUELINE STROFFOLINO, RPR
UNITED STATES DISTRICT COURT - NDNY

A 112

Imburgio - Redirect

1        THE COURT:  Redirect?

2        MS. WILLIAMS:  Yes, Your Honor.

3  REDIRECT EXAMINATION BY MS. WILLIAMS:

4  Q    Is Exhibit 1, the search warrant, still on the witness

5  stand?

6  A    Yes, it is.

7        MS. WILLIAMS:  I'm sorry.  A moment, Your Honor.

8        THE COURT:  That's okay.

9  Q    Could you please turn to page 7 of Government Exhibit 1.

10 Are you on that page?

11 A    I am.

12 Q    Do you see a caption that says technical terms on that

13 page?

14 A    I do.

15 Q    And is this part of the affidavit that you swore to before

16 Judge Stewart?

17 A    It is.

18 Q    And that you consulted with AUSA Suarez on?

19 A    Yes.

20 Q    Can you turn to page 8?  And you'll see paragraph B on that

21 page.

22 A    I do.

23 Q    Can you please read the first two sentences that start with

24 digital camera?  Can you read that out loud, please?

25 A    Yes.  Digital camera:  A digital camera is a camera that

JACQUELINE STROFFOLINO, RPR
UNITED STATES DISTRICT COURT - NDNY

1  records pictures as digital picture files rather than by using
2  photographic film. Digital cameras use a variety of fixed and
3  removable storage media to store their recorded images.
4  Q   And what is removable storage media to your understanding?
5  A   My understanding is that is something in the nature of that
6  SD card.
7  Q   And when you wrote in your affidavit this section about
8  digital cameras, were you saying that a cellphone has that type
9  of quality?
10 A   Yes.
11 Q   I'm also going to direct your attention to paragraph C on
12 page 8. Can you read that paragraph for the record, please?
13 A   Sure. Portable media player: A portable media player or
14 MP3 player or iPod is a handheld storage device designed
15 primarily to store and play audio, video, and photographic
16 files. However, a portable media player can also store other
17 digital data.
18        (Reporter clarification.)
19 Q   I believe that will start with the sentence that begins
20 with some.
21 A   Some media players can also use removable storage media.
22 Removable storage media include various types of flash memory
23 cards or miniature hard drives. This removable storage media
24 can also store any digital data. Depending on the model, a
25 portable media player may have the ability to store large -- I'm

---

1  sorry, very large amounts of electronic data and may offer
2  additional features such as a calendar, contact list, clock, or
3  games.
4  Q   And on the next page, on page 9, there's also a paragraph
5  that says GPS?
6  A   Yes.
7  Q   Were you also stating that a phone can act like or has GPS
8  qualities?
9  A   Yes.
10 Q   And in paragraph E, there's a paragraph titled PDA or
11 personal digital assistant. Are you also saying that PDAs or
12 that cellphones can act like PDAs?
13 A   Yes.
14 Q   I'm going to draw your attention to about halfway down that
15 paragraph, and there's a sentence that begins at the end of the
16 a line with, "PDAs usually include." Do you see where I am?
17 A   I do.
18 Q   Can you read that, those three sentences, please?
19 A   PDAs usually include a memory card or other removable
20 storage media for storing data and a keyboard and/or touch
21 screen for entering data. Removable storage media include
22 various types of flash memory cards or miniature hard drives.
23 Q   One more sentence.
24 A   This removable storage media can store any digital data.
25 Q   And I'm going to draw your attention now to paragraph 22,



---

1  which is on page 11, paragraph 22. Can you read the first
2  sentence, please?
3  A   Based on my training, experience, and research, I know that
4  the subject device has capabilities that allow it to serve as a
5  wireless telephone, digital camera, portable media player, GPS
6  navigation device, and PDA.
7  Q   And the next sentence, please?
8  A   In my training and experience, examining data stored on
9  devices of this type can uncover, among other things, evidence
10 that reveals or suggests who possessed or used the device as
11 well as where and when they possessed and used the device.
12 Q   So can you explain to the Court based upon what you just
13 read why you believed an SD card could be searched in a search
14 warrant for the phone?
15 A   The intention was to see if there was any data on the phone
16 that led to specific location information.
17 Q   And why was that important for this investigation?
18 A   Because the purpose of the investigation was to prove that
19 Mr. Tompkins was residing and -- was residing in a place where
20 he had not registered as a sex offender.
21 Q   And you're aware that the search warrant must describe
22 places where you believe that information would be located?
23 A   That's correct.
24 Q   And you believe that information would be located where?
25 A   Within the phone.

---

1  Q   To also include what, if anything?
2  A   The SD card.
3        MS. WILLIAMS: I have no further questions, Your
4  Honor.
5        THE COURT: Mr. Evangelista.
6        MR. EVANGELISTA: Just briefly.
7  RECROSS-EXAMINATION BY MR. EVANGELISTA:
8  Q   You didn't know how this phone stored any of the
9  information gathered from any of these sources, right?
10 A   I'm sorry?
11 Q   So the phone, how many different ways can a Samsung phone
12 store electronic data from a GPS?
13 A   I don't know specifically how many different ways.
14 Q   Can it store it on internal memory?
15 A   It may be able to.
16 Q   Can it store it into the web?
17 A   I don't know. It may be able to.
18 Q   Can it store it on an SD card?
19 A   I believe so.
20 Q   So you know it can store it on an SD card, but don't know
21 whether it has internal memory?
22 A   I don't know that for certain.
23 Q   You don't know whether it can store Wi-Fi to the web?
24        MS. WILLIAMS: Objection, Your Honor.
25        MR. EVANGELISTA: Judge, I don't --

1    THE COURT: He's probing as to what the basis is for

2  his statement that he believes memory can be stored on an SD

3  card. So he's asking him how the other memory functions of a

4  cellphone work to point out that he may not have known that the

5  SD card stores memory. Is that the purpose of your question?

6    MR. EVANGELISTA: Judge, yes.

7    THE COURT: So overruled.

8    MS. WILLIAMS: May I add one more point, Your Honor,

9  to the objection?

10    THE COURT: Sure.

11    MS. WILLIAMS: As the defense has elicited, this

12  expert is not testifying -- I'm sorry. This witness is not

13  testifying as an expert witness, and in fact --

14    THE COURT: No. He's testifying as somebody who took

15  the phone from the defendant and passed it on to the state

16  forensic analyzers. I understand that.

17    MS. WILLIAMS: Yes, Your Honor.

18    THE COURT: And the record reflects that.

19    MS. WILLIAMS: Yes, Your Honor.

20    THE COURT: Any objection?

21    MR. EVANGELISTA: Judge, I would move to strike any

22  statement of opinion he gave regarding the operations of the

23  phone and the SD card.

24    THE COURT: Well, if you happen to own a phone and

25  you're not qualified as an expert, you certainly know something

1  about how the phone works, don't you?

2    MR. EVANGELISTA: Yes, Judge.

3    THE COURT: That's how he's testifying.

4    MR. EVANGELISTA: With that clarification, Judge, may

5  I continue? Just briefly, Judge.

6    THE COURT: Go ahead.

7  BY MR. EVANGELISTA:

8  Q   You didn't know whether this phone had an SD card in it,

9  correct?

10  A   I did not know.

11  Q   The language that was just read to you is not from your

12  pen. It's boilerplate, right?

13  A   I don't know that for certain. I think it may be

14  boilerplate. It was based on conversation I had with the US

15  Attorney's Office.

16  Q   Do you think this language was made up specifically? You

17  swore to is this. Is this language coming from your head?

18  A   It's based on my consultation with the US Attorney's

19  Office.

20  Q   So it's coming from their heads?

21  A   It's a compilation of our conversations. It's both of us.

22  Q   And just so it's clear, you did not know whether this phone

23  used an SD card to store anything?

24  A   I did not know that for certain, no.

25    MR. EVANGELISTA: Thank you. Nothing further, Your

**A 114**

1  Honor.

2    THE COURT: Redirect?

3    MS. WILLIAMS: No redirect, Your Honor.

4    THE COURT: Okay. Thank you. You can step down.

5  Who's next, Ms. Williams?

6    MS. WILLIAMS: At this point, I believe based upon the

7  testimony elicited today, there is not a need for a Franks

8  hearing.

9    Specifically the defense raised in their motion that

10  Special Agent Brian Seymour utilized bad faith in intentionally

11  misleading United States Magistrate Judge Daniel Stewart in

12  authorizing a search of an SD card. In the government's

13  understanding of the Franks case, the defense must first put

14  forth some offer of proof of this intentional bad faith, which

15  the government contends the defense has not.

16    Subject to the Court's ruling, and the government does

17  have Agent Seymour outside, but the government would first

18  request this Court issue a ruling as to whether or not a Franks

19  hearing is necessary to pursue that matter.

20    THE COURT: What do you say, Mr. Evangelista?

21    MR. EVANGELISTA: Judge, we never accused Mr. Seymour

22  of acting in bad faith. What I did say in my motion was the

23  language the government used in the second search warrant

24  glossed over in my opinion what really the search warrant issued

25  a search for. It said the subject device, parenthetically

1  inclusive of the phone and the SD card.

2    Nowhere -- I mean the government infers that that's

3  what the first warrant said, but nowhere in the first warrant

4  does it say that Judge Stewart authorizes a search of the phone

5  and defined the subject device as anything more than what's

6  listed in attachment A in the first affidavit or first search

7  warrant.

8    So we didn't even seek a Franks hearing. We didn't

9  seek to say the second search warrant was done in bad faith. We

10  used that information to show the Court that they recognized

11  there was a problem with the first search warrant, and they --

12    THE COURT: Not at the time the first search warrant

13  was drawn.

14    MR. EVANGELISTA: Correct.

15    THE COURT: And the search was made. Later on, they

16  decided, well, maybe we should get a second warrant.

17    MR. EVANGELISTA: When they decided in the second

18  warrant to include the card in the affidavit or the part A of

19  the search warrant, I believe that they tried to expand what the

20  first search warrant authorized them to search by including the

21  language that I referenced in my memo. I'm not accusing anyone

22  of bad faith. It's just --

23    THE COURT: There's no bad faith in drawing the

24  warrant.

25    MR. EVANGELISTA: Correct, Judge.

USA v. Tompkins - 20-CR-37

1  THE COURT:  What you're saying is that the impropriety
2  occurred when they searched the CD card without having been
3  listed in the warrant.

4  MR. EVANGELISTA:  I'm not saying that it was even an
5  impropriety, Judge.  I'm saying is they put in that second
6  warrant what they are wishing that the first warrant said, but
7  the first warrant's language didn't say anything about the
8  subject device being defined as the phone and the SD card.  It's
9  not in there.

10  THE COURT:  But you're asking for suppression based on
11  the fact that a search was made following the execution of the
12  first warrant, which did not mention the CD card, right?

13  MR. EVANGELISTA:  The SD card, yes, sir.

14  THE COURT:  That's what you're here for.

15  MR. EVANGELISTA:  Correct.

16  THE COURT:  Do you object to that?

17  MS. WILLIAMS:  No, Your Honor.  As long as we're
18  taking the defense's position today that there was no bad faith
19  on the part of the government or its agents, because in the
20  defense's submissions, it states that the second warrant
21  intentionally misled the Court about what property was to be
22  searched.

23  THE COURT:  I didn't see that at all.  I'm getting to
24  the point where I'm a little bit confused about all the
25  different claims, but I didn't remember in the papers that the

---

USA v. Tompkins - 20-CR-37

1  defense was claiming that the government in bad faith either
2  sought the first warrant or sought the second warrant.  I think
3  the claim is that the government in seeking the second warrant
4  tacitly acknowledged that the first warrant didn't cover the
5  search of the CD card.  That's what I took from it.  Whether
6  that's right or wrong, I don't know.

7  MR. EVANGELISTA:  Judge, also whether or not the first
8  warrant included the SD card or not in the definition of subject
9  device has nothing to do with probable cause to issue the second
10  warrant.  The probable cause to issue the second warrant, which
11  I think would be the issue for a Franks hearing, it was derived
12  from what we say was an unlawful search of the SD card, but it's
13  not bad faith.  That's my interpretation.

14  THE COURT:  That's why I think the government is
15  interested in making sure you're not claiming bad faith.

16  MS. WILLIAMS:  That's correct.

17  THE COURT:  I think that's clear now they're not.

18  MS. WILLIAMS:  Yes, Your Honor.

19  THE COURT:  So you don't want to have to call this
20  guy, right, Seymour?

21  MS. WILLIAMS:  No, Your Honor.  As long as the
22  representations today are that the defense is not claiming bad
23  faith, which I think we have now confirmed.

24  THE COURT:  Right.

25  MS. WILLIAMS:  Yes, Your Honor.

*A 115*

---

USA v. Tompkins - 20-CR-37

1  THE COURT:  So what's next?

2  MS. WILLIAMS:  The government has no further witnesses
3  to call.  May I have a moment, Your Honor?

4  THE COURT:  Okay.

5  MS. WILLIAMS:  No further witnesses, Your Honor.  With
6  that, the government rests.

7  THE COURT:  Does the defense have witnesses?

8  MR. EVANGELISTA:  Maybe, Judge.  Judge, the
9  government's witness list obviously included Agent Seymour and
10  Agent Martin.  I would at this point like to introduce the
11  search warrant and seizure warrant and application that Agent
12  Seymour produced.  If I introduce that, I don't believe I need
13  to call him as a witness.

14  MS. WILLIAMS:  No objection to that introduction, Your
15  Honor.

16  THE COURT:  Do you want to offer those?

17  MR. EVANGELISTA:  Judge, I have marked as Defense
18  Exhibit 1 the search warrant and seizure warrant and application
19  prepared by Agent Seymour, which on its face names the phone and
20  the SD card.  I think that's been beaten.

21  THE COURT:  The Court will receive Defendant's
22  Exhibit 1 in evidence for purposes of the hearing.

23  MR. EVANGELISTA:  Judge, can I just have a moment --

24  THE COURT:  Sure.

25  MR. EVANGELISTA:  -- to go through my paperwork --

---

USA v. Tompkins - 20-CR-37

1  THE COURT:  Sure.  Take a look.

2  MR. EVANGELISTA:  -- for Seymour and Special Agent
3  Martin?  Judge, Courtney is here from my office.  She helped me
4  on my brief.

5  THE COURT:  That's fine.

6  MR. EVANGELISTA:  All right, Judge.  With the
7  admission of that August search warrant, Defense 1, Judge, the
8  defense has no further witnesses.

9  THE COURT:  So the government has rested, and the
10  defense has rested; is that right?

11  MS. WILLIAMS:  That's correct, Your Honor.

12  MR. EVANGELISTA:  Yes.

13  THE COURT:  Does anybody want to make closing
14  argument, or do you want to waive those?

15  MS. WILLIAMS:  The government will make a closing
16  argument, Your Honor.

17  THE COURT:  All right.  You get to go first.

18  MR. EVANGELISTA:  Is the Court intent on issuing a
19  decision today?  If not, I would prefer to make our closings in
20  written form to brief the additional facts that came out.

21  THE COURT:  All right.  How long do you want to take?
22  I'm not going to do it this afternoon.  So how long do you want
23  to take to submit some kind of a writing?

24  MR. EVANGELISTA:  I'd like to get the transcript,
25  Judge, and then just have a week after that.

USA v. Tompkins - 20-CR-37

1  THE COURT: Ask the stenographer how long it will

2  take.

3  MR. EVANGELISTA: How long do you think it will take

4  to get the transcript without paying extra?

5  THE REPORTER: Early next week would be fine.

6  MR. EVANGELISTA: Two weeks, Judge, or three weeks.

7  THE COURT: Three weeks?

8  MR. EVANGELISTA: Yes, sir. If the government would

9  prefer to make --

10  MS. WILLIAMS: No objection, Your Honor.

11  THE COURT: You'd like to submit a writing as well?

12  MS. WILLIAMS: Yes, Your Honor.

13  THE COURT: Would you like to submit it a week after

14  he submits his?

15  MS. WILLIAMS: Yes, Your Honor.

16  THE COURT: So ordered. Anything further from

17  anybody?

18  Court stands adjourned in this matter.

19  (The matter adjourned at 3:42 p.m.)

20

21

22

23

24

25

JACQUELINE STROFFOLINO, RPR
UNITED STATES DISTRICT COURT - NDNY

---

USA v. Tompkins - 20-CR-37

1  CERTIFICATION OF OFFICIAL REPORTER

2

3

4  I, JACQUELINE STROFFOLINO, RPR, Official Court Reporter,

5  in and for the United States District Court for the Northern

6  District of New York, do hereby certify that pursuant to Section

7  753, Title 28, United States Code, that the foregoing is a true

8  and correct transcript of the stenographically reported

9  proceedings held in the above-entitled matter and that the

10  transcript page format is in conformance with the regulations of

11  the Judicial Conference of the United States.

12

13  Dated this 16th day of November, 2020.

14

15  /s/ JACQUELINE STROFFOLINO

16  JACQUELINE STROFFOLINO, RPR

17  FEDERAL OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25

JACQUELINE STROFFOLINO, RPR
UNITED STATES DISTRICT COURT - NDNY

---

USA v. Tompkins - 20-CR-37

1  INDEX TO WITNESSES

| GOVERNMENT: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Peter Kozel | 4 | 8 | | |
| | 12 | 28 | 41 | 42 |
| Robert John Imburgio | 43 | 46 | 51 | 53 |
| | | | 56 | 60 |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JACQUELINE STROFFOLINO, RPR
UNITED STATES DISTRICT COURT - NDNY



A 116

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

    -v-

ERIC TOMPKINS,
                Defendant.

CASE NO: 1:20-CR-0037 (TJM)
**POST-HEARING BRIEF**

---

Eric Tompkins's cellular telephone was seized from him when he was arrested for failing

to register as a sex offender. Deputy United States Marshal Robert Imburgio applied for a

warrant to search the phone for evidence of Mr. Tompkins's failure to register. The warrant did

not explicitly authorize the search of the Micro SD card that had been inserted into the telephone.

Despite that lack of explicit authorization, New York State Investigator Paul J. Kozel

forensically examined the Micro SD card after he was unable to access the data on the phone

itself. In the process, Kozel allegedly discovered images of child pornography. Months later, the

government obtained a second search warrant explicitly authorizing the search of the SD card.

The information the government provided to the magistrate as probable cause for the second

warrant was discovered during the unauthorized first search. Mr. Tompkins was subsequently

charged with possessing child pornography. (Dkt. No. 1.)

Mr. Tompkins has moved to suppress the evidence found in those searches. (Dkt. Nos. 9,

16.) The government has opposed the motion. (Dkt. No. 13.) On November 10, 2020, the Court

conducted an evidentiary hearing. (Dkt. No. 24.) Kozel and Imburgio testified. *Id.* at 3:12-42:22,

1

*A 117*

43:4-63:4. As discussed below, the officers' testimony showed that Kozel exercised unbridled discretion when he elected to search the SD card. The Fourth Amendment's particularity requirement was designed to prevent such exercises of discretion. Accordingly, the defense respectfully requests that the Court suppress all evidence discovered in the two searches of the Micro SD card inserted into Mr. Tompkins's cell phone.

## LEGAL ARGUMENT

The Fourth Amendment "was enacted in part to curb the abuses of general warrants, devices which provided British officers with broad discretion to search the homes of citizens of · the Colonies for evidence of vaguely specified crimes." *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011) (citing *Ellison v. Balinski*, 625 F.3d 953, 958 (6th Cir.2010)). The Founders intended for the Fourth Amendment to "make[] general searches . . . impossible and prevent[] the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196 (1927). Accordingly, the Fourth Amendment requires that search warrants particularly describe the place to be searched and the items to be seized. *Kentucky v. King*, 563 U.S. 452, 459 (2011); *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

"[T]he very purpose of the particularity requirement is to curtail the officers' discretion when executing the warrant." *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 460 (S.D.N.Y. 2013) (citing *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992)). "Ideally, as little as is possible should be 'left to the discretion of the officer executing the warrant.'" *United States v. Vilar*, No. S305CR621KMK, 2007 WL 1075041, at *21 (S.D.N.Y. Apr. 4, 2007) (quoting *United States v. Buck*, 813 F.2d 588, 590-91 (2d Cir.1987)). Courts analyzing the particularity requirement consistently stress the importance of limiting officers' discretion. *See, e.g., United States v. Sears*, 411 F.3d 1124, 1127–28 (9th Cir. 2005) ("[P]articularity ensures that nothing is

2

*A 118*

left to the discretion of the officer executing the warrant."); *United States v. Robinson*, 275 F.3d 371, 381 (4th Cir. 2001) ("A sufficiently particular warrant describes the items to be seized in such a manner that it leaves nothing to the discretion of the officer executing the warrant."); *Bartholomew v. Pennsylvania.*, 221 F.3d 425, 428–29 (3d Cir. 2000) (The particularity requirement "limit[s] the agents' discretion as to what they are entitled to seize."); *United States v. Hotal*, 143 F.3d 1223, 1227 (9th Cir. 1998) ("Particularized descriptions serve the purpose[] of . . . ensuring that the discretion of the officers executing the warrant is limited."); *United States v. Towne*, 997 F.2d 537, 548 (9th Cir. 1993) (same); *Montilla Records of Puerto Rico, Inc. v. Morales* 575 F.2d 324, 326 (1st Cir. 1978) ("[N]othing is left to the discretion of the officer executing the warrant."); *United States v. Safford*, No. 1:17-CR-00054 (MAD), 2017 WL 11407489, at *8 (N.D.N.Y. Sept. 18, 2017), aff'd, 814 F. App'x 638 (2d Cir. 2020) ("Courts implement the particularity requirement by insisting that warrants not leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized."); *United States v. Stacey*, No. 1:16-CR-00096 (MAD), 2017 WL 11464292, at *7 (N.D.N.Y. Aug. 9, 2017) (same); *United States v. D'Amico*, 734 F. Supp. 2d 321, 359 (S.D.N.Y. 2010) ("The Fourth Amendment's particularity requirement guards against general searches that leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized.").

In defiance of the Constitutional particularity mandate, Kozel exercised unbridled discretion when he opted to search the SD card. Kozel had reviewed the search warrant before he began his forensic examination. (Dkt. No. 24 at 17:9-11.) He knew that the warrant authorized the search of "a Samsung Model SM-J336AZ cell phone bearing serial number R28K53A6L4T." He knew that the warrant did not mention the SD card. (Dkt. No. 24 at 18:8-10.) From his initial physical examination of the phone, he knew that (1) the SD card was visible when the back of

3

*A 119*

the phone was removed; (2) the back of the phone had been removed before he received it so that the battery could be taken out; and (3) the back of the phone had remained removed long enough for the phone's serial number (which was visible only when the back was removed) to be noted for inclusion in the search warrant. (Dkt. No. 24 at 19:7-14, 22:8-9, 28:12-18, 28:25-29:1; Govt. Ex. 5.) He thus knew that the SD card had been visible to the officials who prepared the warrant affidavit, but that it had not been listed in the warrant.

Kozel attempted to forensically examine the cell phone as explicitly directed by the warrant. However, he was unable to complete an examination because the phone was password protected. (Dkt. No. 24 at 19:18-20.) Rather than ending his work or seeking further guidance from an agent or the Court, Kozel opted to search the SD card.[1]

Kozel's unauthorized exercise of discretion was apparently part of a common practice in the Computer Crime Unit where he worked. Kozel testified that he has seen search warrants that list SD cards as separate items to be searched. (Dkt. No. 24 at 34:3-9.) But rather than adhere strictly to the language of the warrant, the Computer Crime Unit decides what it is authorized to search based on how many bags the evidence arrives in. (Dkt. No. 24 at 37:21-38:21.) If a phone and an SD card arrive in separate bags, the Unit takes the position that the warrant must explicitly mention the SD card before it can be searched. *Id.* But if they arrive in the same bag, the Unit will search both even if the warrant does not list the SD card. *Id.* This is precisely the type of discretion that the Fourth Amendment's particularity requirement was designed to

---

[1] Kozel attempted to justify this unauthorized exercise of discretion by testifying that if an SD card is "inserted into a phone, it's a component of it." (Dkt. No. 24 at 12:15-19.) In addition to being unauthorized by the plain language of the warrant, Kozel's justification was not factually correct. A "component" is "a constituent part." https://www.merriam-webster.com/dictionary/component. "Constituent" means "essential." https://www.merriam-webster.com/dictionary/constituent. As Kozel testified, an SD card is not essential because cellular phones do not require an SD card in order to operate. (Dkt. No. 24 at 11:7-8; 14:20-22.).

*A 120*

prevent. Accordingly, the defense respectfully requests that the Court suppress all evidence discovered in the searches of the SD card.

## CONCLUSION

The Fourth Amendment requires that search warrants particularly describe the place to be searched and the items to be seized. *Kentucky v. King*, 563 U.S. 452, 459 (2011); *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). "[T]he very purpose of the particularity requirement is to curtail the officers' discretion when executing the warrant." *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 460 (S.D.N.Y. 2013) (citing *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992)). Here, the warrant particularly described the item to be searched as "a Samsung Model SM-J336AZ cell phone bearing serial number R28K53A6L4T." The warrant did not list an SD card. Straying from the plain language of the warrant, an investigator opted to search the SD card when he could not access the phone itself. This discretionary search violated the Fourth Amendment. Accordingly, the defense respectfully requests that the Court suppress the evidence discovered in that search and in a later search of the same SD card.

DATED: November 30, 2020

LISA A. PEEBLES
FEDERAL PUBLIC DEFENDER

By: */s/ Paul J. Evangelista, Esq.*
First Assistant Federal Public Defender
Bar Roll No. 507507
Federal Public Defender's Office
39 N. Pearl Street, 5th Floor
Albany, New York   12207
(518) 436-1850 x 112

To:   Rachel L. Williams, AUSA (via ECF)
       Eric Tompkins (via mail)



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES OF AMERICA,

Docket No.:   1:20-CR-00037-TJM

    v.

Eric William Tompkins,

         Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## GOVERNMENT RESPONSE TO
## DEFENSE POST-HEARING BRIEF

Dated: December 15, 2020

        ANTOINETTE T. BACON
        Acting United States Attorney
        Northern District of New York

By:    /s/ Rachel L. Williams
        Rachel L. Williams
        Assistant United States Attorney
        Bar Roll No. 701542
        455 Broadway
        Albany, New York 12007
        T:  (518) 431-0234
        Rachel.Williams@usdoj.gov

A122

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.    BACKGROUND ................................................................................................ 2

III.    ANALYSIS ....................................................................................................... 5

    A.    The Search of the SUBJECT CARD was constitutional ......................................... 5

    B.    Law Enforcement Officers acted in good faith when they searched the SUBJECT
        CARD purusant to the Original and Subsequent Search Warrants ............................. 11

IV.    CONCLUSION ................................................................................................. 13

A 123

The United States of America (hereinafter "government"), by and through its attorney, the United States Attorney for the Northern District of New York, submits this memorandum of law in opposition to defendant Eric William Tompkins' Motion to Suppress. *See* Dkt. No. 9-1

## I.    INTRODUCTION

The defendant moves to suppress all evidence discovered during a government forensic examination of the SUBJECT CARD, inserted inside of the SUBJECT PHONE. The defense argues that the Original Search Warrant for the SUBJECT PHONE did not specifically describe or mention the SUBJECT CARD, which rendered its search unconstitutional. The defense further asserts that the good faith exception does not apply in the instant case, because law enforcement officials who executed the Subsequent Search Warrant "intentionally obscured the source of the probable cause 'images' used in the second warrant by intentionally misrepresenting and expanding the property the Magistrate authorized to be searched to include the SanDisk Micro SD Card." *See* Dkt. 9-1.

The Government submits that the search of the SUBJECT CARD was authorized by the Original Search Warrant. The plain language of the Original Search Warrant permitted the search of the SUBJECT CARD. Additionally, the SUBJECT CARD is a component of the SUBJECT PHONE and therefore lawfully searched by law enforcement officials pursuant to the Original Search Warrant. Alternatively, even if this Court finds the search of the SUBJECT CARD to be outside the scope of the Original Search Warrant, law enforcement officers acted in good faith when they searched the SUBJECT CARD. At the November 11, 2020 Evidentiary Hearing in this matter, the government established that law enforcement officials had an objective and reasonable belief that the SUBJECT CARD was a component of the SUBJECT PHONE, and could therefore be lawfully searched.

1

*A 124*

## II.   BACKGROUND

On September 3, 2009, the defendant was convicted of violating RCW A.44.089, Child Molestation Third Degree in the State of Washington as a result of his guilty plea to this offense. As part of his plea agreement, the defendant was required to register as a sex offender and register his address with any new state to which he moved. *See* Dkt. 9-2, ¶ 7.

On October 19, 2019, the New York State Division of Criminal Justice Service (NYDCJS) determined the defendant was not registered as a sex offender in New York State. *See* Dkt. 9-2, ¶ 15.

On March 18, 2019, the Honorable Daniel J. Stewart signed a Criminal Complaint accusing the defendant of violating 18 U.C.S. § 2250(a) – failure to register as a sex offender, and signed a warrant for the defendant's arrest. *See* Dkt. 9-2, ¶ 16.

On March 28, 2019, the defendant was arrested by the United States Marshal Service (USMS). Law enforcement officials seized the defendant's Samsung SM-J336AZ cell phone, bearing serial number R28K53A6L4T (SUBJECT PHONE), from the defendant's person. The SUBJECT PHONE remained in the possession of the USMS. *See* Dkt. 9-2, ¶ 17.

On April 19, 2019, law enforcement officials applied for a Search and Seizure Warrant for the SUBJECT PHONE (Original Search Warrant). In Attachment A to the Original Search Warrant, the property to be searched is "a Samsung Model SM-J336AZ cell phone bearing serial number R28K53A6L4T currently located in the United States Marshals Service evidence locker located in Albany New York (hereinafter the SUBJECT DEVICE). This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the *electronically stored information* described in Attachment B." *See* Dkt. 9-2, Attachment A. (emphasis added).

A 125

Attachment B to the Original Search Warrant directed law enforcement officials to search "All records on the SUBJECT DEVICE described in Attachment A that related to violations of 18 U.C.S. § 2250(a), Failure to Register as a Sex Offender, and involve ERIC TOMPKINS [...]" *See* Dkt. 9-2, Attachment B. The last paragraph of Attachment B stated the "terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or *electronic storage (such as flash memory or other media that can store data*) and an photographic form." *See* Dkt. 9-2, Attachment B (emphasis added).

On May 1, 2019, the USMS transferred possession of the SUBJECT DEVICE to the New York State Police's Computer Crimes Unit (CCU) in order for the CCU to conduct a forensic analysis of the SUBJECT DEVICE. Peter Kozel, the New York State Police Senior Investigator in Charge of the CCU, observed a Micro SD Card, bearing serial number 88460VJG50FF (SUBJECT CARD), inserted inside and attached to the SUBJECT PHONE. Investigator Kozel was unable to unlock the SUBJECT PHONE, as it was locked and required a PIN to open. Investigator Kozel removed the attached SUBJECT CARD from the SUBJECT PHONE and conducted a forensic examination of the SUBJECT CARD's data for evidence of the defendant's charged 18 U.S.C. § 2250(a) violation. During the course of the forensic examination of the SUBJECT CARD, Investigator Kozel observed several images of child pornography contained in the SUBJECT CARD's deleted space. This senior investigator stopped his review of the SUBJECT CARD and reported his discovery of the child pornography images to Deputy United States Marshal (DUSM) Imburgio. *See* Dkt. 9-3, ¶ 10.

On August 14, 2019, DUSM Imburgio requested a search and seizure warrant for the SUBJECT PHONE and SUBJECT CARD (Subsequent Search Warrant). Attachment A to the

3



Subsequent Search Warrant described the property to be searched as the SUBJECT PHONE and SUBJECT CARD, which Attachment A collectively referred to as the "SUBJECT DEVICE." *See* Dkt. 9-3, Attachment A. Attachment B limited the records and information sought to those related to violations of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(a)(1). *See* Dkt. 9-3, Attachment B.

In paragraph 9 of the Affidavit that supported the Subsequent Search Warrant (Subsequent Affidavit), the affiant stated that the Magistrate Judge "issued a search warrant for the SUBJECT DEVICE (inclusive of the SUBJECT PHONE and SUBJECT CARD), to search for information that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 2250(a). That search warrant is also attached hereto as an exhibit for reference." *See* Dkt. 9-3, ¶ 9.

In paragraph 10 of the Subsequent Affidavit, the affiant stated that a "forensic examination has been completed of the SUBJECT CARD, which was attached to, and removed from, the SUBJECT PHONE, and data extracted has been analyzed for evidence of SORNA violations (18 U.S.C. § 2250(a)), as authorized by Judge Stewart's warrant." *See* Dkt. 9-3, ¶ 10.

In paragraph 11 of the Subsequent Affidavit, the affiant stated that the Senior Investigator who completed the forensic examination on the SUBJECT CARD "observed several images in the SUBJECT CARD's deleted space that he identified as depicting the sexual exploitation of minors, as that term is defined in 18 U.S.C. § 2256." The affiant then provided an example of four of these images, providing their file names and image descriptions. *See* Dkt. 9-3, ¶ 11.

On January 30, 2020, the defendant was indicted in the present case for a violation of 18 U.S.C. 2252A(a)(5)(B), possession of child pornography. *See* Dkt. 1.

A 127

On June 12, 2020, the Defense filed its Memorandum of Law in Support of Eric Tompkins' Motion to Suppress ("Defense Motion"). *See* Dkt. 9-1.

On June 26, 2020, the government submitted its Response to the Defense Memorandum of Law in Support of Eric Tompkins' Motion to Suppress ("Government Response"). *See* Dkt. 13.

On November 10, 2020, this Court held an evidentiary hearing on the Defense Motion. At this hearing, the government called now-retired Investigator Peter Kozel and Deputy United States Marshal Robert Imburgio as witnesses. *See* Dkt. 24.

On December 1, 2020, the defense filed its Post-Hearing Brief. The government now respectfully submits its Response.

## III.    ANALYSIS

The search of the SUBJECT CARD was constitutional because the Original Search Warrant provided for its search, as the SUBJECT CARD is a form of electronic storage and is a component of the SUBJECT PHONE. Even if this Court finds that the SUBJECT CARD should have been specifically described in the Original Search Warrant, law enforcement officials acted in good faith when they searched the SUBJECT CARD pursuant to the Original and Subsequent Search Warrants.

### A.    The search of the SUBJECT CARD was constitutional.

To comport with the Fourth Amendment, a search warrant must particularly describe the place to be searched and the person or things to be seized. U.S. Const. amend. IV. This 'particularity requirement' provides a "limitation curtailing the officers' discretion when executing the warrant" so that the "safeguard of having a magistrate determine the scope of the



search is not lost.'" United States v. Voustianiouk, 685 F.3d 206, 211 (2d Cir. 2012) (quoting United States v. George, 975 F.2d 72, 76 (2d Cir. 1992)). However, the "particularity requirement is a standard of practical accuracy rather than a hypertechnical one." United States v. Fiorito, 640 F.3d 338, 348 (8th Cir. 2011); see also United States v. Otero, 563 F.3d 1127, 1132 (10th Cir. 2009)("[a] warrant need not necessarily survive a hyper-technical sentence diagraming and comply with the best practices of *Strunk & White* to satisfy the particularity requirement.") Additionally, "Courts have frequently rejected particularity arguments where context makes clear that a specific phrase or paragraph, although insufficiently precise when read in isolation, is nevertheless appropriately limited." United States v. Alston, 2016 U.S. Dist. LEXIS 63776, at 12 (S.D.N.Y. Apr. 29, 2016) (citing Hale v. United States, No. 08 Civ. 94, 2010 U.S. Dist. LEXIS 73604 (N.D. Ill. July 22, 2010) (Government admitted that phrase was non-specific when read in isolation, but context prevented warrant from being overbroad)).

As the Supreme Court has recently noted, modern cellphones are "mini computers" capable of storing a litany of data. Riley v. California, 573 U.S. 373 (2014). Federal courts have "rejected most particularity challenges to warrants authorizing the seizure and search of entire personal or business computers." United States v. Bass, 785 F.3d 1043, 1049 (6th Cir. 2015)(quoting United States v. Richards, 659 F.3d 527, 539 (6th Cir. 2011)). This occurs because "[c]riminals can—and often do—hide, mislabel, or manipulate files to conceal criminal activity [such that] a broad, expansive search of the [computer] may be required." Bass, 785 F.3d at 1049 (quoting United States v. Stabile, 633 F.3d 219, 237 (3d Cir. 2011)).

In United States v. Wilson, a 2019 decision by the U.S. District Court of the Western District of Missouri, the Court was presented with the issue of whether the search of a micro SD card inserted into a cell phone was lawful when the search warrant did not specifically describe

6

*A 129*

the SD card as property to be searched. United States v. Wilson, No. 17-4106, 2019 U.S. Dist. LEXIS 166318, (W.D. Mo., Sept. 16, 2019). Instead, the search warrant sought "all data [...] including but not limited to all contents of the cellular phone, such as applications installed, messages sent and received, picture and video files which may still be on the device, including any deleted data which may be recovered from the memory of the cell phone." Id. at 4. On appeal, Wilson argued that the search of the SD Card was unconstitutional because the SD Card was not specifically described in the search warrant and, therefore, constituted an unlawful warrantless search. Id. at 7.

In upholding the constitutionality of the search of the SD Card, the Wilson Court refused to apply a strict, "hypertechnical" application of the particularity requirement of the Fourth Amendment, and instead chose a "standard of practical accuracy." Id at 7 (quoting United States v. Fiorito, 640 F. 3d 338, 346 (8th Cir. 2011). The Wilson Court looked to the 8th Circuit's analysis of the particularity requirement in the Beckmann decision.

In Beckmann, law enforcement officers received a defendant's consent to search his computer, which had two external hard drives connected to it and one of the hard drives was disconnected from a wall socket. United States v. Beckmann, 786 F.3d 672. 676 (8th Cir. 2015). On appeal, Beckmann argued that his consent to search the computer did not include the two external hard drives. Id. at 677. Beckmann asserted that the hard drives at issue were not component parts of the computer, but rather more akin to a cellular phone. Id. at 679. The 8th Circuit disagreed based on the functionality of a hard drive. It found that the "sole purpose of an external hard drive is to store computer data. Additionally, external hard drives, unlike cellular telephones, are functionally inoperable – and their contents unreviewable – when unplugged from a computer." Id. The Circuit Court next looked to the term "computer" and found that the

7

A 130

"common understanding" of this term "encompasses the collection of component parts involved in a computer's operation." Id. at 678 (quoting United States v. Herndon, 501 F.3d 683, 690 (6th Cir. 2007)). The Court then concluded that the connected external hard drives were a component of the computer and, a result, law enforcement had an objectively reasonable basis to conclude that they were encompassed in Beckmann's consent to search the computer. Id. at 678-679.

The Wilson Court similarly reviewed the functionality of an SD Card and determined it was "substantially similar and functionally the same" as an external hard drive as "both are solely used to store digital data." Wilson, No. 17-4106, 2019 U.S. Dist. LEXIS 166318, at 9. Like an external hard drive, an SD Card is "functionally inoperable – and their contents unreviewable – when unplugged from a digital device." Id at 9-10 (quoting Beckmann, 786 F.3d at 679). As a result, the Wilson Court found that, "because as a connected external hard drive is commonly understood to be part of a computer, it therefore follows that a connected SD card is commonly understood to be part of a cell phone." Wilson, No. 17-4106, 2019 U.S. Dist. LEXIS 166318 at 10; see also United States v. Herndon, 501 F.3d 683, 691 (6th Cir 2007)(holding that "the term "computer" is commonly understood to include the collection of components involved in a computer's operation"). As a component of the cellular phone, the Court held that the search warrant for the cellular phone did not need to specifically describe the SD Card, and the search of the SD Card was therefore constitutional.

In the instant matter, this Court should find that the Original Search Warrant authorized a search of the SUBJECT CARD for two primary reasons: First, the plain language of Attachment B to the Original Search Warrant directed law enforcement officials to search the SUBJECT PHONE for all "records" of the SORNA violation in "whatever form and by whatever means [the records] may have been created or stored, including any form of computer or *electronic*

8

A 131

*storage (such as flash memory or other media that can store data)* and any photographic form."
As the SUBJECT CARD is by its very nature electronic storage, and was connected to the
SUBJECT PHONE, the Original Search Warrant provided for its lawful search. Additionally,
Attachment B to the Original Search Warrant further directed law enforcement officials to search
only those records that related to the alleged 18 U.S.C. 2250(a) violation. As a result, the
Original Search Warrant particularly described those items to be searched and seized, in
compliance with the Fourth Amendment.

Second, the SUBJECT CARD is a component of the SUBJECT PHONE and did not need
to be specifically described in the Original Search Warrant. This position is supported both by
the logical finding of the Wilson Court, as well as the testimony provided at the evidentiary
hearing in this matter by Retired New York State Police Investigator in Charge Peter Kozel
("Investigator Kozel"). As discussed above, this Court should follow the "common
understanding" that the term "computer" encompasses the collection of component parts
involved in the computer's operation, and likewise hold that the term "cellular phone" logically
encompasses the collection of component parts involved in the cellular phone's operation –
which would specifically include an SD Card.

When called to testify by the government, Investigator Kozel provided this Court with his
training, experience, and formal education in the field of digital forensic examinations.
Investigator Kozel stated that that he was an Investigator with the CCU for 13 years, and
conducted over 3,600 hours of training in digital forensic examinations and cyber investigations.
Investigator Kozel further testified that he holds a master's degree in Forensic Computing and
Cybercrime Investigations from the University of Delaware. With regard to his training on the
interaction of cellular phones and SD Cards, Investigator Kozel testified that he has received

9

A 132

training from Paraben, Cellebrite and Teel Technologies. *See* Dkt. 24, 4:8 - 5:24. Investigator

Kozel further stated that he has conducted around 600 digital forensic examinations of cell

phones throughout his career, and about 25 to 50 percent of those cell phones had SD cards

attached to them. *See* Dkt. 24, 12:7-13. Critically, when the government asked Investigator

Kozel whether he considers an SD card to be a component of a cellular phone, Investigaor Kozel

responded, "Yes. If it's inserted into the phone, it's a component of it." *See* Dkt. 24, 12:18-19.

When asked why he considers an SD card to be a component of a cellular phone, Investigator

Kozel explained that an SD Card is a type of flash media, and that the purpose of an SD card and

flash media, in general, is to provide additional storage. *See* Dkt. 24, 6:3-16. When asked by the

government how an SD card interacts with a cellular phone when the SD card is inserted inside

of the phone, Investigator Kozel stated the "mobile device will use [the SD card] as additional

storage." *See* Dkt. 24, 6:19-20. Specially, Investigator Kozel explained that the mobile phone

will "communicate" with the SD card once that SD card is inserted into it, by installing a file

structure on the SD card so that the mobile phone can then use the SD card for storage. *See* Dkt.

24, 6:19-25.

Investigator Kozel also stated that an SD card is solely used to store digital data, and its

contents cannot be viewed without an external source to display the item, just as the <u>Wilson</u>

Court held. *See* Dkt. 24, 16:7. As a result, the SUBJECT CARD is a component of the

SUBJECT PHONE, not akin to one. Additionally, because a cellular phone is - as the Supreme

Court has found, a minicomputer - a component of a cellular phone should be treated no

differently than a component of a computer, like an internal hard drive or an attached external

hard drive.

A 133

Therefore, because the SUBJECT CARD in the present case was attached the SUBJECT PHONE, it was a component of the SUBJECT PHONE and therefore encompassed in the search of the SUBJECT PHONE. As a result, the SUBJECT CARD did not need to be specifically described in the Original Search Warrant to meet the particularly requirement of the Fourth Amendment. For these reasons, the search of the SUBJECT CARD pursuant to the Original Search Warrant was constitutional.

**B.** **Law Enforcement Officers acted in good faith when they searched the SUBJECT CARD pursuant to the Original and Subsequent Search Warrants**

The government maintains that the SUBJECT CARD is a component of the SUBJECT PHONE and did not need to be specifically described in the Original Search Warrant. However, to the extent this Court disagrees, the Government submits the law enforcement officials' search of the SUBJECT CARD was executed in good faith.

The Supreme Court created a "good faith" exception to prevent the exclusion of evidence otherwise unlawfully obtained, applicable only when police act with a "reasonable good faith belief" that their conduct is lawful. United States v. Mayo, No. 2:13-CR-48, U.S. Dist LEXIS 158866 (D. Vt. Nov. 6, 2013)(quoting United States v. Leon, 468 U.S. 897, 909, 919 (1984)). As discussed above, in Beckmann, the 8th Circuit analyzed whether a deputy reasonably believed that Beckmann's consent to search the computer included the external hard drives connected to the computer. In finding the deputy's belief reasonable, the Court looked to the "common understanding that the term "computer" encompasses the collection of component parts involved in a computer's operation." Beckmann, 786 F.3d at 678-679.

Moreover, in evaluating whether officers acted in good faith when conducting a search, courts may look to allied or supporting documents that accompanied the search warrant. United

11



States v. Rosa, 626 F.3d 56, 64 (2d Cir. 2010). While these documents cannot cure a

constitutionally defective warrant, "those documents are still relevant to [the] determination of

whether the officers acted in good faith, because they contribute to [the] assessment of the

officers' conduct in a particular case." Id.

Based on the plain language of the Original Search Warrant, as discussed above,

Investigator Kozel exercised good faith in searching the SUBJECT CARD because an SD card is

logically a component of the cellular phone it is attached to, and the plain language of the

Original Search Warrant provided for a search of flash media. Investigator Kozel's testimony

during the November 10, 2020 evidentiary hearing in this matter further confirmed that

Investigator Kozel exercised good faith in searching the SUBJECT CARD.

Investigator Kozel testified before this Court that he searched the SUBJECT CARD

because it was "part of the overall [SUBJECT PHONE]." See Dkt. 24, 25:14. When asked by

the government why he considers the SUBJECT CARD to be part of the overall SUBJECT

PHONE, Investigator Kozel stated, "[b]ecause it's durably attached to it." See Dkt. 24, 25:19.

Investigator Kozel then explained to the Court that he found the SUBJECT CARD inside the

SUBJECT PHONE, located in a slot referred to as the SD port. See Dkt. 24, 18:14-15. To insert

an SD card into an SD port, Investigator Kozel informed the Court that a user would have to first

remove the back cover of the phone, and then insert the SD card into the SD port by pressing

down on the SD Card and inserting it forward into the SD port in order for a "connection" to be

made between the SD Card and the phone. See Dkt. 24, 24:15. It's this attachment and

connection that allows the phone to communicate with the SD Card, whereby it creates a files

structure on the SD card, allowing the SD card to be used as storage for the phone's data. See

Dkt. 24, 6:19-25.

A 135

Investigator Kozel further testified that, as the former Senior Investigator at the CCU, it is common practice to search an SD card attached to a cellular phone, pursuant to a search warrant for the cellular phone. A separate search warrant for the SD card was not required to search the SD card, so long as the SD card was attached to the phone. *See* Dkt. 24, 26:10-15.

As a result, while the SUBJECT CARD was not specifically identified in the Original Search Warrant, Investigator Kozel searched it in good faith, based on his training, experience, and education on digital forensic examinations and the interplay between cellular phones and SD cards attached to the phones and the common practice of the CCU to search SD cards attached to cellular phones pursuant to a search warrant for the phone.

## IV.    CONCLUSION

Based on the foregoing, the government respectfully requests that this Court deny the Defense's Motion to Suppress and hold that the search of the SUBJECT CARD pursuant to the Original and Subsequent Search Warrants was constitutional.

A136

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA,**

    **v.**                                                  **1:20-CR-37**

**ERIC TOMPKINS,**

            **Defendant.**

---

**THOMAS J. McAVOY,**
**Senior United States District Judge**

**DECISION and ORDER**

## I.    INTRODUCTION

Defendant Eric Tompkins moves to suppress evidence found on a SanDisk Micro SD card ("SD Card") inserted in the SD port of his cellular telephone. Dkt. No. 9. He contends that the discovery of purported images of child pornography on the SD Card pursuant to an April 19, 2019 search warrant were obtained in violation of the Fourth Amendment and must be suppressed. He further contends that these images cannot supply the probable cause basis for an August 14, 2019 search warrant and, without other sufficient probable cause, the fruits of the August 14, 2019 search warrant must be suppressed. The government opposes the motion. Dkt. 13. The Court conducted an evidentiary hearing at which the government called two witnesses: now-retired New York State Police Senior Investigator Peter Kozel ("Investigator Kozel"), and Deputy United States Marshal Robert John Imburgio ("DUSM Imburgio"). *See* Dkt. 24 (hearing

1

*A 137*

transcript).  Following receipt of the hearing transcript, the parties submitted post-hearing briefs. Dkt. 25, Dkt. 26.  The motion is now ripe for disposition.

## II.    FACTUAL

The following constitutes the Court's findings of fact relative to the instant motion. Unless stated otherwise, the factual findings are based upon the credible evidence presented through documents in the record, hearing testimony, and exhibits admitted into evidence at the hearing.

### a. Confiscation of Cellular Telephone/Preparation of Search Warrant Application/April 19, 2019 Search Warrant

On March 18, 2019, the Hon. Daniel J. Stewart, United States Magistrate Judge, signed a Criminal Complaint accusing the defendant of violating 18 U.S.C. § 2250(a) - failure to register as a sex offender, and signed a warrant for the defendant's arrest.  *See United States v. Tompkins*, Case No. 1:19-mj-00159-DJS, Dkt. 1; Dkt. 12, ¶ 16.[1]  The defendant was arrested by the United States Marshal Service (USMS) on March 28, 2019 and DUSM Imburgio seized Tompkins's silver Samsung cellular phone (SUBJECT PHONE). *See* Tr. 44.[2]  At the time, the SUBJECT PHONE was in one piece in that the phone's protective cover and back cover had not been removed, and the battery was still

---

[1]Dkt. 12 consists of the April 19, 2019 Search and Seizure Warrant and DUSM Imburgio's application for that warrant, and Dkt. 12-1 consists of the August 14, 2019 Search and Seizure Warrant and FBI Special Agent Brian Seymour's application for that warrant.  These documents were filed under seal.  Both packets (search warrants and supporting affidavits) were received in evidence at the evidentiary hearing.  Thus, there is no further reason to keep either Dkt. 12 or Dkt. 12-1 under seal.  Accordingly, the Court Clerk is respectfully directed to unseal Dkt. 12 and Dkt. 12-1. When the Court cites to a paragraph in either of these packets, it is referring to the supporting affidavit in that packet.

[2]The Court refers to portions of the hearing transcript, Dkt. 24, as "Tr."



in the phone allowing it to operate. *See* Tr. 44.[3] After taking custody of the SUBJECT

PHONE, DUSM Imburgio spoke to his supervisor who is the USMS office's evidence

custodian. Tr. 45. DUSM Imburgio and his supervisor placed the phone in an evidence

bag and the supervisor "locked it in [the] evidence room until the time where [DUSM

Imburgio] took it over to [the] State Police lab." *Id.*

DUSM Imburgio, who has been with the USMS for ten (10) years, Tr. 48, prepared

an application for a search warrant for the SUBJECT PHONE. This was DUSM Imburgio's

first application for a search warrant for a Samsung cellular phone. Tr. 48. In preparing

the warrant application, DUSM Imburgio consulted with an Assistant United States

Attorney and might have spoken with his supervisor and other investigators at the USMS.

*See* Tr. 46, 48-51. The Assistant United States Attorney who DUSM Imburgio consulted

with "prepared most of the search warrant [application] from [their] discussions, and then

[DUSM Imburgio] read it and signed it." Tr. 49. Although DUSM Imburgio contends that

he did not open the SUBJECT PHONE, remove its battery, or look into back of the phone

before preparing the warrant application, *see* Tr. 55, it is clear that someone at the USMS

opened the phone and removed its battery. The Court reaches this conclusion for two

reasons. One, the search warrant application references the phone's serial number ("S/N")

which is visible only on a sticker located behind the battery. *See* Gov. Ex. 5, p. 6 (bottom

picture); *see also* Gov. Ex. 1 (search warrant and warrant application referencing the

phone's serial number). Two, Investigator Kozel testified that when the SUBJECT PHONE

arrived at the New York State Police Computer Crimes Unit (CCU), it was in a sealed

---

[3](when initially taken into custody, DUSM Imburgio allowed Tompkins to access the phone to retrieve contact information)

evidence bag with its protective cover and back cover attached but with its battery separated from the phone. Tr. 22; Gov. Ex. 5; *see* Tr. 38.[4] When the back cover is removed the SD Card situated in the SUBJECT PHONE's SD port is visible, *see* Gov. Ex. 5, p. 6 (bottom picture), yet neither the warrant application nor the search warrant specifically references an SD card. *See* Gov. Ex. 1. The Court credits DUSM Imburgio's testimony that he was unaware the SUBJECT PHONE had the capability of accepting an SD card, Tr. 50-51, or whether all phones have SD cards. Tr. 55.

On April 19, 2019, DUSM Imburgio applied for a Search and Seizure Warrant for the SUBJECT PHONE to search for evidence of Tompkins's alleged Sex Offender Registration and Notification ("SORNA") violation. *See* Dkt. 12 (Original Search Warrant). He particularly described "[t]he property to be searched is a Samsung Model SM-J336AZ cell phone bearing serial number R28K53A6L4T currently located in the United States Marshals Service evidence locker located in Albany New York (hereinafter the SUBJECT DEVICE)." Dkt. 12, ¶ 5. He further indicated that "[t]he applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B." Dkt. 12, ¶ 6. DUSM Imburgio's affidavit is not incorporated by reference in the Original Search Warrant. *See* Dkt. 12.

Magistrate Judge Stewart issued the warrant on April 19, 2019. *Id.* He found probable cause to forensically exam the SUBJECT PHONE, described as the SUBJECT

---

[4]Investigator Kozel testified: "Things such as batteries, SIM cards, and network connecting devices, it's standard triage practice for the investigator or whoever is seizing the item in the field to remove it or make sure that does not have the ability to connect to a network so that we don't get it and it's connected and running and we wouldn't be able to tell what state it was in at the time of the seizure." Tr. 38.

A 140

DEVICE in Attachment A to the warrant, "for the purpose of identifying the electronically stored information described in Attachment B." Dkt. 12, Attach. A.[5]

Attachment B provides:

1. All records on the SUBJECT DEVICE described in Attachment A that relate to violations of 18 U.S.C. § 2250(a), Failure to Register as a Sex Offender, and involve ERIC TOMPKINS, including:

   a. Evidence indicating TOMPKINS' location and residence, including photographs, messages, call logs, GPS and geolocation data, WiFi connections, internet browsing history and financial records;

   b. TOMPKINS' employment information;

   c. TOMPKINS' registration as a sex offender, including in New York and Washington; and

   d. Evidence indicating TOMPKINS' state of mind as it relates to the crime under investigation.

2. Evidence of user attribution showing who used or owned the SUBJECT DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

Dkt. 12, Attach. B.

---

[5]Attachment A of the Original Search Warrant provides:

The property to be searched is a Samsung Model SM-J336AZ cell phone bearing serial number R28K53A6L4T currently located in the United States Marshals Service evidence locker located in Albany New York (hereinafter the SUBJECT DEVICE).

This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

Dkt. 12, Attach. A.



**b. Search of SUBJECT PHONE pursuant to Original Search Warrant**

On May 1, 2019, the USMS transferred possession of the SUBJECT PHONE to the CCU in order to conduct a forensic analysis of it. Dkt. 12-1, ¶ 10. Investigator Kozel, the New York State Police Senior Investigator in charge of the CCU, conducted this forensic analysis. He was unable to unlock the SUBJECT PHONE as it was PIN code protected and none of the tools that he had available to him were able to bypass that PIN. Tr. 19-20. Unable to unlock the phone itself, Investigator Kozel "moved on to the pieces that [he] could analyze." Tr. 20. This involved the SD Card which was inserted inside and attached to the SUBJECT PHONE via the phone's SD port. *See* Tr. 24. Investigator Kozel acknowledged that he had reviewed the Original Search Warrant and was aware that it did not specifically identify the SD Card. Tr. 25. When asked by the prosecutor why he searched the SD Card, the following colloquy occurred:

A. Because it's part of the overall device.

Q When you say the device, what are you referring to?

A The mobile device, the phone.

Q And when you say that it's overall part of the mobile phone, what makes it part of the mobile phone?

A Because it's durably attached to it.

Q So if the SanDisk SD card were located on this table and it was not attached to the cell phone that we saw in these pictures, would you have believed that the search warrant authorized your search of that SanDisk SD card?

A No. Typically that would have been included as a separate item of evidence and listed separately on a search warrant.

Q So you would not have searched it under those circumstances?

6



A Correct.

Q But as you understood them to be in the search warrant you reviewed, you found it appropriate to search the SanDisk SD card?

A Yes. It was one item of evidence. The prior item, the item was listed. It was a cell phone. Everything attached to it is part of that device.

Q Is it common practice in the CCU, as a former senior investigator of the CCU, to request a separate search warrant for an attached and connected SD card inside of a cellular phone?

A No.

Q Did you have any hesitation whatsoever about your search of that SanDisk SD card as being outside the bounds of the search warrant that you reviewed?

A No, I did not.

 * * *

Q One other question, Mr. Kozel. Would you believe that evidence of the crime at issue that generated the search warrant in this case, a violation of the Sex Offender Registry Notification Act, would potentially be located on that SD card?

A Any type of evidence could be located in a variety of forms on an SD card.

Q And specifically because the SD card was inserted inside the cell phone, does that mean that if there's information on the phone related to a violation of that particular offense, would it be more or less likely that it would also be on the SD card?

A Depending on how the operating system was utilizing the – well, the SD card, and for that fact of the matter, the SIM card, evidence that was being sought could be potentially found on any part of that device.

Q Would you know how this specific SD, SanDisk SD card was set up with the phone if you didn't search it?

A No.

Tr. 25-27.

On cross-examination, Investigator Kozel acknowledged that he had seen the

7

A 143

subsequent search warrant in this case issued after his retirement in which the phone and the SD Card were listed separately. Tr. 33-34. Nevertheless, he felt that the Original Search Warrant authorized him to search the SD Card because "it authorize[d] [him] to search the Samsung phone, which is all inclusive." Tr. 37. Investigator Kozel testified that "we would consider that the same as a tower computer or laptop computer," and that "we would prefer that the case agent or someone who is untrained not open up it and pull all the hard drives out to list them separately. It's standard . . . practice that everything in a device is part of that device unless it's found separately." Tr. 37. He continued by indicating that even if the SD Card had been removed from the phone but was in the same evidence bag, "we would treat it as an item of evidence" unless it was "obviously a disparate type of device" such as a hard drive with a cell phone. Tr. 37-40. On re-direct examination he indicated that he received no indication from any agent or law enforcement officer that the SD Card had not been connected to the SUBJECT PHONE or was for a different device than the Samsung cell phone that was collected in evidence and presented for examination. Tr. 41.

During the course of the forensic examination of the SD Card, Investigator Kozel observed several images contained in the SD Card's deleted space that appeared to be of child pornography. Dkt. 12-1, ¶ 11. Investigator Kozel stopped his review of the SD Card and reported his discovery of the child pornography images to DUSM Imburgio. *Id.*, ¶ 12. [6]

### b. August 14, 2019 Search Warrant

---

[6] Defendant does not contest that Investigator Kozel stopped his review of the data extracted from the SD Card when he viewed what he thought were images of child pornography. Defendant also does not contend that the charges in this case are based upon Investigator Kozel's observations but rather that these observations were improperly made and thus cannot form the basis of probable cause supporting the August 14, 2019 search warrant.



On August 14, 2019, FBI Special Agent Brian Seymour ("SA Seymour") requested and received from Judge Stewart a search and seizure warrant for the SUBJECT PHONE and the SD Card, described as the SUBJECT CARD. *See* Dkt. 12-1 (Subsequent Search Warrant). Attachment A to the Subsequent Search Warrant described the property to be searched as the SUBJECT PHONE and SUBJECT CARD, which Attachment A collectively referred to as the SUBJECT DEVICE. *See id.*, Attach. A. Attachment B to the Subsequent Search Warrant limited the records and information sought to those related to violations of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(a)(1). *See id.*, Attach. B.

In paragraph 9 of SA Seymour's affidavit in support of the Subsequent Search Warrant (Subsequent Affidavit), SA Seymour states that Judge Stewart "issued a search warrant for the SUBJECT DEVICE (inclusive of the SUBJECT PHONE and SUBJECT CARD), to search for information that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 2250(a). That search warrant is also attached hereto as an exhibit for reference." *See* Dkt. 12-1, ¶ 9. Further, in paragraph 10 of the Subsequent Affidavit, SA Seymour states that a "forensic examination has been completed of the SUBJECT CARD, which was attached to, and removed from, the SUBJECT PHONE, and data extracted has been analyzed for evidence of SORNA violations (18 U.S.C. § 2250(a)), as authorized by Judge Stewart's warrant." *See id.*, ¶ 10. In paragraph 11 of the Subsequent Affidavit, SA Seymour states that NYSP Senior Investigator Peter Kozel "observed several images in the SUBJECT CARD's deleted space that he identified as depicting the sexual exploitation of minors, as that term is defined in 18 U.S.C. § 2256." *Id.*, ¶ 11. SA Seymour then provides an example of four of these images, stating their file

9

A 145

names and providing image descriptions. *See id.* SA Seymour indicates that "[a]fter locating the images described above, Senior Investigator Kozel stopped his review of the related data extracted from the SUBJECT CARD and reported his findings to DUSM Imburgio." *Id.,* ¶ 12. SA Seymour sought the Subsequent Search Warrant "to search the SUBJECT CARD for evidence of violations of 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography)." *Id.*

### c. Indictment

Defendant was indicted in the present case for a violation of 18 U.S.C. 2252A(a)(5)(B), possession of child pornography. *See* Dkt. 1. The Indictment alleges that Tompkins possessed child pornography on March 28, 2019, the day the USMS seized his phone. *Id.* The Indictment further alleges that Tompkins "did knowingly possess material that contained one or more images of child pornography . . . that is a Samsung model SMJ336AZ cellular telephone, serial number R28K53A6L4T, containing a SanDisk Micro SD (secure digital) card, which contained numerous graphic images of minors engaged in sexually explicit conduct."

## III. DISCUSSION

### a. Parties' Arguments

#### 1. Defendant's Arguments

Defendant argues the search of the MicroSD card during the execution of the Original Search Warrant violated the Fourth Amendment's particularity requirement because the warrant authorized only the search of the cellular phone, not any electronic devices or items connected to the phone. He contends that the property to be searched

10

A146

as identified in Attachment A to the Original Search Warrant "could not be any clearer." Dkt. 9-1, at 6. Defendant maintains that "Attachment A goes so far as to list the specific model number of the cellular phone, and its unique serial number. At no time does the warrant, or the application (April 19, 2019) mention the SanDisk Micro SD card. Not only is the SanDisk Micro SD card not mentioned by name, Attachment A, places to be searched, does not mention 'storage devices', 'computer storage devices', 'phone media devices' or other 'storage media' as property to be searched." *Id.*, at 6-7. Rather, Defendant contends, the Original Search Warrant clearly identified and authorized the property to be searched as the Samsung cell phone. He notes that the search warrant does not name any other property to be searched, asserting that the language in the search warrant is clear and unambiguous. He also points out that "[t]he application does not present any information on how the phone uses the Micro SD card, as memory or otherwise. The application simply does not discuss the Micro SD card." *Id.* at 10. He contends that probable cause to search cannot be established in an application which does not even mention the device to be searched. *Id.*

Defendant further maintains that once the SD card was encountered during the attempted search of the Samsung cellular phone, law enforcement should have attempted to get a warrant to search the Micro SD card. Instead, he argues, a warrantless search was conducted and evidence was illegally obtained. He contends that the search was in blatant disregard of the clear, unambiguous terms of the April 19, 2019 search warrant. *Id.*, at 7. Thus, he asserts, exclusion of the evidence obtained by law enforcement as a result of the warrantless search of the Micro SD card "is necessary to deter illegal

11

A147

searches." *Id.* (citing *United States v. Leon*, 468 U.S. 897 (1984)).

Defendant argues that the only probable cause offered in support of the August 14, 2019 search warrant were images discovered by New York State Police investigators in the deleted space "of the SanDisk Micro SD card during their warrantless search" as referenced in the paragraph 11 of SA Seymour's affidavit. He maintains that because these images were discovered during a warrantless search, the evidence must be excluded from the August 2019 search warrant. *Id.* at 7-8 (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)). He contends that when the tainted evidence is excised from the August 14, 2019 warrant application, there is no probable cause to issue the warrant and all evidence discovered during the execution of the August 2019 search warrant is fruit of the poisonous tree. *Id.*

Defendant also argues that the application for the August warrant shows that law enforcement was aware of the deficiency in the April warrant application, and that the application for the second warrant misled Judge Stewart about what property the April search warrant authorized to be searched. In this regard, Defendant points to paragraph 9 of the second warrant application which stated: "On April 19, 2019, based on probable cause established in an affidavit sworn to by DUSM Imburgio, attached hereto as an exhibit and incorporated by reference as if fully set forth herein, the Honorable Daniel J. Stewart issued a search warrant for the SUBJECT DEVICE (**inclusive of the SUBJECT PHONE and SUBJECT CARD**), to search for information that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 2250(a). That search warrant is also attached hereto as an exhibit for reference." *Id.*, at 8 (quoting Dkt. 12, ¶ 9)(emphasis



added by Defendant).  He maintains that the good faith exception does not apply because

> [t]he application presented to the Magistrate Judge on August 14, 2019
> shows law enforcement was aware that the April warrant was deficient for
> failing to name the SanDisk Micro SD card as a place to be searched.
> Misleading the Court by affirming that the original warrant defined the
> "SUBJECT DEVICE" as "inclusive of the SUBJECT PHONE and SUBJECT
> CARD", which it clearly does not state, was an attempt to prevent the
> Magistrate from discovering that the information presented in ¶11 of the
> [Subsequent Affidavit] (the deleted images) were recovered as the result of a
> warrantless search.  The good faith exception cannot apply in these
> circumstances. *See* [*U.S. v. Reilly*, 76 F.3d 1271, 1281 (2d Cir. 1996)].

Dkt. 9-1, at 9.  At the suppression hearing, Defense Counsel indicated that Defendant was

not asserting bad faith in drafting the second warrant application such to warrant a *Franks*

hearing, Tr. 63-67, but rather "used [the statement about what the second warrant

application stated about the first warrant] to show the Court that [the government]

recognized there was a problem with the first search warrant," Tr. 64, and to show what

the government wished the first warrant stated but did not.  *See* Tr. 64-65.[7]

---

[7]This colloquy occurred at the hearing:

MR. EVANGELISTA: When they decided in the second warrant to include the card in the
affidavit or the part A of the search warrant, I believe that they tried to expand what the first
search warrant authorized them to search by including the language that I referenced in my
memo. I'm not accusing anyone of bad faith. It's just --

THE COURT: There's no bad faith in drawing the warrant.

MR. EVANGELISTA: Correct, Judge.

THE COURT: What you're saying is that the impropriety occurred when they searched the CD card
without having been listed in the warrant.

MR. EVANGELISTA: I'm not saying that it was even an impropriety, Judge. I'm saying is they
put in that second warrant what they are wishing that the first warrant said, but the first
warrant's language didn't say anything about the subject device being defined as the phone
and the SD card. It's not in there.

THE COURT: But you're asking for suppression based on the fact that a search was made following
the execution of the first warrant, which did not mention the CD card, right?

(continued...)



Further, Defendant argues that *United States v. Wilson*, No.

17-4106-01-CR-C-SRB, 2019 U.S. Dist. LEXIS 166318 (W.D. Mo. Sep. 16, 2019), a case

the government places significant reliance on, is factually distinguishable. In *Wilson*,

investigators testified that their agency "generally only applies for one search warrant for a

cell phone with an inserted micro SD card," and added that "only one warrant is necessary

because an inserted micro SD card is considered part of the cell phone." *Id.*, at *5.

Defendant argues that here, by contrast, "the two warrants (one that does not mention the

SD card, one that explicitly lists it) show that officers in this district list the SD card

separately when they want authority to search it." Dkt. 16, p. 4. Defendant contends that

explicitly listing storage media separately in warrant applications appears to be standard

practice in many jurisdictions. *Id.*[8]

### 2. Government's Arguments

The government argues that the Court should find that the Original Search Warrant

---

[7](...continued)
MR. EVANGELISTA: The SD card, yes, sir.

THE COURT: That's what you're here for.

MR. EVANGELISTA: Correct.

Tr. 64-65.

[8](citing *United States v. Miller*, No. 13-CR-6036L, 2013 WL 4505458, at *1 (W.D.N.Y. Aug. 16, 2013) ("The officers reported their findings to an investigator, who applied for and obtained a second search warrant to authorize a search of the camera and the SD card for any images or videos depicting child pornography."); *United States v. Jones*, No. 18-CR-6061-DGL-JWF, 2019 WL 3416737, at *1 (W.D.N.Y. Apr. 11, 2019), report and recommendation adopted as modified, No. 18-CR-6061L, 2019 WL 2511131 (W.D.N.Y. June 18, 2019) ("The Tennessee search warrants were as follows: (1) a June 29, 2016 warrant for a search of the defendant's unknown cellular devices; (2) a June 30, 2016 warrant for a search of the defendant's home for any digital and/or electronic devices; (3) a July 1, 2016 warrant for a search of the defendant's vehicle; (4) a July 5, 2016 warrant for the search and seizure of six cellular devices; (5) a July 5, 2016 warrant for a search and seizure of a Dell Inspiron laptop computer and a Samsung 80 GB hard drive; and (6) a July 25, 2017 warrant for the search and seizure of eight electronic devices, including the same Dell Inspiron laptop and Samsung hard drive, two Kodak picture cards, two compact flash drives, and two SD cards.").



authorized a search of the SD Card for two reasons. First, it notes, Attachment A to the Original Search Warrant authorizes the forensic examination of the SUBJECT PHONE "for the purpose of identifying the electronically stored information described in Attachment B." Dkt. 28 at 2 (quoting Dkt. 12, Attach A). The government contends that the plain language of Attachment B to the Original Search Warrant directs law enforcement officials to search the SUBJECT PHONE for all "records" of a SORNA violation in "whatever form and by whatever means [the records] may have been created or stored, including any form of computer or *electronic storage (such as flash memory or other media that can store data*) and any photographic form." *Id.* at 5 (quoting Dkt. 12, Attach. B)(emphasis added by government). The government asserts that the SD Card is by its very nature electronic storage, and was connected to the SUBJECT PHONE, so the Original Search Warrant provided for its lawful search. Additionally, the government contends, "Attachment B to the Original Search Warrant further directed law enforcement officials to search only those records that related to the alleged 18 U.S.C. 2250(a) violation. As a result, the Original Search Warrant particularly described those items to be searched and seized, in compliance with the Fourth Amendment." Dkt. 13, at 8.

Second, the government contends that the Court should adopt the logic applied by the Western District of Missouri in *Wilson* and find that the SD Card is a component of the SUBJECT PHONE that did not need to be specifically described in the Original Search Warrant.

Alternatively, the government argues that even if the Court finds the search of the SD Card to be outside the scope of the Original Search Warrant, law enforcement officers acted in good faith when they searched the SD Card. In this regard, the government



contends that at the November 11, 2020 evidentiary hearing it established that law enforcement officials had an objective and reasonable belief that the SD Card was a component of the SUBJECT PHONE, and could therefore be lawfully searched under the good faith exception to the exclusionary rule.

### b. Fourth Amendment

Under the Fourth Amendment to the United States Constitution, "no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "'The manifest purpose of this particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.'" *United States v. Purcell*, 967 F.3d 159, 178 (2d Cir. 2020)(quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)); *see United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013).[9] The particularity requirement also "guards against general searches that leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized." *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990); *see Marron v. United States*, 275 U.S. 192, 196 (1927);[10] *Purcell*, 967 F.3d at 178;[11] *United States v. Safford*, No. 1:17-CR-00054 (MAD),

---

[9](To guard against indiscriminate searches and seizures, "the Fourth Amendment provides that 'a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity.'")(quoting *Kentucky v. King*, 563 U.S. 452, 459 (2011))

[10](The Founders intended for the Fourth Amendment to "make[] general searches . . . impossible and prevent[] the seizure of one thing under a warrant describing another. As to what is to

(continued...)



2017 WL 11407489, at *8 (N.D.N.Y. Sept. 18, 2017),[12] *aff'd*, 814 F. App'x 638 (2d Cir.

2020). The Second Circuit has observed that the nature of the search of electronic

evidence "demands a heightened sensitivity to the particularity requirement." *Galpin*, 720

F.3d at 447 (internal quotations and citation omitted).

"To satisfy the Fourth Amendment's particularity requirement, a warrant must meet

three criteria: (1) it 'must identify the specific offense for which the police have established

probable cause'; (2) it 'must describe the place to be searched'; and (3) it 'must specify the

items to be seized by their relation to designated crimes.'" *Purcell*, 967 F.3d at 178

(quoting *Galpin*, 720 F.3d at 445-46)(internal quotation marks omitted)). "A warrant is

facially unconstitutional if it fails to comply with any of these requirements." *Id.*

### c. Analysis

Both sides present compelling arguments on the initial question of whether the

Original Search Warrant authorized a search of the SD Card consistent with the Fourth

Amendment's particularity requirement. As the government points out, Attachment A to

the Original Search Warrant "authorizes the forensic examination of the SUBJECT

DEVICE for the purpose of identifying the electronically stored information

described in Attachment B," Dkt. 12, Attach. A, and the plain language of Attachment B

directs law enforcement officials to search the SUBJECT PHONE for all "records" of a

---

[10](...continued)
be taken, nothing is left to the discretion of the officer executing the warrant.")

[11]("We have also found the particularity requirement to be violated where a warrant fails to place some 'limitation ... on the kind of evidence sought' and instead 'le[aves] it entirely to the discretion of the officials conducting the search to decide what items [a]re to be seized.'")(*United States v. Buck*, 813 F.2d 588, 592 (2d Cir. 1987)(internal quotation marks omitted))

[12]("Courts implement the particularity requirement by insisting that warrants not leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized.")

A153

SORNA violation in "whatever form and by whatever means [the records] may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form." *Id.*, Attach. B. Investigator Kozel testified based upon his considerable training, experience, and education in the field of digital forensic examinations[13] that an SD card is a type of flash media and that the purpose of an SD card and flash media, in general, is to provide additional storage to a device such as a cellular phone. *See* Dkt. 24, 6:3-16. Further, Investigator Kozel stated that an SD card is used to store digital data, and its contents cannot be viewed without an external source to display the data. *See* Dkt. 24, 16:16-25; 14:9-19; 15:3 - 16:7. Thus, the Court could find, just as the *Wilson* court found, that the SD Card is a component of the cellular telephone that provides additional data storage. Under this analysis, the Court could find the Original Search Warrant particularly described in Attachment A the item to be searched (the SUBJECT PHONE including any component part used for data storage), and particularly described in Attachment B the items to be seized (evidence of a SORNA violation contained in the SUBJECT PHONE's stored data), thus satisfying the Fourth Amendment's particularity requirement.

On the other hand, as the defendant points out, law enforcement separately identified the SUBJECT PHONE and the SD Card in the Subsequent Search Warrant.

---

[13]Investigator Kozel stated that he was an Investigator with the CCU for 13 years, and conducted over 3,600 hours of training in digital forensic examinations and cyber investigations. Investigator Kozel further testified that he holds a master's degree in Forensic Computing and Cybercrime Investigations from the University of Delaware. With regard to his training on the interaction of cellular phones and SD Cards, Investigator Kozel testified that he has received training from Paraben, Cellebrite and Teel Technologies. *See* Dkt. 24, 4:8 - 5:24. Investigator Kozel further stated that he has conducted around 600 digital forensic examinations of cell phones throughout his career, and about 25 to 50 percent of those cell phones had SD cards attached to them. *See id.*, 12:7-13.

18

A 154

This provides some indication of a policy or practice with the relevant agency to separately identify cellular phones and SD cards in search warrant applications, at least where it is evident that an SD card is inserted into a cellular phone. Although there was no testimony indicating that anyone at the USMS was specifically aware that the subject phone contained an SD card, the evidence at the evidentiary hearing showed that the SUBJECT PHONE's back cover had been removed at the USMS office to allow the battery to be taken out. When this was performed, it clearly displayed the SD port with the SD Card inserted. While the failure to separately identify the cellular phone and the SD card in *Wilson* did not result in suppression, Magistrate Judge Epps registered some reservation in that case about the practice of failing to separately identify the cellular phone and an SD card in a search warrant application. *See Wilson*, 2019 U.S. Dist. LEXIS 166318, at *10, n. 4.[14] The potential that the practice or policy exists here of separately identifying cellular phones and SD cards in search warrant applications gives the Court pause in concluding that the Fourth Amendment's particularity requirement was not violated in this case. Nevertheless, even assuming that it was, the government has established a sufficient

---

[14]Magistrate Judge Epps stated in a footnote that "it would likely be prudent to include language that specifically mentions such storage devices in future search warrants. Indeed, it appears other law enforcement departments across the country do so." *Wilson*, 2019 U.S. Dist. LEXIS 166318, at *10, n. 4 (citing *United States v. Thomas*, No. 5:16-CR-001, 2016 WL 7324095, at *2 (W.D. Va. Dec. 15, 2016), *aff'd*, 908 F.3d 68 (4th Cir. 2018)(Search warrant sought "media card, Sim card ... media cloud, any stored electronic data that may be stored inside a smart phone that would be related to this crime and/or crime scene"); *United States v. Kilman*, No. 16-CR-160 (MJD/LIB), 2016 WL 6134546, at *2 (D. Minn. Sept. 6, 2016), *report and recommendation adopted*, No. CR 16-160 (MJD/LIB), 2016 WL 6134512 (D. Minn. Oct. 20, 2016) (noting a search warrant sought "all data related to the crime of Criminal Sexual Conduct contained within the seized cellular phone, SIM card or contained media card ..."); *United States v. Winn*, 79 F. Supp. 3d 904 (S.D. Ill. 2015) (stating an officer applied for a warrant for a "cell phone and its SIM Card or SD Card ... any system files on phone, SIM Card, or SD Card, or any data contained in the cell phone, SIM Card or SD Card to include deleted space"); *United States v. Bourgeois*, No. CRIM 10-25 JRT/JJG, 2010 WL 3613822, at *3 (D. Minn. Sept. 7, 2010) (search warrant for "cell phones including memory cards;" "cameras, film, including any media memory cards;" "computer media, including all hardware and software, and storage media formats ...")).

19

*A 155*

basis to apply the good faith exception to the execution of the Original Search Warrant.

A determination that a Fourth Amendment violation occurred "does not automatically require the suppression of all physical evidence seized or statements derived from that illegal search." *United States v. Bershchansky*, 788 F.3d 102, 112 (2d Cir. 2015). As the Second Circuit has stated, "[e]ven when a search warrant is constitutionally defective, we bear in mind that '[s]uppression of evidence ... has always been [a] last resort, not [a] first impulse.'" *Purcell*, 967 F.3d at 179 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). Further, "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *United States v. Leon*, 468 U.S. 897, 918 (1984).

In *Leon*, the Supreme Court set out an exception to the exclusionary rule for a search conducted in "reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *Id.* at 905. In determining whether to apply the good faith exception, courts examine "whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." *United States v. Rosa*, 626 F.3d 56, 64 (2d. Cir. 2010) (internal quotations and citations omitted). Suppression is not warranted where agents rely in good faith on a search warrant that lacks particularity and "their actions bear none of the hallmarks of a general search."

*Rosa*, 626 F.3d at 66;[15] *see United States v. Clark*, 638 F.3d 89, 99 (2d Cir. 2011).[16]

"Thus, the good-faith inquiry here 'is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.'" *Bershchansky*, 788 F.3d at 113 (quoting *Herring*, 555 U.S. at 145). "[W]hen the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . the deterrence rationale [of the exclusionary rule] loses much of its force, and exclusion cannot pay its way." *Davis v. U.S.*, 564 U.S. 229, 238 (2011)(internal quotation marks and citations omitted)).

The evidence presented at the evidentiary hearing establishes that it was objectively reasonable for Investigator Kozel to conclude that the Original Search Warrant allowed him to conduct a forensic examination of the SUBJECT PHONE's SD card. Attachment A of the Original Search Warrant, which Investigator Kozel examined before conducting his forensic examination, "authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B." Attachment B, in turn, allows for the search of "[a]ll records on the SUBJECT DEVICE described in Attachment A that relate to violations of 18 U.S.C. § 2250(a), Failure to Register as a Sex Offender, and involve ERIC TOMPKINS." After describing the types of evidence and information the warrant authorizes to be searched for, the warrant defines the terms "records" and "information" to "include all of the foregoing items of evidence in whatever form and by whatever means they may have been

---

[15](refusing to suppress based on executing agent's good faith reliance on defective warrant)

[16](recognizing "an exception to the exclusionary rule for evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant")(internal quotation marks omitted)

A157

created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form." In light of Investigator Kozel's understanding based upon his experience, training, and education that an SD card attached to a cellular phone is part of the data storage capabilities of that phone, it was objectively reasonable for him to "move on" to a forensic examination of the SD Card after he was unable to open the phone itself because it was PIN protected. Moreover, Investigator Kozel forensically examined the contents of the SD Card for purposes of determining whether it contained evidence of a SORNA violation by the defendant, which he reasonably believed he was authorized to do. When he discovered images that appeared to contain child pornography, he ceased his examination and contacted DUSM Imburgio. This indicates that in executing the Original Search Warrant, Investigator Kozel acted in good faith reliance upon his understanding of what constitutes the component parts of a cellular phone and the data storage capabilities of such a device with an attached SD card. Under the totality of the circumstances, a reasonably well trained officer in Investigator Kozel's position with similar background and technical training would not have known that the search of the SD Card for evidence of a SORNA violation was illegal. Furthermore, for essentially the same reasons, it cannot be concluded that Investigator Kozel deliberately acted in violation of the terms of the Original Search Warrant as he understood them to be. And the fact that he ended his search of the SD Card and contacted DUSM Imburgio when he discovered what appeared to be evidence of child pornography (which is evidence beyond the scope of what the Original Search Warrant authorized him to seize) indicates that he did not engage in a general exploratory search or act with a culpable state of mind warranting exclusion.

22

*A 158*

For these reasons, the Court finds that the good faith exception to the exclusionary rule applies to Investigator Kozel's forensic examination of the SD Card. Consequently, the Court will not suppress evidence that he observed images he believed to be child pornography on the SD Card. Having reached this conclusion, the Court finds there was probable cause for the issuance of the August 14, 2019 search warrant.

## IV. CONCLUSION

For the reasons discussed above, Defendant's motion to suppress, Dkt. 9, is **DENIED**. The Court Clerk is respectfully directed to unseal Dkt. 12 and Dkt. 12-1.

**IT IS SO ORDERED.**

Dated: January 28, 2021

Thomas J. McAvoy
Senior, U.S. District Judge

A 159

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.   1:20-CR-00037 (TJM) |
| | ) | |
| **v.** | ) | **Conditional Plea Agreement** |
| | ) | |
| **ERIC WILLIAM TOMPKINS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

U.S. DISTRICT COURT - N.D. OF N.Y.

**FILED**

AUG 1 1 2021

AT_____ O'CLOCK_____
John M. Domurad, Clerk - Albany

The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of New York, and defendant **Eric William Tompkins** (hereinafter "the defendant"), by and through the defendant's counsel of record, hereby enter into the following plea agreement pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure:

1) <u>**The Defendant's Obligations:**</u>

   a) **Guilty Plea:** The defendant will change the defendant's previously-entered plea of "not guilty" and plead guilty to Count 1 of indictment in Case No. 1:20-CR-00037 (TJM) charging possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B).

   b) **Special Assessment:** The defendant will pay an assessment of $100, pursuant to 18 U.S.C. § 3013, payable to the U.S. District Court, at the time of sentencing.

   c) **Additional Special Assessment:** In addition to the assessment imposed under § 3013, unless the court finds the defendant to be indigent, the defendant shall pay an additional assessment of $5,000, pursuant to 18 U.S.C. § 3014(a). This assessment is payable only after the defendant has satisfied all outstanding court-ordered fines, orders of restitution, and any other obligation related to victim-compensation arising from the criminal convictions on which this assessment is based. 18 U.S.C. § 3014(b).

*A 160*

d) **Compliance with Other Terms of Agreement:** The defendant will comply in a timely manner with all of the terms of this plea agreement.

e) **Restitution:** The minors depicted in the images involved in the defendant's criminal activity, along with any and all relevant conduct, are victims of his offense, whether or not those minors are named in the indictment or identified in the factual basis of the defendant's guilty plea. The defendant therefore consents to an order pursuant to 18 U.S.C. § 2259(a) and (b)(2) directing him to pay restitution in an amount to be agreed to by the parties or determined by the court for the full amount of the victims' losses that were incurred or are reasonably projected to be incurred by the victims as a result of the trafficking in child pornography depicting the victims. The Court shall order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the victims' losses, but which is no less than $3,000 per victim. 18 U.S.C. § 2259 (b)(2)(A) and (B).

   The "full amount of the victims' losses" includes any costs incurred, or that are reasonably projected to be incurred in the future, by the victims, as a proximate result of the offenses involving the victims, including: medical services relating to physical, psychiatric, or psychological care; physical and occupational therapy or rehabilitation; necessary transportation, temporary housing, and child care expenses; lost income; reasonable attorneys' fees, as well as other costs incurred; and any other relevant losses incurred by the victims. 18 U.S.C. § 2259(c)(2)(A)-(F).

f) **Child Pornography Assessment:** In addition to any other criminal penalty, restitution, or special assessment authorized by law, pursuant to 18 U.S.C. § 2259A(a), the court shall order a mandatory assessment for in an amount of not more than $17,000 pursuant to 18 U.S.C. § 2259A(a)(1). The court shall consider the factors set forth in sections 3553(a)

and 3572 to determine the amount of the assessment, 18 U.S.C. § 2259A(c), and imposition of such assessment does not relieve the defendant of, or entitle the defendant to reduce the amount of any other penalty by the amount of the assessment. 18 U.S.C. § 2259A(d).

g) **Forfeiture:** Pursuant to 18 U.S.C. § 2253 and 21 U.S.C. § 853(p), the defendant will consent to entry of an order directing forfeiture to the United States of the property described in the Forfeiture Allegation in the information described above, and as more fully set out below:

(1) A Samsung model SM-J336AZ, IMEI: 355269091218588, bearing serial number R28K53A6L4T; and

(2) A SanDisk Micro SD XC 1 card, bearing serial number 88460VJG50FF

2) The Government's Obligations:

a) **Non-prosecution for other offenses:** For so long as the defendant's guilty plea and the sentence remain in effect, the government will not seek other federal criminal charges against the defendant based on conduct described in the indictment in Case No 1:21-CR-00037 (TJM) and/or in the paragraph of this agreement entitled "Factual Basis for Guilty Plea," occurring before the date on which the defendant signs this agreement. This agreement does not prevent the government from seeking charges based on other conduct.

b) **Compliance with Other Terms of Agreement:** The government will comply in a timely manner with all of the terms of this plea agreement.

3) **Potential Maximum Penalties:** The defendant understands that the Court can impose the following maximum penalties for the offense to which the defendant agrees to plead guilty and may be required to impose mandatory minimum terms of imprisonment, all as set out below:

a) **Maximum term of imprisonment:** 20 years, pursuant to 18 U.S.C. § 2252A(b)(2).

b) **Mandatory minimum term of imprisonment:** 10 years, pursuant to 18 U.S.C. § 2252A(b)(1).

c) **Maximum fine:** $250,000, pursuant to 18 U.S.C. § 3571b)(3)

d) **Supervised release term:** In addition to imposing any other penalty, the sentencing court must require the defendant to serve a term of supervised release between 5 years and life, to begin after imprisonment. *See* 18 U.S.C. § 3583(k). A violation of the conditions of supervised release during that time period may result in the defendant being sentenced to an additional term of imprisonment.

e) **Required Registration for Sex Offenders:** Under the Sex Offender Registration and Notification Act, the defendant, as a result of the conviction in this case, must register as a sex offender, and keep the registration current, in each jurisdiction where the defendant resides, where the defendant is an employee, and where the defendant is a student. For initial registration purposes, the defendant also must register in New York as a result of this conviction, even if the defendant resides in a different jurisdiction. A sex offender who knowingly fails to register or update a required registration may be subject to prosecution under 18 U.S.C. § 2250, and face a penalty of up to ten years imprisonment.

f) **Other adverse consequences:** Other adverse consequences may result from the defendant's guilty plea as further described in paragraph F below.

4) **Elements of Offense:** The defendant understands that the following are the elements of the offense to which the defendant agrees to plead guilty. The defendant admits that the defendant's conduct satisfies each and every one of these elements.

a) *First*, the defendant knowingly possessed material that contains one or more visual depictions that were child pornography;

4

b) *Second*, the visual depictions had been mailed or shipped or transported using a means or facility of interstate commerce or foreign commerce, or in or affecting such commerce by any means including by computer, or were produced using materials that had been shipped or transported in and affecting such commerce by any means including by computer;

c) *Third*, the defendant knew of the sexually explicit nature of the visual depictions and that the visual depictions were of an actual minor or minors engaged in sexually explicit conduct; and

d) *Fourth*, the defendant has a prior conviction under the law of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving any minor.

5) **Factual Basis for Guilty Plea:** The defendant admits the following facts, that those facts demonstrate the defendant's guilt for the offense to which the defendant is pleading guilty, and that there are no facts establishing a viable defense to that offense:

a) On or about July 23, 2009, the defendant pled guilty in the Superior Court of Washington for Okanogan County to Child Molestation in the Third Degree, in violation of Revised Code of Washington Section 9A 44.089, which makes it unlawful to have sexual contact with a person who is at least fourteen years old but less than sixteen years old when the perpetrator is at least forty-eight months older than the victim, and on or about September 3, 2009, the defendant was sentenced to 12 months incarceration .

b) On April 19, 2019, the defendant knowingly possessed child pornography on a Samsung SM-J336AZ cellular phone, bearing serial number 88460VJG0FF ("Cellular Phone") containing a SanDisk Micro SD XC I card bearing serial number 88460VJG50FFc ("SD Card") inserted inside of and attached to the phone's SD card port.

c) A forensic search of the defendant's phone and attached SD card, confirmed that the defendant possessed 26 images of child pornography on the cellular telephone and its attached Micro SD card. An example of the recovered images include the following:

(1) **Image 12: 1RipfRzITYgp4Zy7Dr9eTinHffQ.cnt:** (March 25, 2019). This image file depicts a naked female baby posed on her side with an adult thumb spreading open the labia, exposing the baby's vulva.

(2) **Image 27: mPJ6ZDntAmtNVHcTpFspd9LD-0Q.cnt:** (March 24, 2019). This image depicts a naked prepubescent girl posing on a bed, laying on her side with her knees up toward her chest, exposing her vagina. The lascivious exhibition of the child's vagina is the focal area of the image.

(3) **Image 35: Screenshot_20190316-225523_Tumblr.jpg:** (March 16, 2019). This image depicts four prepubescent girls, all below 12 years of age, standing in front of what appears to be a bed, holding their shirts up above their exposed breasts while their underwear is pulled down to their upper thigh, exposing their genital areas.

(4) **Image 41: Screenshot_20190324-145353_Tumblr.jpg:** This image depicts the lascivious exhibition of the genitals of a prepubescent girl who is posed sitting with her legs spread, pelvis slightly lifted, exposing her vagina. Her right hand holds up her shirt to further expose her vaginal area.

d) The defendant knowingly possessed the images of child pornography on his Samsung SM-J336AZ cellular phone, bearing serial number 88460VJG0FF and SanDisk Micro SD XC 1 card bearing serial number 88460VJG50FF, both of which were manufactured in China. The Cell Phone and SD Card were therefore used to facilitate the offense of conviction. The defendant is the owner of the Cell Phone and SD Card.

A165

6) **Sentencing Stipulations:**

a) The defendant's base offense level is 18 pursuant to U.S.S.G. § 2G2.2(a)(1).

b) The offense level is increased by two levels pursuant to U.S.S.G. § 2G2.2(b)(2) because the offense involved a prepubescent minor or a minor who had not attained the age of 12 years.

c) The offense level is increased by two levels pursuant to U.S.S.G. § 2G2.2(4) because the offense involved infants or toddlers.

d) The offense level is increased by two levels pursuant to U.S.S.G. § 2G2.2(b)(6) because the offense involved the use of a computer.

e) The offense level is increased by two levels pursuant to U.S.S.G. § 2G2.2(b)(7)(A) because the offense involved at least 10 images but fewer than 150 images.

f) The government will recommend a 2-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. § 3E1.1(a) if, (i) through the time of sentencing, the government is convinced that the defendant has demonstrated "acceptance of responsibility" for the offense to which the defendant is pleading guilty and all relevant conduct, as defined in U.S.S.G. § 1B1.3; and (ii) the government does not determine that the defendant, after signing this agreement, committed any other federal, state, or local crimes, or engaged in conduct that constitutes "obstruction of justice," as defined in U.S.S.G. § 3C1.1.

g) The government will move for a 1-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. § 3E1.1(b) if the government is convinced that the defendant has accepted responsibility within the meaning of U.S.S.G. § 3E1.1(a) and further assisted authorities in the investigation or prosecution of the

7

A166

defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, and the defendant otherwise qualifies for such adjustment by having a combined offense level of 16 or more before receipt of any acceptance of responsibility adjustment under U.S.S.G. § 3E1.1(a).

7) **Waiver of Rights to Appeal and Collateral Attack:** The defendant waives (gives up) any and all rights, including those conferred by 18 U.S.C. § 3742 and/or 28 U.S.C. §§ 2241 and 2255, to appeal and/or to collaterally attack the following (except that the defendant does not waive the right to raise a claim based on alleged ineffective assistance of counsel):

a) The conviction resulting from the defendant's guilty plea;

b) Any claim that the statute to which the defendant is pleading guilty is unconstitutional;

c) Any claim that the admitted conduct does not fall within the scope of the statute;

d) Any sentence to a term of imprisonment of 151 months or less;

e) Any sentence to a fine within the maximum permitted by law;

f) Any sentence to a term of supervised release within the maximum permitted by law;

g) Any order of forfeiture or restitution imposed by the Court that is consistent with governing law and is not contrary to the terms of this agreement.

Nothing in this appeal waiver is meant to be or should be construed as a representation of or agreement concerning the appropriate sentence in this case.

Pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, the parties agree that with the consent of the Court, the defendant reserves the right to have an appellate court review the following determinations adverse to the defendant in the Court's Decision and Order issued on

A167

January 28, 2021, denying the defendant's motion to suppress the child pornography recovered from the defendant's cellular telephone and Micro SD card, filed on June 12, 2020. If the defendant prevails on that appeal, the defendant will be permitted to withdraw the guilty plea without penalty.

---

A. **Right to Counsel:** The defendant has a right to assistance of counsel in connection with settlement of this case and understands that right. Defense counsel has advised the defendant of nature of the charges to which the defendant is agreeing to plead guilty and the range of possible sentences.

B. **Waiver of Trial-Related Rights:** The defendant has the following additional constitutional rights in connection with the charges in this case: (i) to be presumed innocent until proven guilty beyond a reasonable doubt; (ii) to plead not guilty; (iii) to trial by jury; (iv) to confront, cross-examine, and compel the attendance of witnesses at trial; (v) to present defense evidence; and (vi) to remain silent and be protected against compelled self-incrimination. The defendant understands that by pleading guilty, the defendant waives (gives up) these rights.

C. **Court Not Bound by Plea Agreement:** This plea agreement is made pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure. The Court is neither a party to, nor bound by this Plea Agreement. The Court may accept or reject this Plea Agreement or defer a decision until it has considered the Presentence Investigation Report prepared by the United States Probation Office. If the Court rejects the provisions of this agreement permitting the defendant to plead guilty to certain charges in satisfaction of other charges, the Court will permit the defendant to withdraw the plea of guilty before sentencing, pursuant to Fed. R. Crim. P. 11(c)(5) & (d).

D. **Court Not Bound by Agreed-Upon Recommendations, Stipulations, and Requests:** If this agreement contains any provisions under Fed. R. Crim. P. 11(c)(1)(B) by which the government agrees to recommend, stipulates, or agrees not to oppose the defendant's request, that a particular sentence or sentencing range is appropriate or that a particular provision of the federal sentencing guidelines, or a policy statement, or sentencing factor does or does not apply, such a recommendation, stipulation, or request does not bind the Court, which may make independent factual findings by a preponderance of the evidence and may reject such recommendations, requests, and stipulations between the parties. If the Court rejects one or more recommendations, stipulations, or requests, the defendant is not entitled to withdraw the defendant's plea of guilty and is not released from the obligations described in this agreement. Under such circumstances, the government reserves the right to support and defend, in connection with any post-sentencing proceedings, any decision the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations, stipulations, or requests set out in this agreement.

E. **Sentencing:**

   a. **Maximum terms of imprisonment:** The defendant understands that the Court has discretion to impose a sentence within the statutory maximum sentence(s) set out in this agreement. If the defendant is pleading guilty to multiple charges, the Court may be required by law to have the sentences of imprisonment on the convictions resulting from those charges run consecutively to each other. Otherwise, the Court has discretion to have sentences of imprisonment run concurrently or consecutively. *See* 18 U.S.C. § 3584.

   b. **Mandatory minimum terms of imprisonment:** If specified in this agreement, the conviction on one or more charges to which the defendant has agreed to plead guilty may

require imposition of a mandatory minimum term of imprisonment. In such cases, the court must impose a term of imprisonment no less than the required mandatory minimum term unless an exception to that requirement applies. Such exception may be dependent on a motion by the government.

c. **Section 851 Enhancements**: The defendant understands that if the government has filed an information against the defendant as provided 21 U.S.C. § 851, alleging that the defendant has one or more final convictions for a felony drug offense, and, as part of this agreement, the defendant has admitted and/or affirmed that the defendant was so convicted, then, by pleading guilty, the defendant will lose the right to attack any sentence the court imposes by challenging any such prior conviction.

d. **Sentencing guidelines:**

   i. The actual sentence to be imposed upon the defendant is within the discretion of the sentencing Court, subject to the statutory maximum and mandatory minimum penalties, as described above, and the provisions of the Sentencing Reform Act and the United States Sentencing Guidelines promulgated thereunder. While the Court is not bound to impose a sentence within the applicable sentencing guidelines range, it must take into account the sentencing guidelines, along with the other factors set forth in 18 U.S.C. § 3553(a).

   ii. Any estimate of the defendant's offense level, criminal history category, and sentencing guidelines range provided before sentencing is preliminary and is not binding on the parties to this agreement, the Probation Office, or the Court. Until the Probation Office has fully investigated the defendant's criminal history, it is not possible to predict with

11

certainty the defendant's criminal history category and, in some cases, the defendant's offense level.

iii. Under certain circumstances, the defendant's criminal history may affect the defendant's offense level under the federal sentencing guidelines. If the presentence investigation reveals that the defendant's criminal history may support an offense level different than an offense level stipulated in this agreement, the parties are not bound by any such stipulation as to the defendant's offense level and may advocate with respect to how the defendant's criminal history affects the offense level.

e. **Factual findings:** The defendant understands that the sentencing Court may make factual findings with respect to any and all sentencing factors and issues, including those referenced in the United States Sentencing Guidelines, whether or not such factors or issues have been admitted by the defendant or stipulated by the parties. In making those findings by a preponderance of the evidence, the Court may consider any reliable evidence, including hearsay. The Defendant understands that the sentence imposed may be determined based upon such judicial fact-finding.

f. **Use of the Defendant's Statements:** The defendant understands that the sentencing court may consider any statement that the defendant has made or makes in this Plea Agreement, during the guilty plea, to the Probation Office, and at sentencing when imposing sentence. In addition the government may be able to use the defendant's statements in this agreement and at the guilty plea and at sentencing in any criminal, civil, or administrative proceeding. For example, if the defendant fails to enter a guilty plea (as required by this agreement) or the defendant's guilty plea is later withdrawn or vacated for any reason other than the Court's rejection of this Plea Agreement under Fed. R. Crim. P. 11(c)(5), or the defendant's

withdrawal pursuant to Rule 11(a)(2), the government may introduce the defendant's statements into evidence in any prosecution. If, however, the Court rejects this Plea Agreement under Fed. R. Crim. P. 11(c)(5), and the defendant withdraws the guilty plea pursuant to Fed. R. Crim. P. 11(d)(2)(A), the government will not be permitted to use any of the defendant's statements in this Plea Agreement. To the extent that Rule 11(f) of the Federal Rules of Criminal Procedure and/or Rule 410 of the Federal Rules of Evidence are inconsistent with this paragraph, the defendant waives (gives up) any protections under those rules.

g. **Government's Discretion to Recommend a Sentence:** Unless a stipulation in this agreement explicitly limits the government's discretion with respect to its recommendations at sentencing, this agreement does not prevent the government from urging the sentencing Court to find that a particular offense level, criminal history category, ground for departure, or guidelines range applies; from recommending a specific sentence within the applicable guidelines range as determined by the Court or as urged by the government; or, if the government deems appropriate, recommending that the Court impose a sentence above the applicable guidelines range.

h. **Sentencing-Related Information:** The government has the right to advise the sentencing Court and the Probation Office of any information, in aggravation or mitigation of sentencing, whether or not encompassed within the count(s) to which the defendant has agreed to plead guilty, subject only to the limitation described in U.S.S.G. §1B1.8. No stipulation in this plea agreement limits the obligations of both parties to ensure that the sentencing Court has all information pertinent to its determination of an appropriate sentence. The parties may provide any factual information relevant to sentencing to the

13

*A172*

Probation Office and/or to the Court, without limitation, before or after the completion of the Presentence Investigation Report. The parties agree that the submission of such information shall not be deemed "advocacy" in violation of any stipulation in this plea agreement.

i. **Supervised Release Term and Conditions:** If the defendant is placed on supervised release, under some circumstances, including the defendant's violation of one or more supervised release conditions, the Court may extend the term of supervised release, and may modify, reduce, or enlarge the conditions of such release.

F. **Other Adverse Consequences:** The following are some examples of the adverse consequences of pleading guilty other than the sentence imposed by the Court, along with any judicial order of forfeiture and/or restitution:

a. Conviction of a felony may result in the loss of civil rights, including, but not limited to, the right to vote and the right to possess firearms.

b. If the defendant is not a United States citizen, such conviction may result in deportation or removal from the United States, may bar readmission to the United States if the defendant leaves the country, and may result in a denial of a pending or future application for citizenship. If the defendant is a naturalized United States citizen, such conviction may result in denaturalization, followed by deportation or removal from the United States. Under federal law, removal or deportation may be an almost certain consequence of a conviction for a broad range of federal offenses, including, but not limited to, aggravated felonies, as defined in 8 U.S.C. § 1101(a)(43), and crimes of moral turpitude, which includes crimes involving fraud. Removal and other immigration consequences are the subject of a separate proceeding. No one, including the defendant's attorney and the Court,

14

A173

can predict with certainty the effect of the conviction resulting from this agreement on the defendant's immigration status. The defendant understands this uncertainty and nonetheless wishes to plead guilty regardless of any immigration consequences that the guilty plea may entail, even if the consequence is the defendant's automatic removal from the United States.

c. A felony conviction may adversely affect the defendant's ability to hold certain professional licenses and may impair the defendant's ability to do business with federal, state, and local governments or to receive benefits from such governments.

There may be other adverse consequences as well, some of them unforeseeable. It may be difficult or impossible to predict all of the adverse consequences of the defendant's guilty plea. The defendant agrees that any resulting adverse consequences, whether or not foreseen or foreseeable, will not provide a basis for withdrawing from the guilty plea described in this agreement or otherwise challenging the resulting conviction and sentence.

G. **Restitution:** Independent of any agreement to pay restitution, and whether there is any such agreement, the sentencing Court may be required to order that the defendant pay restitution to any victim of the offense(s) of conviction under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. In addition, the sentencing Court may have the authority to order that the defendant pay restitution to any victim of the offense(s) of conviction pursuant to 18 U.S.C. §§ 3663 & 3664. In any case involving a conviction for a sexual exploitation offense in chapter 110 of title 18 of the United States Code, the Court must order restitution for the full amount of the victim's losses as determined by the court. The victim's losses include, but are not limited to medical services related to physical, psychiatric, or psychological care; physical or

15

A174

occupational therapy or rehabilitation; necessary transportation, temporary housing, and child care expenses; lost income; attorney's fees and other costs; and any other losses suffered by the victim as a proximate result of the offense. The restitution payment will be in addition to any other civil or criminal penalty authorized by law.

H. **Forfeiture:** If the defendant has agreed to forfeiture of assets, the defendant agrees to the following terms and conditions:

a.  The defendant hereby forfeits, to the United States, all right, title, and interest of any nature in any and all assets that are subject to forfeiture, including substitute assets, as set forth above, whether those assets are in the possession or control of the defendant, a nominee, or some other third party.

b.  The defendant consents to the entry of an order of forfeiture of the assets described above.

c.  The defendant is aware that pursuant to Rule 32.2(b)(4)(A) of the Federal Rules of Criminal Procedure, a preliminary order of forfeiture becomes final as to a given defendant at sentencing or at any time before sentencing if the defendant consents. The defendant consents that the preliminary order of forfeiture in this case shall become final as to the defendant before sentencing, as of the date the preliminary order of forfeiture is entered by the Court. The defendant understands that the government, upon entry of the preliminary order of forfeiture, will address any potential third party claims pursuant to Rule 32.2(c), and seek to finalize forfeiture.

d.  Forfeiture of the defendant's assets will not satisfy all, or any portion of, a fine, restitution, or other monetary penalty that the Court may impose upon the defendant in addition to forfeiture. Satisfaction of all, or any portion of, any restitution, fine, or other penalty that

the Court may impose upon the defendant in addition to forfeiture will not satisfy all, or any portion of, any forfeiture judgment ordered by the Court.

e. In the event that any successful claim is made, by any third party, to the assets described above, the defendant agrees to forfeit substitute assets equal in value to the assets transferred to any such third party. The defendant agrees that forfeiture of substitute assets shall not be deemed an alteration of the Defendant's sentence.

f. The defendant agrees to cooperate with the United States by taking whatever steps are necessary to pass clear title to the United States of any forfeitable assets, including but not limited to, surrendering title; completing any documents or legal proceedings required to transfer assets to the United States; and taking necessary steps to ensure that assets subject to forfeiture are not sold, disbursed, expended, destroyed, damaged, hidden or otherwise made unavailable for forfeiture or removed beyond the jurisdiction of the Court.

g. The defendant waives the right to a jury trial on the forfeiture of assets. The defendant waives all constitutional, legal, and equitable defenses to the forfeiture of assets, as provided by this agreement, in any proceeding, including but not limited to any jeopardy defense or claim of double jeopardy or any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of an excessive fine.

h. The defendant acknowledges that the government may institute civil or administrative proceedings against any or all of the defendant's forfeitable assets, including, but not limited to substitute assets and any forfeitable assets not identified by the defendant, and agrees not to contest any such forfeiture proceedings.

A176

i.  The defendant represents and warrants that the defendant has no direct or indirect interest in any property, real or personal, or other asset subject to forfeiture by virtue of this plea agreement, other than those listed above.

j.  In the event the government determines that the defendant has breached any condition of this plea agreement, none of the forfeited property shall be returned to the defendant, nor shall the defendant assert any claim to the forfeited property. The defendant shall not reacquire any forfeited property, directly or indirectly, through family members, nominees, friends, or associates.

I.  **Determination of Financial Condition and Payment of Interest and Penalties:**

a.  In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees fully to disclose all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party.

b.  The defendant will promptly submit a complete, accurate, and truthful financial statement to the United States Attorney's Office, in a form it provides and as it directs.

c.  The defendant authorizes the United States Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

d.  Interest and penalties may accrue, as a matter of law, on any unpaid financial obligation imposed as part of the defendant's sentence, from as early as the date of sentencing.

J.  **Remedies for Breach:**

a.  Should the government determine that the defendant, after the date the defendant has signed this plea agreement, (i) has committed any further crime or violated any condition

18

A 177

of release or supervision imposed by the Court (whether or not charged); (ii) has given false, incomplete, or misleading testimony or information; or (iii) has moved to withdraw the defendant's guilty plea for reasons other than those described in this agreement or otherwise has breached any term or condition of this plea agreement or supplemental agreements with the government, the government will have the right, in its sole discretion, to void this agreement, in whole or in part. In the event of such breach, the defendant will remain obligated to plead guilty and otherwise comply with the terms of this agreement and will not be permitted to withdraw the defendant's guilty plea under this agreement. The defendant will be subject to prosecution for any federal criminal violation of which the government has knowledge, including but not limited to charges that this Office has agreed to dismiss or not to prosecute under this agreement.

b.  If the defendant breaches this agreement, the government will have the following remedies, among others, available to it:

i.  To bring prosecution for any federal criminal offenses dismissed or not prosecuted under this agreement. The defendant waives (gives up) any defense or objection to the commencement of any such prosecution that is not time-barred by the applicable statute of limitations as of the date on which the defendant signed this plea agreement, notwithstanding the expiration of the statute of limitations between the signing of the agreement and the commencement of any such prosecution.

ii.  In connection with any such prosecution, any information, statement, and testimony provided by the defendant, and all leads derived therefrom, may be used against the defendant, without limitation and without regard to any rights the defendant may have under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410.

A178

iii. To utilize any information, statement, or testimony provided by the defendant in any proceeding, including at sentencing, notwithstanding U.S.S.G. §1B1.8;

iv. To advocate if, and how, any particular adjustment or specific offense characteristic affects the applicable Sentencing Guidelines range without regard to any contrary stipulations contained in this agreement;

v. To refrain from making any sentencing-related motion favorable to the defendant without regard to any provision in this agreement obligating the government to consider making or make such motion upon fulfillment of certain conditions;

vi. To urge the sentencing Court to take the defendant's breach into account when imposing sentence;

vii. To recommend any sentence the government deems appropriate, even if such recommendation is at odds with any stipulation in this agreement.

K. **Limitations:** This agreement is between the United States Attorney's Office for the Northern District of New York and the defendant. References to "the government" in this agreement refer only to that Office. This agreement does not bind any other federal, state, or local prosecuting authorities. Furthermore, this agreement does not prohibit the United States, any agency thereof, or any third party from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant, including, but not limited to, proceedings by the Internal Revenue Service relating to potential civil tax liability, proceedings relating to the forfeiture of assets, and proceedings by the Department of Homeland Security, Bureau of Citizenship and Immigration Services relating to the immigration status of the defendant.

A 179

L. **Agreement Must be Signed; Modifications Must be Written or on the Record:** This agreement, to become effective, must be signed by all of the parties listed below. No promises, agreements, terms, or conditions other than those set forth in this plea agreement will be effective unless memorialized in writing and signed by all parties or confirmed on the record before the Court.

M. **Agreement to Plead Guilty Voluntary:** The defendant acknowledges reading each of the provisions of this plea agreement with the assistance of counsel and understands its provisions. The defendant further acknowledges that the defendant's agreement to plead guilty is voluntary and did not result from any force, threat, or promises (other than the promises in this plea agreement and any written supplemental agreements or amendments).

ANTOINETTE T. BACON
*Acting United States Attorney*

/s/ Rachel Williams

8·11·21

_____          _____
Rachel L. Williams                              Date
Assistant United States Attorney
Bar Roll No. 701542

8·11·21

_____          _____
Eric William Tompkins                           Date
Defendant

8.11.21

_____          _____
Paul Evangelista                                Date
Attorney for Defendant
Bar Roll No. 507507

A180

# UNITED STATES DISTRICT COURT

## Northern District of New York

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|

**v.**

Eric Tompkins
a.k.a. Eric W. Tompkins

Case Number:  DNYN 1:19CR00165-001
DNYN 1:20CR00037-001

USM Number:  26045-052

Paul J. Evangelista, Assistant Federal Public Defender
54 State Street, Suite 310
Albany, NY 12207
518-436-1850
Defendant's Attorney

## THE DEFENDANT:

☒  pleaded guilty to count(s)     1   of Indictment 1:19CR165 on September 9, 2019 and 1 of Indictment 1:20CR37 on August 11, 2021.
☐  pleaded nolo contendere to count(s)  which was accepted by the court.
☐  was found guilty on count(s) of the  on  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 1:19CR165 | | | |
| 18 U.S.C. § 2250(a) | Failure to Register as a Sex Offender | 03/18/2019 | 1 |
| 1:20CR37 | | | |
| 18 U.S.C. §§ 2252A(a)(5)(B) & 2252A(b)(2) | Possession of Child Pornography | 03/28/2019 | 1 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment.  The sentence is imposed in accordance with 18 U.S.C. § 3553 and the Sentencing Guidelines.

☐  The defendant has been found not guilty on count(s)
☐  Count(s)  ☐ is  ☐ are  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

March 16, 2022
Date of Imposition of Judgment

Thomas J. McAvoy
Senior, U.S. District Judge

March 16, 2022
Date

A181

DEFENDANT:      Eric Tompkins
CASE NUMBERS: DNYN 1:19CR00165-001 & DNYN 1:20CR00037-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:
**41 months on Count 1 of Indictment 1:19CR165 and 120 months on Count 1 of Indictment 1:20CR37,
counts to run concurrently, for a total term of imprisonment of 120 months**

☒ The court makes the following recommendations to the Bureau of Prisons:

    1.   The defendant participate in sex offender treatment.

    2.   The defendant participate in substance abuse treatment.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at  ☐ a.m. ☐ p.m. on.

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on.

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

**I have executed this judgment as follows:**

Defendant delivered on _____ to _____

at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

_____
BY DEPUTY UNITED STATES MARSHAL

A182

DEFENDANT:    Eric Tompkins
CASE NUMBERS: DNYN 1:19CR00165-001 & DNYN 1:20CR00037-001

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:
**5 years on Count 1 of Indictment 1:19CR165 and 15 years on Count 1 of Indictment 1:20CR37**

## MANDATORY CONDITIONS

1. You must not commit another federal, state, or local crime.

2. You must not unlawfully possess a controlled substance.

3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

    ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

4. ☐ You must make restitution in accordance with 18 U.S.C. § § 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*

5. ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(deselect if inapplicable)*

6. ☒ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

If this judgment imposes a fine or restitution, it is a condition of supervised release that you pay in accordance with the Schedule of Payments sheet of this judgment.

You must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

A183

DEFENDANT:     Eric Tompkins
CASE NUMBERS: DNYN 1:19CR00165-001 & DNYN 1:20CR00037-001

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4.  You must answer truthfully the questions asked by your probation officer.

5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12. If the court determines in consultation with your probation officer that, based on your criminal record, personal history and characteristics, and the nature and circumstances of your offense, you pose a risk of committing further crimes against another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

13. You must follow the instructions of the probation officer related to the conditions of supervision.

14. You must provide the probation officer with access to any requested financial information.

15. You must submit your person, and any property, house, residence, vehicle, papers, effects, computer, electronic communications devices, and any data storage devices or media, to search at any time, with or without a warrant, by any federal probation officer, or any other law enforcement officer from whom the Probation Office has requested assistance, with reasonable suspicion concerning a violation of a condition of probation or supervised release or unlawful conduct by you. Any items seized may be removed to the Probation Office or to the office of their designee for a more thorough examination.

*A184*

DEFENDANT:      Eric Tompkins
CASE NUMBERS: DNYN 1:19CR00165-001 & DNYN 1:20CR00037-001

## SPECIAL CONDITIONS OF SUPERVISION

1.  You shall not have direct contact with any child you know or reasonably should know to be under the age of 18 without the permission of the probation officer. If you do have any direct contact with any child you know or reasonably should know to be under the age of 18 without the permission of the probation officer, you shall report this contact to the probation officer within 24 hours. Direct contact includes written communication, electronic communication, in-person communication, or physical contact. Direct contact does not include incidental contact during ordinary daily activities in public places.

2.  You shall not go to, or remain at, any place where you know children under the age of 18 are likely to congregate, including parks, schools, playgrounds, and childcare facilities without the permission of the probation officer.

3.  You shall not go to, or remain at, a place for the primary purpose of observing or contacting children under the age of 18.

4.  You shall undergo a psychosexual evaluation and, if recommended by the evaluator, you shall participate in a mental health treatment program, which may include, but will not be limited to, participation in a sex offense-specific treatment program. The probation office shall approve the location, frequency, and duration of treatment. You shall abide by the rules of the program. You shall contribute to the cost of any evaluation, testing, treatment and/or monitoring services rendered in an amount to be determined by the probation officer based on your ability to pay and the availability of third party payments.

5.  Your supervision may include examinations using a polygraph, computerized voice stress analyzer, or other similar device to obtain information necessary for supervision, case monitoring, and treatment. You shall answer the questions posed during the examination, subject to your right to challenge in a court of law the use of such statements as violations of your Fifth Amendment rights. In this regard, you shall be deemed to have not waived your Fifth Amendment rights. The results of any examinations shall be disclosed to the U.S. Probation Office and the Court, but shall not be further disclosed without the approval of the Court.

6.  You shall not use or possess any computer, data storage device, or any internet capable device unless you participate in the Computer and Internet Monitoring Program (CIMP), or unless authorized by the Court or the U.S. Probation Office. If placed in the CIMP, you shall comply with all of the rules of the program and pay the costs associated with the program. The U.S. Probation Office may use and/or install any hardware or software system that is needed to monitor your use of a computer or internet capable device. You shall permit the U.S. Probation Office to conduct periodic, unannounced examinations of any computer equipment, including any data storage device, and internet capable device you use or possess. This equipment may be removed by the U.S. Probation Office or their designee for a more thorough examination. You may be limited to possessing one personal internet capable device to facilitate the U.S. Probation Office's ability to effectively monitor your internet related activities.

7.  If your employment requires the use of a computer, you may use a computer in connection with the employment approved by the probation officer, at your place of employment, provided you notify your employer of: (1) the nature of your conviction; and (2) the fact that your conviction was facilitated by the use of the computer. The Probation Office shall confirm your compliance with this notification requirement.

8.  You shall participate in a program for substance abuse which shall include testing for use of controlled substances, controlled substance analogues, and alcohol. This may include outpatient treatment as recommended by the treatment provider based upon your risk and needs. You may also be required to participate in inpatient treatment upon recommendation of the treatment provider and upon approval of the Court. The probation office shall approve the location, frequency, and duration of outpatient treatment. You shall abide by the rules of any treatment program which may include abstaining from the use of any alcohol. You shall contribute to the cost of any evaluation and/or treatment in an amount to be determined by the probation officer based on your ability to pay and the availability of third party payments.

A185

DEFENDANT:     Eric Tompkins
CASE NUMBERS: DNYN 1:19CR00165-001 & DNYN 1:20CR00037-001

## DEFENDANT'S ACKNOWLEDGMENT OF APPLICABLE CONDITIONS OF SUPERVISION

Upon a finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

The conditions of supervision have been read to me.  I fully understand the conditions and have been provided a copy of them.  For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.


_____
Defendant

_____
Date


_____
U.S. Probation Officer/Designated Witness

_____
Date


A 186

DEFENDANT:     Eric Tompkins
CASE NUMBERS: DNYN 1:19CR00165-001 & DNYN 1:20CR00037-001

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **JVTA Assessment*** | **AVAA Assessment**** | **Fine** | **Restitution** |
|---|---|---|---|---|---|
| **TOTALS** | $ 200 | $ 0 | $ 0 | $ 0 | $ 0 |

☐   The determination of restitution is deferred until.  An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such
       determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

       If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in
       the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid
       before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
|  | $ | $ |  |
| **Totals** | $ | $ |  |

☐   Restitution amount ordered pursuant to plea agreement   $

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the
       fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to
       penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

       ☐   the interest requirement is waived for the    ☐ fine   ☐   restitution.

       ☐   the interest requirement for the    ☐   fine   ☐ restitution is modified as follows:

*Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
**Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
***Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or
after September 13, 1994, but before April 23, 1996.

A 187

DEFENDANT:       Eric Tompkins
CASE NUMBERS: DNYN 1:19CR00165-001 & DNYN 1:20CR00037-001

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   ☒   In full immediately; or

B   ☐   Lump sum payment of $ due immediately; balance due

     ☐   not later than, or

     ☐   in accordance with   ☐ D,   ☐ E,   ☐ F,   or   ☐ G below; or

C   ☐   Payment to begin immediately (may be combined with   ☐ D,   ☐ E, or   ☐ G below); or

D   ☐   Payment in equal  installments of $ over a period of, to commence  after the date of this  judgment; or

E   ☐   Payment in equal  installments of $ over a period of, to commence  after release from  imprisonment to a term of supervision; or

F   ☐   Payment during the term of supervised release will commence within  after release from imprisonment. The court  will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

G   ☐   Special instructions regarding the payment of criminal monetary penalties:


Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to **Clerk, U.S. District Court, Federal Bldg., 100 S. Clinton Street, P.O. Box 7367, Syracuse, N.Y. 13261-7367**, or to pay electronically, visit www.nynd.uscourts.gov for instructions, unless otherwise directed by the court, the probation officer, or the United States attorney.  If a victim cannot be located, the restitution paid to the Clerk of the Court for that victim shall be sent to the Treasury, to be retrieved when the victim is located.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

     ☐   Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

     ☐   The Court gives notice that this case involves other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein and may order such payment in the future.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☒   The defendant shall forfeit the defendant's interest in the following property to the United States:
     The property outlined in the Preliminary Order of Forfeiture in 1:20CR37.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA Assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.



# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA    )
                                  )
           v.                 )        CRIMINAL NO. 19CR165 & 20CR
                                    )

ERIC TOMPKINS             )

## NOTICE OF APPEAL

Notice is hereby given that the above-named Defendant hereby appeals to the United

States Court of Appeals for the Second Circuit from the judgment of conviction and sentence

entered on  March 16, 2022    .

                                           Respectfully submitted,
                                           Lisa A. Peebles
                                           Federal Public Defender

                                           */s/*
                                         Paul J. Evangelista
                                         Assistant Federal Public Defender
                                         54 State Street, Suite 310
                                         Albany, New York 12207
                                         518.436.1850

## CERTIFICATE OF SERVICE

I hereby certify that this electronically filed document will be sent electronically to the registered
participants as identified on the Case Management and Electronic Case Files System (CM/ECF).

A189